# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

—————————————————————
)
RIO GRANDE FOUNDATION,                )
                                      )
                Plaintiff,            )
                                      )
        v.                            )    Case No. 1:17-cv-00768-JCH-CG
                                      )
CITY OF SANTA FE, et al.,             )
                                      )
                Defendants.           )
—————————————————————)

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, pursuant to Fed. R. Civ. P. 56, respectfully move this Court for an order granting summary judgment to defendants because subsection 9-2.6 of the Santa Fe City Campaign Code is consistent with the U.S. Constitution and New Mexico Constitution. Defendants are filing with this motion a Memorandum in Support, a Statement of Material Facts Not in Genuine Dispute, two supporting declarations with exhibits appended thereto, and a Proposed Order. This motion is opposed by plaintiff. Defendants respectfully request oral argument.

**Dated** this 11th Day of June, 2018.

                                Respectfully submitted,

Tara Malloy, DC Bar No. 988280*            CITY ATTORNEY
Megan P. McAllen, DC Bar No. 1020509*      CITY OF SANTA FE, NEW MEXICO
CAMPAIGN LEGAL CENTER                      s/ Marcos D. Martinez
1411 K Street, NW, Suite 1400              Marcos D. Martínez
Washington, D.C. 20005                     Assistant City Attorney, City of Santa Fe
Telephone: (202) 736-2200                  200 Lincoln Avenue
tmalloy@campaignlegalcenter.org,           P.O. Box 909
mmcallen@campaignlegalcenter.org           Santa Fe, New Mexico 87504-0909
                                           Telephone: (505) 955-6967
*Appearing pro hac vice                    mdmartinez@ci.santa-fe.nm.us

                    *Counsel for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| RIO GRANDE FOUNDATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:17-cv-00768-JCH-CG |
| | ) |
| CITY OF SANTA FE, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................v

INTRODUCTION .............................................................................................................1

STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE ..........................2

    A.  The City of Santa Fe, the Ethics and Campaign Review Board, and the Campaign Code ......................................................................................................................2

    B.  The Challenged Law (SFCC § 9-2.6) ..............................................................3

    C.  The 2015 Ordinance ........................................................................................4

    D.  Rio Grande Foundation .....................................................................................8

    E.  The "Soda Tax" Ballot Proposition and No Way Santa Fe ............................10

    F.  ECRB Enforcement Action Against RGF ......................................................13

SUMMARY OF ARGUMENT .......................................................................................14

STANDARD OF REVIEW .............................................................................................17

ARGUMENT ...................................................................................................................17

    I.  Disclosure Laws Serve the Important Public Interest of Informing the Electorate ..........17

        A.  Disclosure rules "do not prevent anyone from speaking" and face less demanding First Amendment scrutiny than other types of campaign finance regulation .............18

        B.  The Supreme Court and this Circuit have repeatedly confirmed that disclosure of ballot-measure funding serves vital informational interests ........................................19

    II.  Subsection 9-2.6 Is Constitutional on Its Face .................................................22

        A.  RGF bears a heavy burden in proving facial unconstitutionality. ...............22

        B.  Disclosure of those who fund election-related speech in Santa Fe bears a substantial relation to the important informational interest articulated by the Supreme Court ....................................................................................................24

        C.  Subsection 9-2.6 is carefully drawn so that it sweeps no more broadly than necessary to achieve its purpose ......................................................................26

            1.  *The reporting required is minimal* ................................................26

            2.  *The event-driven reporting Santa Fe requires is doctrinally distinct from more onerous PAC disclosure regimes* ........................................27

            3.  *Only "earmarked" contributions must be reported* .......................31

            4.  *The provision applies to local elections in a small city, and its coverage is tailored accordingly* ....................................................................32

III. Subsection 9-2.6 Is Constitutional As Applied to RGF ....................................................33

    A. RGF has not met the standard for an as-applied "harassment" exemption from Santa Fe's facially valid disclosure requirement .................................................................33

    B. RGF's tax status is immaterial to the constitutionality of a disclosure requirement ...35

    C. RGF is not the type of "small-scale issue committee" that has received as-applied relief from this Circuit ................................................................................................36

**CONCLUSION** ....................................................................................................................39

## TABLE OF AUTHORITIES

**Cases:**

*Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183 (D.N.M. 2010)....................................................................................................38

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................17

*Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182 (1999)...................................19, 20

*Buckley v. Valeo*, 424 U.S. 1 (1976) ...........................................................17, 19, 23

*Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290 (1981) .............. 16-17, 18, 19, 20

*Citizens United v. FEC*, 558 U.S. 310 (2010)....................................................... *passim*

*Citizens United v. Schneiderman*, 203 F. Supp. 3d 397 (S.D.N.Y. 2016) .............................. 33-34

*Coal. for Secular Gov't v. Gessler*, 71 F. Supp. 3d 1176 (D. Colo. 2014). ...................................37

*Coal. for Secular Gov't v. Williams*, 815 F.3d 1267 (10th Cir. 2016) ("*CSG*").................. *passim*

*Ctr. for Individual Freedom, Inc. v. Madigan*, 697 F.3d 464 (7th Cir. 2012) ..............................21

*Ctr. for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270 (4th Cir. 2013).........................16, 36

*Del. Strong Families v. Att'y Gen. of Del.*, 793 F.3d 304 (3d Cir. 2015) ...................30, 31, 32, 36

*FEC v. Mass. Citizens for Life*, 479 U.S. 238 (1986) ("*MCFL*") ...........................................27, 28

*First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765 (1978).................................................15, 18, 20

*Free Speech v. FEC*, 720 F.3d 788 (10th Cir. 2013) ............................................................. 20-21

*Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076 (10th Cir. 1999)...........................................17

*Iowa Right to Life Comm. v. Tooker*, 717 F.3d 576 (8th Cir. 2013).............................................30

*Indep. Inst. v. FEC*, 216 F. Supp. 3d 176 (D.D.C. 2016)............................................................35

*Indep. Inst. v. Gessler*, 71 F. Supp. 3d 1194 (D. Colo. 2014)....................................................36

*Indep. Inst. v. Williams*, 812 F.3d 787 (10th Cir. 2016) ........................................20, 27, 29, 31, 32

*John Doe No. 1 v. Reed*, 561 U.S. 186 (2010)...........................................................17, 23, 24, 33

*Justice v. Hosemann*, 771 F.3d 285 (5th Cir. 2015) ........................................................ 30-31, 32

*L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32 (1999) ...................................22

*Majors v. Abell*, 361 F.3d 349 (7th Cir. 2004)..........................................................................20

*McConnell v. FEC*, 540 U.S. 93 (2003)...................................................................17, 19, 20, 35

*Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864 (8th Cir. 2012)......................30

*Nat'l Org. for Marriage v. McKee*, 649 F.3d 34 (1st Cir. 2011) ("*NOM*") ............................20, 32

*New Mexico Youth Organized v. Herrera*, 611 F.3d 669 (10th Cir. 2010) ..................................22

*N.Y. State Club Ass'n v. City of N.Y.*, 487 U.S. 1 (1988)........................................................15, 22

*People for Pearce v. Oliver*, No. 17-CV-752 JCH/SMV, 2017 WL 5891763 (D.N.M. Nov. 28, 2017))..................................................................................................................25

*ProtectMarriage.com v. Bowen*, 830 F. Supp. 2d 914 (E.D. Cal. 2011) .......................................35

*Sampson v. Buescher*, 625 F.3d 1247 (10th Cir. 2010) .........................................16, 19, 21, 29, 37

*State v. Ongley*, 882 P.2d 22 (N.M. Ct. App.1994) .....................................................................38

*State v. Tapia*, 414 P.3d 332 (N.M. 2018) ....................................................................................38

*United States v. Brune*, 767 F.3d 1009 (10th Cir. 2014) ..............................................................22

*United States v. Carel*, 668 F.3d 1211 (10th Cir. 2011) ..............................................................24

*United States v. Harriss*, 347 U.S. 612 (1954) ......................................................................18, 20

*Wisc. Right to Life, Inc. v. Barland*, 751 F.3d 804 (7th Cir. 2014)..............................................29

*Worley v. Fla. Sec'y of State*, 717 F.3d 1238 (11th Cir. 2013)..............................................18, 31

*Yamada v. Snipes*, 786 F.3d 1182 (9th Cir. 2015) ................................................................30, 31

**Federal Statutes:**

Fed. R. Civ. P. 56(c) ......................................................................................................................17

**Santa Fe City Code of Ordinances:**

SFCC § 6-16.2(A) .............................................................................................................................2

SFCC § 6-16.2(E) .............................................................................................................................2

SFCC § 9-2.2 ...............................................................................................................................2, 24

SFCC § 9-2.2(B) .............................................................................................................................24

SFCC § 9-2.3(N) .........................................................................................................................3, 28

SFCC § 9-2.6 ..............................................................................................................................26, 31

SFCC § 9-2.6(A) .........................................................................................................................4, 16

SFCC § 9-2.6(B) ...............................................................................................................................4

SFCC § 9-2.7 ...................................................................................................................................28

SFCC § 9-2.8 ................................................................................................................28

SFCC § 9-2.9(F) ...........................................................................................................28

SFCC § 9-2.9(H)(1) ......................................................................................................28

SFCC § 9-2.9(H)(3) ......................................................................................................28

SFCC § 9-2.10 ..............................................................................................................28

SFCC § 9-2.11 ..............................................................................................................28

SFCC § 9-2.13 ..............................................................................................................28

# INTRODUCTION

Like many other states and municipalities, the City of Santa Fe requires basic disclosure from those spending money to support or oppose ballot measures in local elections, so as to enable the voting public to assess and understand the interests vying for their votes. The specific disclosure provision challenged here, subsection 9-2.6 of the Santa Fe City Campaign Code, "do[es] not prevent anyone from speaking," *Citizens United v. FEC*, 558 U.S. 310, 366 (2010), nor does it in any way restrict plaintiff Rio Grande Foundation ("RGF") from advocating for or against Santa Fe ballot measures. The law merely requires RGF to file reports disclosing such activity—and any donor who specifically contributed to RGF to fund it—if and when RGF's spending exceeds the statutory threshold. This disclosure "enables the electorate to make informed decisions and give proper weight to different speakers and messages," *id.* at 371, and is entirely consistent with the U.S. Constitution and the governing case law.

Notwithstanding this precedent, RGF brings this suit challenging subsection 9-2.6 under the First and Fourteenth Amendments to the U.S. Constitution and Article II, § 17 of the New Mexico Constitution. But there is no question that RGF's "No Way Santa Fe" campaign had an explicit electoral purpose—defeating the 2017 "soda tax" ballot proposition—and City voters had an interest in knowing who was behind it. And RGF acknowledges that it has already filed the required report, disclosing two contributors that earmarked their money for this campaign, and that neither RGF nor its donors have suffered any discernible harm or "harassment" as a result.

Defendants City of Santa Fe ("City" or "Santa Fe") and its Ethics and Campaign Review Board ("ECRB" or "Board") therefore respectfully request that the Court grant summary judgment for the City.

**STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE[1]**

The following material undisputed facts entitle the City to judgment as a matter of law.

**A.  The City of Santa Fe, the Ethics and Campaign Review Board, and the Campaign Code**

1.      As a municipal charter city in the State of New Mexico, the City of Santa Fe administers local elections pursuant to the City Charter and the Santa Fe City Code of 1987 ("SFCC").

2.      The ECRB has a mandate to promote and enforce compliance with the City's Campaign Code (Section 9-2 SFCC 1987), as well as the Public Campaign Finance Code (Section 9-3 SFCC 1987) and the Code of Ethics (Section 1.7 SFCC 1987). *See* SFCC § 6-16.2(A).

3.      Subsection 9-2.6 of the Campaign Code was enacted in 2005, and thereafter amended in 2007, 2013, and 2015. *See* Miller Exs. B, C, D, and E (Ord. No. 2005-14, § 29; Ord. No. 2007-11, § 7; Ord. No. 2013-28, § 3; Ord. No. 2015-23, § 3).

4.      The Campaign Code's overriding purpose and intent is to secure "full[ ] disclos[ure]" of "political campaign contributions and expenditures," and to avoid "secrecy in the sources and application of such contributions," because "the public's right to know how political campaigns are financed far outweighs any right that [they] remain secret and private." SFCC § 9-2.2.

5.      The ECRB is vested with the responsibility to "periodically review and recommend changes to the governing body for improving" the Campaign Code as necessary to achieve its purposes, "particularly following a municipal election." SFCC § 6-16.2(E).

6.       Following an extensive review of issues that had emerged during the 2014 elections, including the operation of the City's public financing program, coordination provisions, and

---

[1]    The Declarations of Justin Miller and Megan P. McAllen, with supporting exhibits, are filed herewith and incorporated by reference for all purposes. Unless stated otherwise, references to the declarations' supporting exhibits are denoted "Miller Ex. __" and "Def. Ex. __," respectively.

disclosure requirements, the ECRB concluded that adjustments to the Campaign Code's disclosure requirements were necessary to effectuate the Code's purposes and ensure that City voters remained informed about those spending money to influence their votes. Miller Decl. ¶¶ 9-11, 22-25; *see also* Miller Ex. A ("ECRB R.").[2]

7.      In 2015, the City Council adopted changes to the Campaign Code at the recommendation of the ECRB. The 2015 amendments to SFCC § 9-2.6 ("2015 Ordinance") are the subject of this legal challenge. Compl. ¶¶ 2-3; Miller Ex. E (Ord. No. 2015-23); Def. Ex. A.[3]

8.      The City of Santa Fe has an estimated citizen voting age population of 58,453 and an estimated total population of 82,927. *See* Def. Ex. B (U.S. Census Bureau, 2012-2016 Am. Cmty. Survey 5-Year Estimates (2016)). Given its small population, elections in Santa Fe are relatively inexpensive affairs and even $250 can buy a significant amount of exposure for a political message.

**B.  The Challenged Law (SFCC § 9-2.6)**

9.      SFCC § 9-2.6 does not ban or restrict any speech; instead, it provides voters with relevant information about where political campaign money comes from and how it is spent, so that voters can make informed choices in elections. Miller Decl. ¶ 13.

10.      SFCC § 9-2.6 does not require groups subject to its terms to create or operate as a "political committee," *id.* § 9-2.3(N). It simply requires modest, event-driven reporting from persons that make expenditures of $250 or more for "any form of public communication . . . that

---

[2]     Cited portions of the minutes and accompanying legislative materials for the eight ECRB meetings held between December 17, 2014 and May 20, 2015 are compiled in the ECRB record ("ECRB R."), attached as Exhibit A to the Miller Declaration.

[3]     Cited portions of the minutes from the June 29 and July 13, 2015 City Finance Committee meetings, and the Meeting and Public Hearing held before the City Council on July 29, 2015, are compiled in Exhibit A to the McAllen Declaration.

either expressly advocates the election or defeat of a candidate, or the approval or defeat of a ballot proposition; or refers to a clearly identifiable candidate or ballot proposition within sixty (60) days before an election at which the candidate or proposition is on the ballot." *Id.* § 9-2.6(A).

11.     Persons filing under SFCC § 9-2.6 must report only their expenditures for covered communications, specified by date, amount, recipient, and purpose, but need not report their other disbursements. Miller Decl. ¶ 15; SFCC § 9-2.6(A).

12.     Similarly, filers need report only those contributions "received for the purpose of paying for" such expenditures, *i.e.*, contributions that are "earmarked" by the contributor for that purpose. Miller Decl. ¶ 16. A campaign finance report must specify all such earmarked contributions by date, amount, and contributor's name, address, and occupation. SFCC § 9-2.6(A).

13.     The reporting is event-driven: SFCC § 9-2.6(A) requires groups to file campaign finance reports only when their campaign communications total $250 or more. The report is due on the next regularly scheduled reporting date after the threshold has been met, *i.e.*, the "day[ ] prescribed for the filing of campaign finance statements." *Id.*; *see also* Miller Decl. ¶ 17.

14.     If a filer receives earmarked contributions from another entity that does not disclose its contributors, it need not "trace back" these contributions to their original sources, but instead must include a disclaimer on its campaign materials stating that the material is supported by "donations from an organization that is not required to disclose its contributors." SFCC § 9-2.6(B).

**C.  The 2015 Ordinance**

15.     Even before the 2015 Ordinance took effect, subsection 9-2.6 required entities spending $250 or more to disseminate "campaign materials supporting the election or defeat of an identifiable candidate or of a ballot proposition" to file a report disclosing their contributors who

4

had donated for the purpose of supporting such materials. Miller Ex. D (Ord. No. 2013-28, § 3).

16.      During the 2014 elections, however, concerns arose about the scope and sufficiency of the disclosure required under the then-governing Campaign Code. Miller Decl. ¶ 22.

17.      City residents expressed concerns about potential coordination between outside groups and candidates, and about the lack of transparency with respect to the outside groups' funding sources. Miller Decl. ¶ 22; Def. Ex. A, at 34 (City Council Mins. at 53 (Shandler)) (describing "citizens that alleged local unions acted in coordination with other candidates" in 2014 Mayoral race); Def. Ex. C (Mark Oswald, *Santa Fe's Public Campaign Financing Panned Anew Over Outside Spending For Gonzales*, Albuquerque J. (Feb. 9, 2015)). For instance, then-Councilor Patti Bushee, who lost her campaign for Mayor in 2014, commented that she faced "dark outside money with no remedies offered through the city code or this Board." ECRB R. at 31 (Feb. 9 Mins. at 4).

18.      Following the 2014 elections, the ECRB and the City were urged to undertake a review of the Campaign Code by members of the public, including representatives of Common Cause New Mexico, the Santa Fe Neighborhood Law Center, and the League of Women Voters of Santa Fe County ("LWV"), as well as by a former City Councilor, Karen Heldmeyer, who called for strengthening the law's political reporting provisions. Miller Decl. ¶ 23; ECRB R. at 11-12 (Heldmeyer Ltr.) (detailing concerns including transparency of donors to outside groups and need to "provide the maximum amount of information to the voters in a timely manner").

19.      The 2015 Ordinance was the culmination of an extensive, two-stage collaboration between the ECRB and the City Council. The ECRB reviewed the Campaign Code and developed legislative recommendations over the course of eight public meetings between December 17, 2014 and May 20, 2015, and then referred its proposed changes to the City Council for consideration.

The proposals were incorporated into legislation, whereupon the Council reviewed the record developed by the Board and ultimately enacted the legislation after further deliberation and amendment. Miller Decl. ¶¶ 24-26.

20.     The Board carefully designed its proposed improvements to the reporting requirement in SFCC § 9-2.6 to effectuate the public's informational interests while minimizing any disclosure burden or administrative costs borne by filers. Miller Decl. ¶ 29.

21.     For example, the Board deliberated and incorporated an express "earmarking" limitation for donor disclosure that provided that a group making expenditures for covered communications would be required to report only those donors who gave for explicit electoral purposes. Miller Decl. ¶¶ 16, 30-31; *see also* ECRB R. at 63 (Discussion draft dated 4/10/2015) (flagging earmarking language for discussion).

22.     The Board also deliberated on the monetary threshold at which coverage under SFCC § 9-2.6 should commence. ECRB R. at 70-71 (Apr. 15 Mins. at 4-5).

23.     Public commenters objected to raising the existing $250 threshold and other limits of the Campaign Code, because higher thresholds would not reflect Santa Fe's "small municipal campaigns," ECRB R. at 54, 60 (Mar. 18 Mins. at 4, 10), and they wanted certain campaign communications like telephonic push polls to remain covered, *id.* at 94-95 (May 20 Mins. at 8-9).

24.     Public support for improvements to the independent spending disclosure provision was strong throughout the review process. Citizens expressed "dismay[] at the amount of dark money brought to bear on the races," ECRB R. at 16 (Jan. 21 Mins. at 3 (Larson)), and noted "frustration, because often you could not be sure where the outside money came from," *id.* at 21 (Jan. 21 Mins. at 3, 8 (Heldmeyer)). The ECRB was urged to consider solutions that would "ensure the public's

right to know" and "increas[e] the extent to which there is disclosure of sources of outside funding," *id.* at 20-21 (Jan. 21 Mins. at 8 (LWV)). Commenters introduced polls showing 92% support for full disclosure at the state level, *id.* at 60 (Mar. 18 Mins. at 10 (Common Cause)).

25.     At the conclusion of this six-month period of deliberation and public comment, the Board voted to submit its legislative recommendations to the City Council. ECRB R. at 92-94 (May 20 Mins. at 6-8); Miller Decl. ¶ 37. In referring its recommendations, the Board explained that "[t]hey strengthen the current code by expanding the definition of campaign activities engaged in by independent spenders to cover more campaign activities" and "require more detailed disclosure by independent organizations of the sources of their funds." ECRB R. at 100 (ECRB Submittal to Finance Comm. (June 29, 2015)).

26.     Following the referral, Councilor Ives introduced legislation incorporating the Board's suggestions in the City Council. *See* Bill No. 2015-26. The bill was debated at two Finance Committee meetings on June 29 and July 13, 2015. At a public hearing on July 29, 2015, the full City Council heard testimony from ECRB representatives and the public, and thereafter voted to approve the bill, as amended. Def. Ex. A (Council materials).

27.     Local citizens spoke universally in favor of the legislation at the City Council hearing. *See, e.g.*, Def. Ex. A, at 38 (City Council Mins. at 57 (LWV)) (urging Council to "make the requirements for disclosure as strong as you" can); *id.* at 38-39 (Mins. at 57-58 (Beninato)) (commenting "it is of utmost importance to have as much disclosure as possible"). For example, Simon Brackley, the President of the Santa Fe Chamber of Commerce, "said the Chamber supports [the ECRB] recommendations," emphasizing that his members "support steps forward in terms of efficiency and transparency," because they "believe those issues are of most concern to business

people and citizens of Santa Fe.'" *Id.* at 39 (Mins. at 58). Mr. Brackley also penned an op-ed the Sunday before the hearing calling on the Council to update the City's public financing system to address the growing prevalence of undisclosed "dark" money. Def. Ex. D (Simon Brackley, *Let's Fix Public Campaign Financing in Santa Fe*, Santa Fe New Mexican (July 25, 2015)).

28.      The City Council made clear, as did the ECRB, that it wished to secure meaningful campaign finance information for Santa Feans while taking care to comply with the First Amendment and governing judicial precedent. ECRB R. at 98 (Ltr. from J. Miller to City Council (May 22, 2015)); *id.* at 99-100 (ECRB Submittal to Finance Comm. (June 29, 2015)).

29.      As an Assistant City Attorney commented at the public hearing, "The U.S. Supreme Court has said cities cannot limit Washington, D.C. unions from expending money, but let's try to monitor them better, require expanded disclosure of who they are . . . . [L]et's have an expanded revelation of these third party groups." Def. Ex. A, at 34 (City Council Mins. at 53 (Shandler)).

**D.  Rio Grande Foundation**

30.      Plaintiff RGF is an Albuquerque-based nonprofit corporation organized under section 501(c)(3) of the federal tax code. Compl. ¶ 7; Def. Ex. F, at RGF 00141 (RGF Form 990 (2016)).

31.      RGF was founded in 2000 by former New Mexico Attorney General Hal Stratton and economist Harry Messenheimer. Def. Ex. E (page from RGF website listing "Accomplishments"). It is governed by an eight-member Board of Directors, and lists on its website a staff of eight, including its full-time, compensated President, Paul Gessing. *See* Def. Ex. F, at RGF 00147 (RGF Form 990 (2016)); *About the Rio Grande Foundation*, Rio Grande Found., http://riogrande foundation.org/about-the-rio-grande-foundation (last visited June 11, 2018).

32.      RGF's annual revenue between 2012 and 2016 ranged between $404,773 and

$213,306. Def. Ex. F at RGF 00154 (RGF Form 990 (2016)).

33.     RGF often participates in legislative and policy advocacy in New Mexico, including advocacy for and against ballot measures; for example, RGF made public communications opposing the City of Albuquerque's 2017 paid sick leave proposition and was part of a coalition organized to oppose the measure. Def. Ex. G ("Don't Be Fooled" mailer opposing measure and related press release); Def. Ex. H (select communications discussing Albuquerque sick leave).

34.     As a "Section 501(c)(3)" organization with annual receipts exceeding $50,000, RGF is subject to extensive reporting and recordkeeping requirements under federal tax law, including filing a Form 990 or Form 990-EZ as its annual return with the IRS. Def. Ex. I (IRS, Instructions for Form 990 at 2-3 (2017)).

35.     Organizations that file Form 990 or 990-EZ must report their aggregate annual contributions received; if they have large donors, they must also file a Schedule B listing the names and addresses of each contributor who gave the greater of $5,000 or two percent of their contributions received during the year. Def. Ex. I (990 Instr. at 11). The entire Form 990 filed with the IRS is required to be made available for public inspection, except that the names and addresses of contributors disclosed on Schedule B may be redacted. *Id.* (990 Instr. at 77).

36.     To file an accurate annual return and Schedule B, and to comply with other tax regulations, 501(c)(3) organizations must maintain detailed records of the source and amount of their receipts. The IRS advises nonprofits to keep records of contributions from all donors. Def. Ex. J (IRS Compliance Guide for 501(c)(3) Public Charities, at 15).

37.     RGF has not alleged or shown that the Campaign Code would burden its activities or create any administrative activities for RGF beyond those that it already undertakes in the ordinary

course of business and/or to comply with federal tax law.

38.     RGF has not alleged any facts or introduced any evidence suggesting the disclosure required by SFCC § 9-2.6 has had any concrete adverse effect on its fundraising. Nor could RGF produce any evidence that any of its contributors have ever professed a desire for anonymity or requested that their names be kept confidential. Def. Ex. K (RGF Resp. to RFP 6).

39.     RGF has made no allegation that any of its Board members, staff, or donors have ever been subject to harassment or reprisals by reason of their association with RGF. Def. Ex. K (RGF Resp. to Interrog. 1).

40.     RGF has disclosed at least some of its contributors in the past without apparent incident, including the two donors it disclosed in its campaign finance report covering the No Way Santa Fe initiative. Ans. Ex. 1 (Doc. 12-1) (RGF Campaign Statement).

**E.  The "Soda Tax" Ballot Proposition and No Way Santa Fe**

41.     The Santa Fe City Council voted to hold a special municipal election on May 2, 2017 to pose to the residents of Santa Fe the question of whether to vote for or against a sugary sweetened beverage tax ("Soda Tax"). Ans. ¶ 15.

42.     The soda tax measure drew an unprecedented level of campaign spending in Santa Fe. Four groups reported expenditures and/or in-kind contributions exceeding $250, and two, "Pre-K for Santa Fe" and "Better Way for Santa Fe & Pre-K," raised about $1.9 million and $2.2 million respectively for their advocacy. Def. Ex. L at 1, 3 (disclosure reports with cumulative totals).

43.     Thanks to the Campaign Code's disclosure provisions, Santa Feans could learn that "Pre-K for Santa Fe," a committee supporting the measure, was principally backed by billionaire and former New York City Mayor Michael Bloomberg. In total, Bloomberg contributed almost

$800,000 to support the measure. Def. Ex. L at 2. On the other side, disclosure reports revealed that "Better Way for Santa Fe & Pre-K," an opponent of the measure whose name similarly suggested it was local and concerned with early education, was likewise almost entirely funded by a single out-of-state donor, a Washington, D.C.-based beverage industry group. *Id.* at 4.

44.     RGF was a vocal public opponent of the soda tax. In a proposal dated February 3, 2017, RGF solicited funds to "[w]ork to defeat proposed City of Santa Fe tax on sugary beverages." Def. Ex. M (proposing to "leverage social media, hard mailing lists, and a broad activist network to generate and organize the Santa Fe public and electorate").

45.     RGF sent a contribution acknowledgment letter dated April 4, 2017, to Barry Kiess, then-CEO of the Coca-Cola Bottling Co., referring to the soda tax and thanking him for his $10,000 gift to RGF. Def. Ex. N (Kiess letter); Def. Ex. O (T.S. Last, *Santa Fe Council Votes To Put Soda Tax For Pre-K Program Before Voters*, Albuquerque J. (Mar. 9, 2017)).

46.     Shortly thereafter, on April 6, 2017, RGF announced the launch of its "No Way Santa Fe" initiative, which it described as a campaign to "raise awareness" of "damaging beverage taxes." Def. Ex. P (emails from T.S. Last and Daniel Chacon to Zachary Shandler regarding RGF press release); Compl. ¶ 18.

47.     RGF's No Way Santa Fe website, http://www.nowaysantafe.com, expressly advocated the defeat of the proposition, listing reasons it was "A Truly Terrible Tax Scheme" and stating "Vote on Tuesday, May 2, 2017!" Def. Ex. Q (No Way Santa Fe website).

48.     The website prominently features a video that expressly advocates the rejection of the proposition, projecting the likely deleterious effects of a soda tax and ending with, "Do we want this to happen in Santa Fe? No way!" Def. Ex. R (video transcript).

49.     The video and website prominently identify "No Way Santa Fe" as "A Project of the Rio Grande Foundation." *See* Def. Ex. Q at RGF00263 (website); Def. Ex. R (video screenshots).

50.     RGF also paid to promote its website and advocacy against the soda tax via its Facebook page. One promoted post urged: "Families in Santa Fe can't afford more taxes on the beverages they love! Learn more: NoWaySantaFe.com." Def. Ex. S (Facebook post).

51.     RGF also claims (Compl. ¶ 23) to have spent $1,500 on postcard mailers that it planned to, but ultimately did not, distribute to Santa Fe voters urging them to "Vote 'Against' the Soda Tax." Def. Ex. T (mailers).

52.     One of the two postcards RGF produced is red and expressly advocates the defeat of the soda tax measure: "SUPPORT LIBERTY. Vote AGAINST the soda tax." The red mailer does not mention RGF, but includes a disclaimer stating that it was "Paid for by 'No Way Santa Fe'" and a return address at the same P.O. Box used by RGF. Def. Ex. T (red mailer).

53.     The other postcard is blue, features images of U.S. Senator Bernie Sanders, and also expressly advocates the defeat of the soda tax measure: "Bernie Sanders opposes regressive taxes like Santa Fe Mayor Javier Gonzales' beverage tax. You can, too. Election Day is May 2nd." The blue mailer includes a disclaimer identifying both No Way Santa Fe and RGF, with a return address in Santa Fe. Def. Ex. T (blue mailer).

54.     The Interstate Policy Alliance produced the No Way Santa Fe video and website and contributed them to RGF pursuant to an "ongoing arrangement" between the two entities, the details of which remain unknown. Def. Ex. K (RGF Resp. to Interrog. 2).

55.     The Interstate Policy Alliance is a Washington, D.C.-based organization that shares an address with a public affairs firm, Berman and Company, as well as an array of nonprofit entities

managed by the firm. Def. Ex. U (Employment Policies Inst. Found. Form 990 (2016)).

**F.  ECRB Enforcement Action against RGF**

56.     After RGF announced the launch of its No Way Santa Fe initiative, several members of the local press contacted the ECRB seeking comment as to whether No Way Santa Fe would be required to disclose under SFCC § 9-2.6, based on their proposed activities. Def. Ex. P (D. Chacon & T.S. Last emails).

57.     On April 7, 2017, the ECRB received a complaint against RGF from Edward Stein alleging RGF was in violation of SFCC § 9-2.6. Mr. Stein amended the complaint to provide additional information, including a web address for the No Way Santa Fe video. Compl. ¶¶ 24, 28.

58.     Stein also submitted an affidavit from Glenn Silber, an award-winning documentary filmmaker, who attested that he estimated that RGF's No Way Santa Fe video would cost an "absolute minimum of three thousand dollars ($3,000.00), and possibly two or three times that amount." Miller Ex. G (Affidavit of Glenn Silber ¶ 13).

59.     On April 6, 2017, the Assistant City Attorney sent a letter to Paul Gessing, RGF President, informing him that it appeared that RGF had spent more than $250 on broadcast advertisements referring to a ballot proposition, in which case, RGF was required to file a campaign finance statement by the next reporting date, *i.e.*, April 7, 2017. Compl. ¶ 22.

60.     On April 24, 2017, the Board held a hearing on the merits of Complaints #2017-4/4A where it heard testimony from Mr. Stein, Mr. Silber, Mr. Gessing, and RGF counsel, Carlin Hunter. Miller Ex. F (Apr. 24, 2017 Mins. at 4-23).

61.     The Board found that RGF created a sub-entity called "No Way Santa Fe," and that on April 11, 2017, No Way Santa Fe began running a video on its web page opposing the soda tax

proposition. Miller Decl. ¶ 41; Ans. Ex. 2 (Doc. 12-2).

62.    After hearing uncontroverted testimony from Mr. Silber alleging that the cost of the video was at least $3,000, but "probably closer to at least twice that," Miller Ex. F (Apr. 24, 2017 Mins. at 17),  the Board found that the video cost more than $250.00 to make. *Id.* (Mins. at 22). Gessing, appearing on behalf of RGF, did not contest the findings. He alleged the video was created by a third party and given to RGF, but refused to identify the third party. *Id.* (Mins. at 15).

63.    Gessing stated that RGF spent approximately $200 in advertising fees connected to the video. He also stated that RGF had planned to send postcards opposing the soda tax and had been "contemplating radio advertising." Miller Ex. F (Apr. 24, 2017 Mins. at 15).

64.    The Board voted unanimously to find that RGF had violated SFCC § 9-2.6 by creating No Way Santa Fe, which made independent expenditures and received contributions of items of value in amounts totaling $250 or more, and failing to file a campaign report. It issued a reprimand to RGF and ordered RGF to file a campaign report to cover the in-kind contributions and expenditures related to the No Way Santa Fe initiative. Miller Ex. F (Apr. 24, 2017 Mins. at 22).

65.    RGF subsequently submitted a one-time, six-page campaign finance report disclosing receipt of a $7,500 in-kind contribution from Interstate Policy Alliance and a $250 contribution from James Higdon, and seven expenditures to Facebook for advertising. Ans. Ex. 1 (Doc. 12-1).

66.    RGF filed no other reports. It did not register or report as a political committee.

67.    The Board took no further action against RGF. No penalties or fines were assessed. Ans. Ex. 2 (Doc. 12-2) (Order of Public Reprimand).

## SUMMARY OF ARGUMENT

Subsection 9-2.6 does not bar anyone from "speak[ing] freely and openly about issues that

matter to them." Compl. ¶ 3. It simply requires modest, event-driven reporting to ensure that Santa

Fe voters are fully informed about those making or funding expenditures to influence their votes.

The Supreme Court has repeatedly voiced approval of such disclosure laws, holding that they

permit robust debate on political issues while arming voters with the information necessary "to

evaluate th[ose] arguments," *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 793 n.32 (1978),

and to "make informed decisions" at the polls, *Citizens United*, 558 U.S. at 371. And both the

Supreme Court and the Tenth Circuit have recognized that the public's essential need for such

disclosure extends beyond candidate elections, and also encompasses "an interest in knowing who

finances support or opposition to a given ballot initiative." *Coal. for Secular Gov't v. Williams*,

815 F.3d 1267, 1278 (10th Cir. 2016) ("*CSG*").

    RGF nevertheless challenges subsection 9-2.6 facially and as applied to its activities.

    In the First Amendment context, a law will only be struck down as facially overbroad if a

plaintiff can "demonstrate from the text of [the law] and from actual fact that a substantial number

of instances exist in which the [law] cannot be applied constitutionally." *N.Y. State Club*, 487 U.S.

at 14 (1988). RGF has not even attempted to make this showing.

    Nor could it. Disclosure of those who fund advocacy for and against ballot measures in

Santa Fe bears a "substantial relation" to the "important" informational interest articulated by the

Supreme Court, and thus more than meets "exacting scrutiny" review. *Citizens United*, 558 U.S.

at 366-67. To be sure, the Tenth Circuit has questioned the imposition of full political committee

status—and the comprehensive registration, reporting, and recordkeeping it typically entails—on

small-scale groups engaged in minimal ballot measure-related advocacy. *CSG*, 815 F.3d at 1278-

79; *Sampson v. Buescher*, 625 F.3d 1247 (10th Cir. 2010). But this case concerns *no such law*. The

event-driven reporting Santa Fe requires is constitutionally distinct from the PAC disclosure regimes pared back by the Tenth Circuit. And subsection 9-2.6 is carefully tailored in many additional respects: it limits donor disclosure to those who "earmark" their funds for electoral advocacy; its monetary threshold is calibrated to the jurisdiction's size; and it requests only the most basic information about covered expenditures and contributions. SFCC § 9-2.6(A).

RGF has also failed to state a valid as-applied First Amendment claim because it has not even alleged—much less offered evidence to show—that there is "a reasonable probability that [its] members would face threats, harassment, or reprisals if their names were disclosed." *Citizens United*, 558 U.S. at 370. This is the only as-applied exemption from a facially constitutional disclosure measure recognized by the Supreme Court. *Id.*

RGF also contends that subsection 9-2.6 is unconstitutional as applied to itself and "others similarly situated," meaning apparently *any* "nonprofit" or "charitable" organization that spends money to support or oppose Santa Fe ballot measures. *See, e.g.*, Compl. ¶¶ 63, 64. But no court has ever limited a disclosure law's reach based on the tax status of the organizations it regulates. On the contrary, courts have struck down attempts to exempt charities from lawful disclosure, finding that such exceptions "do not bear a substantial relation to [the] governmental interest" in "providing the electorate with information about the source of campaign-related spending." *Ctr. for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270, 289 (4th Cir. 2013).

Lastly, any claim that the law creates any particular as-applied administrative burdens for RGF is unsustainable: RGF is a long-standing, well-funded New Mexico think tank and its entire reporting obligation under the challenged law was discharged by the filing of a single 6-page form disclosing two donors. Ans. Ex. 1 (Doc. 12-1).

For all these reasons, subsection 9-2.6 should be upheld. The simple disclosure it requires ensures that Santa Feans are informed about the interests attempting to influence their votes— without which they can "look forward to a society which . . . campaigns anonymously . . . and even exercises the direct democracy of initiative and referendum hidden from public scrutiny and protected from the accountability of criticism. This does not resemble the Home of the Brave." *John Doe No. 1 v. Reed*, 561 U.S. 186, 228 (2010) (Scalia, J., concurring).

## STANDARD OF REVIEW

Summary judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is "material" if it could have an effect on the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1079 (10th Cir. 1999). There is no material issue of fact for the Court to decide, and summary judgment is therefore appropriate.

## ARGUMENT

## I.  Disclosure Laws Serve the Important Public Interest of Informing the Electorate.

Disclosure of the sources of funding for election-related speech has been a feature of American campaign finance law for more than a century, and the Supreme Court has consistently upheld such laws against constitutional challenge. *See Buckley v. Valeo*, 424 U.S. 1, 64-68 (1976) (upholding Federal Election Campaign Act ("FECA") disclosure requirements); *McConnell v. FEC*, 540 U.S. 93, 194-99 (2003) (upholding McCain-Feingold Act's federal disclosure requirements); *Citizens United*, 558 U.S. at 366-71 (same); *see also Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 299-300 (1981) ("*CARC*") (expressing approval of disclosure in ballot initiative context); *Bellotti*, 435 U.S. at 791 n.32 (same).

**A.  Disclosure rules "do not prevent anyone from speaking" and face less demanding First Amendment scrutiny than other types of campaign finance regulation.**

The Supreme Court has consistently applied a less demanding standard of scrutiny to disclosure laws than it has to other forms of campaign finance regulation, because disclosure requirements "'impose no ceiling on campaign-related activities,' and 'do not prevent anyone from speaking.'" *Citizens United*, 558 U.S. at 366. Therefore, while restrictions on election-related expenditures are subject to "strict scrutiny," *id.* at 340, disclosure laws receive only "exacting scrutiny," *id.* at 366, and are constitutional so long as there is a "'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Id.* at 366-67.

Accordingly, even as the Court has invalidated some campaign finance laws that place limits on contributions or spending, it has consistently upheld disclosure laws as a constitutionally preferable alternative. *See id.* at 369 (describing *Buckley* and *McConnell* and noting that *United States v. Harriss*, 347 U.S. 612 (1954), "upheld registration and disclosure requirements on lobbyists, even though Congress has no power to ban lobbying itself"); *see also CARC*, 454 U.S. at 299, 294 n.4 (striking down contribution limit because "the integrity of the political system will be adequately protected" by "publication of a list of all contributors of more than $50"); *Bellotti*, 435 U.S. at 792 & n.32 (striking down corporate expenditure ban in part because disclosure sufficed to enable "the people . . . to evaluate the arguments to which they are being subjected").

"[E]very one of [the] Circuits who have considered the question" since *Citizens United*—including this one—"have applied exacting scrutiny to disclosure schemes," *Worley v. Fla. Sec'y of State*, 717 F.3d 1238, 1242 (11th Cir. 2013) (collecting cases); *see also CSG*, 815 F.3d at 1275 ("[E]xacting scrutiny is the standard that controls this case."); *Sampson*, 625 F.3d at 1255 (same).

18

**B. The Supreme Court and this Circuit have repeatedly confirmed that disclosure of ballot-measure funding serves vital informational interests.**

Transparency ensures that voters are "'fully informed' about the person or group who is speaking," *Citizens United*, 558 U.S. at 368, and the Supreme Court has consistently upheld disclosure laws on that basis. This informational interest supports disclosure of both "the source and amount of money spent by proponents to get a measure on the ballot," *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 203 (1999) ("*ACLF*"), and the source and amount of money spent to advocate for a qualified measure *on* the ballot, *CARC*, 454 U.S. at 299-300—just as it supports disclosure of the financing of candidate advocacy and lobbying.

The Supreme Court set forth the governing doctrine on disclosure in *Buckley*, where it upheld FECA's disclosure requirements, explaining that they served three important purposes: "providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions." *McConnell*, 540 U.S. at 196. The first of these, the public's informational interest, was "alone . . . sufficient to justify" disclosure laws. *Citizens United*, 558 U.S. at 369.[4]

As numerous courts have recognized, disclosure of those who fund independent campaign speech directly serves this interest. Knowing the identity of a speaker is critical because "a speaker's credibility often depends crucially on who he is." *Majors v. Abell*, 361 F.3d 349, 352

---

[4]   Indeed, with respect to the disclosure of *independent* spending, which the Supreme Court believes "pose[s]" far fewer "dangers of real or apparent corruption," *Buckley*, 424 U.S. at 46, the Court has questioned whether the other two interests are relevant at all. *Buckley* noted, for instance, that had the constitutionality of the federal independent expenditure disclosure statute relied on the anti-corruption interest, that "might have been fatal," *id.* at 80; it went on to sustain the provision because, although the "corruption potential" of independent expenditures "may be significantly different" than that of contributions or coordinated expenditures, "the informational interest can be as strong." *Id.* at 81.

(7th Cir. 2004); *see also Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 57 (1st Cir. 2011) ("*NOM*") ("Citizens rely ever more on a message's source as a proxy for reliability and a barometer of political spin."). The campaign finance case law is replete with examples of groups that participate in elections "while hiding behind dubious and misleading names" to disguise their funding sources." *McConnell*, 540 U.S. at 128, 197. Some of these groups have "frankly acknowledged" that it can be "much more effective to run an ad by the 'Coalition to Make Our Voices Heard' than it is to say paid for by 'the men and women of the AFL-CIO.'" *Id.* at 128 n.23.

The Supreme Court has long recognized that disclosure is crucial not only in the candidate election context, but also with respect to ballot issue advocacy, because "[i]dentification of the source of advertising" for ballot measures enables the public "to evaluate the arguments to which they are being subjected." *Bellotti*, 435 U.S. at 792 n.32; *see also ACLF*, 525 U.S. at 203 ("Through the disclosure requirements . . . voters are informed of the source and amount of money spent . . . . [and] will be told 'who has proposed [a measure],' and 'who has provided funds for its circulation.'" (second alteration in original)); *CARC*, 454 U.S. at 299 ("The integrity of the political system will be adequately protected if [ballot measure] contributors are identified."). Indeed, the Court has long accepted the informational interest as justification for political disclosure laws outside the context of candidate elections to support other kinds of issue-related disclosure. *See, e.g.*, *Harriss*, 347 U.S. at 625 (upholding federal lobbying disclosure statute).[5]

---

[5] *Citizens United* confirmed that disclosure may extend to the "full range" of electioneering communications, specifically rejecting the distinction between express and issue advocacy, 558 U.S. at 368-69—as this Circuit has recognized. *Indep. Inst. v. Williams*, 812 F.3d 787, 791 (10th Cir. 2016) ("Supreme Court precedent allows limited disclosure requirements for certain types of ads prior to an election even if the ads make no obvious reference to a campaign."); *Free Speech v. FEC*, 720 F.3d 788, 795 (10th Cir. 2013); *see also Ctr. for Individual Freedom, Inc. v. Madigan*,

The Tenth Circuit, too, has confirmed that disclosure laws serve important informational interests in the context of ballot measure elections. *See Sampson*, 625 F.3d at 1257 (recognizing that "on three occasions [the Supreme Court] has spoken favorably of such requirements"). Although it has objected to the application of specific *political committee* disclosure laws to small groups with minimal amounts of ballot issue-related activity, it has never suggested that requiring disclosure of ballot measure advocacy is itself constitutionally suspect. Instead, it has explicitly "assume[d] that there is a legitimate public interest in financial disclosure from" ballot proposition groups, *id.* at 1259, and has recognized that "[v]oters certainly have an interest in knowing who finances support [for] or opposition to a given ballot initiative," *CSG*, 815 F.3d at 1280.

In its decisions striking down more comprehensive disclosure regimes as applied to small groups, the Tenth Circuit's concerns arose from the particular disclosure laws at issue, *i.e.*, laws requiring entities engaged in ballot measure-related advocacy to register as political committees and comply with comprehensive registration, reporting, and recordkeeping requirements, even when their "major purpose" did not relate to such advocacy. *See infra* Part II.C.2 (distinguishing PAC disclosure laws reviewed in *CSG* and *Sampson*). But these decisions simply stand for the uncontroversial proposition that the state's informational interest is not absolute: the burdens created by a disclosure law must be "balance[d]" against the strength of the state interest in the particular information it requires. *Id.* at 1278. In *CSG*, for example, the Tenth Circuit found that the informational interest was outweighed by the "substantial burdens" imposed by Colorado's PAC disclosure regime on a small group. *Id.* at 1279. It simultaneously recognized, however, that

_____

697 F.3d 464, 484 (7th Cir. 2012) ("*Citizens United* made clear that the wooden distinction between express advocacy and issue discussion does not apply in the disclosure context.").

"[a]n issue committee raising or spending a meager $200 might still be required to disclose *limited* information without violating the First Amendment." *Id*. at 1278 (emphasis added).

In short, the constitutionality of a disclosure measure turns in part on the scope of reporting required and the actual burdens imposed. The statute reviewed in *New Mexico Youth Organized v. Herrera*, 611 F.3d 669, 671 (10th Cir. 2010), for instance, required any issue group to register as a political committee and file reports until "the committee has dissolved or no longer exists." *Id*. at 673. But this is not the type of law challenged in this case: *none* of the administrative burdens identified in *Herrera* are imposed by subsection 9-2.6. *See infra* Part II.C. *Herrera*'s review of political committee status—and the similar analyses in *CSG* and *Sampson*—therefore has limited application here.

## II.    Subsection 9-2.6 Is Constitutional on its Face.

### A.    RGF bears a heavy burden in proving facial unconstitutionality.

RGF challenges SFCC § 9-2.6 both facially and as applied. Compl. (Request for Relief). In the First Amendment context, a court will only strike down a law as facially overbroad if a plaintiff can "demonstrate from the text of [the law] and *from actual fact* that a *substantial* number of instances exist in which the [law] cannot be applied constitutionally." *N.Y. State Club Ass'n v. City of N.Y.*, 487 U.S. 1, 14 (1988) (emphasis added). Invalidation on overbreadth grounds is "'strong medicine'" that should be employed "with hesitation, and then 'only as a last resort.'" *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999). "The Supreme Court has 'vigorously enforced the requirement that a statute's overbreadth be *substantial*' in both absolute and relative terms." *United States v. Brune*, 767 F.3d 1009, 1018 (10th Cir. 2014).

But RGF has offered no evidence to establish substantial overbreadth, and cannot

22

"demonstrate from the [law's] text" or "actual fact" that disclosure under subsection 9-2.6 carries the risk of a substantial number of unconstitutional applications, or that the "potential chilling effect" is "both real and substantial." *Id.* Santa Fe's law has a plainly legitimate sweep, and RGF has not identified any unconstitutional applications—much less a substantial number of them.

RGF has also failed to state a valid as-applied First Amendment claim, as discussed more fully in Part III, *infra*. The Supreme Court has recognized only one constitutionally mandated as-applied exemption from a facially valid political disclosure law: where there is "a reasonable probability that [a] group's members would face threats, harassment, or reprisals if their names were disclosed." *Citizens United*, 558 U.S. at 370; *Buckley*, 424 U.S. at 74. But RGF has not even attempted to present the "specific evidence of past or present harassment" required to claim that exemption. *Doe*, 561 U.S. at 204.

The remainder of RGF's as-applied arguments are simply facial claims dressed up in "as-applied" garb. RGF contends that subsection 9-2.6 cannot be constitutionally applied to it or "others similarly situated," Compl. ¶ 75, meaning (apparently) that the disclosure it requires would be unconstitutional with respect to *any* organization, or more narrowly, to any "nonprofit" or "charitable" organization, that spends money to support or oppose City ballot measures. *See, e.g.*, Compl. ¶ 63 (complaining that "[d]onors are less likely to donate money to *charities*" as a result of Santa Fe's law (emphasis added)); *id.* ¶ 64 (challenging application of disclosure requirements to "nonprofit[s]" or "organizations like" RGF). Ultimately, the claimed unconstitutionality does not flow from the law's application *to RGF* or its donors, but would reach any disclosure of paid political advertising in the ballot measure context. And that is precisely the relief RGF seeks: a declaration that SFCC § 9-2.6 is unconstitutional "as it relates to speech about the approval or

23

defeat of a ballot proposition," and a permanent injunction "prohibiting [Santa Fe] from administering [§ 9-2.6] as it relates to speech about municipal ballot propositions." Compl. at 13.

These are facial claims. Whether a challenge is treated as facial or as-applied "depends on how the *plaintiffs* elect to proceed—whether they seek to vindicate their own rights based on *their own circumstances* (as-applied) or . . . to invalidate a[ ] [statute] based on how it affects them *as well as other conceivable parties* (facial)." *United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011) (alteration in original). If RGF prevails on these claims, the "relief that would follow"—a declaratory judgment that subsection 9-2.6 cannot be constitutionally applied to *any* ballot measure-related advocacy or to any "charity" engaged in such advocacy—would necessarily "reach beyond the particular circumstances" of this case. *Doe*, 561 U.S. at 194. RGF "must therefore satisfy [the] standards for a facial challenge to the extent of that reach." *Id.*

**B. Disclosure of those who fund election-related speech in Santa Fe bears a substantial relation to the important informational interest articulated by the Supreme Court.**

The Campaign Code's stated purposes are virtually identical to those approved by the Supreme Court, and include: (A) "[t]hat public confidence in municipal government is essential and must be promoted by all possible means"; (B) "[t]hat political campaign contributions and expenditures be fully disclosed to the public and that secrecy in the sources and application of such contributions be avoided"; (C) "[t]hat the public's right to know how political campaigns are financed far outweighs any right that this matter remain secret and private." SFCC § 9-2.2.

The 2015 amendments to the Code were enacted to protect "the public's right to know how political campaigns are financed" and to ensure that political spending would be "fully disclosed to the public." SFCC § 9-2.2(B). And the public plainly supported the effort. At the Board's

January 21, 2015 meeting, for example, public commenters expressed "dismay[] at the amount of dark money brought to bear on the races," Facts ¶ 24, and said "there was frustration, because often you could not be sure where the outside money came from" and "people need to have confidence in the electoral system." ECRB R. at 21 (Jan. 21 Mins. at 8) (Heldmeyer). And a letter read into the record from the League of Women Voters of Santa Fe County further urged the ECRB to adopt recommendations that would "ensure the public's right to know"—such as by "increasing the extent to which there is disclosure of sources of outside funding." Facts ¶ 24.

And later, at the City Council hearing, numerous local citizens again spoke in favor of transparency. For example, the President of the Santa Fe Chamber of Commerce voiced strong support for the ECRB's recommendations, emphasizing his members' particular support for "steps forward in terms of efficiency and transparency," which he called the issue "of most concern to business people and citizens of Santa Fe.'" Facts ¶ 27.[6]

It is undisputed that RGF's "No Way Santa Fe" campaign had an explicit electoral purpose. The website, video, and proposed mailers expressly advocated the defeat of the soda tax measure. Facts ¶¶ 46-53. Fundraising appeals make plain that RGF solicited and received large contributions for the specific purpose of "kill[ing]" the soda tax measure. Facts ¶¶ 44-45. Under longstanding Supreme Court precedent, City voters had an interest in knowing who was funding this effort.

---

[6]    Mr. Brackley also penned an op-ed in the New Mexican, *see* Facts ¶ 27, decrying the growing prevalence of undisclosed "dark" money in Santa Fe: "[O]utside money is increasingly playing a role in our local elections, and it requires a fix to our system. This money comes from groups and organizations that do not have to disclose their spending, and in Santa Fe, we saw the impact of this 'dark' money firsthand during the 2013 mayoral race." *See also People for Pearce v. Oliver*, No. 17-CV-752 JCH/SMV, 2017 WL 5891763, at *2 n.2 (D.N.M. Nov. 28, 2017) (noting that "[c]ourts may take judicial notice of publications introduced to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true'").

**C. Subsection 9-2.6 is carefully drawn so that it sweeps no more broadly than necessary to achieve its purpose.**

Santa Fe is under no obligation to demonstrate that its disclosure law is the "least restrictive means" of achieving its purpose; that standard is reserved for laws that trigger strict scrutiny. Nevertheless, the City was careful to craft a law that imposes only minimal reporting obligations and reaches no further than necessary to serve its important purposes. This is more careful tailoring that the Supreme Court or this Circuit have demanded of disclosure laws, and easily passes muster.

      *1. The reporting required is minimal.*

When—and only when—a "person" spends $250 to advocate for the passage or defeat of a ballot measure, it must submit a simple form setting forth basic information about its campaign-related expenditures and contributions. Expenditures need only be specified "by date, the amount of the expenditure, the name and address of the person or entity where an expenditure was made and the purpose of the expenditure." SFCC § 9-2.6. Information about contributions need only include the "date, amount of contribution, name, address and occupation of the person or entity from whom the contribution was made," and only extends to contributions received "for the purpose of paying for such expenditures." *Id.* The Act requires an entity like RGF, unlike a political committee, to submit this information once, when it reaches the $250 threshold, and it is required to undertake additional reporting only if it makes ongoing expenditures to influence voters. *Id.*

Nothing in subsection 9-2.6 or any other provision of the Code imposes a significant burden. The great majority—if not all—of this information would already be maintained by a nonprofit group through standard bookkeeping undertaken in the ordinary course of business. Indeed, 501(c)(3) organizations, such as RGF, are already subject to far more extensive reporting and recordkeeping requirements under federal tax law. These include filing a Form 990 as their

annual return with the IRS every year, as well as an accompanying Schedule B disclosing the names and addresses of each contributor who gave the greater of $5,000 or two percent of the contributions received during the year. For these reasons, the IRS recommends that each tax-exempt group maintains comprehensive records of "its donors and grantors and the amount of cash contributions or grants . . . received from each." Def. Ex. J (IRS Compliance Guide, at 15).

Lastly, the earmarking provision in subsection 9-2.6 means that many groups, as a practical matter, need only disclose a handful of donors, all of whom gave specifically to further the group's campaign-related spending. Here, RGF disclosed a total of two contributors who gave specifically to further its No Way Santa Fe initiative. And RGF admits that no more than five donors in the last *four years* have earmarked their contributions for ballot measure spending, Def. Ex. K (RGF Resp. to Interrog. 3), although RGF engaged in multiple campaigns during that time frame.

> ### 2. *The event-driven reporting Santa Fe requires is doctrinally distinct from more onerous PAC disclosure regimes.*

The reporting requirements are undemanding by design. The City Council carefully tailored them to ensure that they did not impose the far more extensive burdens that come with PAC status. Both the Supreme Court and the Tenth Circuit have distinguished PAC disclosure regimes from the type of event-driven, minimally burdensome reports that subsection 9-2.6 requires. *See, e.g.*, *Indep. Inst. v. Williams*, 812 F.3d 787, 795 n.9 (10th Cir. 2016).

PAC regulation typically entails a host of "[d]etailed recordkeeping and disclosure obligations, along with the duty to appoint a treasurer and custodian of records." *FEC v. Mass. Citizens for Life*, 479 U.S. 238, 254 (1986) ("*MCFL*"). These requirements may include formal registration, regular reporting, and other organizational burdens such as the creation and maintenance of segregated bank accounts and years-long record-keeping. *Id*. at 253-54 (detailing

federal law requirements for PACs). Recognizing that PAC status comes with attendant burdens such as "the need to assume a more sophisticated organizational form, to adopt specific accounting procedures, [and] to file periodic detailed reports," *id*. at 255, the Supreme Court has indicated that formal PAC status creates burdens that "small entities may be unable to bear." *Id*. at 254.

But subsection 9-2.6 imposes no such requirements on RGF or any other organization. It simply requires an entity to file an event-driven report for the benefit of voters when it spends $250 to influence their votes. Unlike a PAC, an entity meeting this threshold need not comply with other aspects of Santa Fe's campaign finance laws. It need not: register itself by filing a statement of organization, *see* SFCC § 9-2.7; appoint a treasurer or custodian of records, *see id*. § 9-2.8; open and maintain a separate campaign depository, *id*. § 9-2.9(H)(1); file regular disclosure reports on a fixed schedule, *id*. § 9-2.10; file a statement in reporting periods with no campaign spending, *id*. § 9-2.13; disclose and itemize every receipt and disbursement, *id*. § 9-2.11; liquidate and disburse all funds at the conclusion of a campaign, *id*. § 9-2.9(H)(3); or maintain its records for two years following a campaign, *id*. § 9-2.9(F)—although it likely does so anyway, *see* Facts ¶¶ 34-36, *supra*. In short, an organization that meets the threshold need not "assume a more sophisticated organizational form . . . adopt specific accounting procedures, [or] . . . . file detailed periodic reports." *MCFL*, 479 U.S. at 255. Only "political committees" must do so.[7]

Subsection 9-2.6's simple, event-driven disclosure of expenditures made to influence voters and contributions given "for the purpose of paying for such expenditures" is not comparable

---

[7]   The Code's provisions regulating PACs are closely circumscribed by the narrow definition of "political committee," which includes only entities "formed for the principal purpose" of engaging in certain specific kinds of electioneering activities in City elections. SFCC § 9-2.3(N). RGF's alleged activities do not meet that definition, and it does not challenge these provisions.

to the extensive obligations imposed by the Colorado "issue committee" disclosure law reviewed in *Sampson* and *CSG*. In *Sampson*, the court of appeals emphasized that Colorado required any group of two or more persons who spent $200 on a *statewide* ballot issue "(1) to register as an issue committee, (2) to establish a committee bank account with a separate tax identification number, and (3) to comply with the reporting requirements." 625 F.3d at 1251. In *CSG*, the court noted that Colorado's online filing system included thirty-five training videos to ease compliance with the law's extensive reporting regime, which required groups to file twelve annual reports detailing their activity in minute detail. 815 F.3d at 1279. *CSG* was also based on a full trial record demonstrating the law's particular effects on the plaintiff, who, among other things, was assessed a late-filing penalty after submitting a disclosure report one day late—because her house had flooded. *Id.* at 1273. *See infra* Part III.C.

Subsection 9-2.6 does not trigger political committee status for RGF or other organizations and includes none of the attendant requirements. The legal regimes are simply incomparable. And the Tenth Circuit itself has recognized precisely this distinction, noting that "[t]he obligations that come with political committee status, including reporting and auditing requirements . . . tend to be considerably more burdensome than disclosure requirements."  *Indep. Inst.*, 812 F.3d at 795 n.9.

Other Circuits, too, have been clear that the type of event-driven reporting that characterizes subsection 9-2.6 is a relatively light burden indicative of careful tailoring. The Seventh Circuit, for example, explained that a "one-time, event-driven disclosure rule is far less burdensome than the comprehensive registration and reporting system imposed on political committees." *Wisc. Right to Life, Inc. v. Barland*, 751 F.3d 804, 824 (7th Cir. 2014). The event-driven nature of reporting requirements has often been the saving grace of disclosure legislation

far more extensive than Santa Fe's. The Third Circuit, for example, upheld a Delaware law requiring comprehensive, but event-driven reporting in part because "[d]isclosure that is singular and event-driven is far less burdensome than the comprehensive registration and reporting system oftentimes imposed on political committees." *Del. Strong Families v. Att'y Gen. of Del.*, 793 F.3d 304, 312 n.10 (3d Cir. 2015) ("*DSF*") (citation omitted) (upholding law requiring groups spending $500 or more on electioneering ads to disclose *all* contributors for as much as the preceding four years). Unlike Santa Fe's law, the Delaware law contained no earmarking provision. *See infra* Part II.C.3; *see also Yamada v. Snipes*, 786 F.3d 1182, 1199 n.9 (9th Cir. 2015) (upholding Hawaii disclosure law because it was "contingent on an organization's ongoing contributions and expenditures, reflecting its close[ ] tailoring to Hawaii's informational interest"). Each of these decisions upheld the laws in large part because they were event-driven and thus appropriately tailored to the informational interest at stake.[8] So too is Santa Fe's.

In other words, the Supreme Court and the courts of appeals have all recognized the constitutionally relevant distinction between event-driven disclosure laws like Santa Fe's—which have been uniformly upheld following *Citizens United*—and the political committee disclosure regimes that troubled the court of appeals in *Sampson* and *CSG*. The latter have been overwhelmingly upheld, too, except for a few laws, like Colorado's, which simply went too far. *See, e.g.*, *Justice v. Hosemann*, 771 F.3d 285, 287-89 (5th Cir. 2015) (rejecting facial challenge to

---

[8]  The Eighth Circuit, conversely, has cut back laws *because* they lacked the carefully tailored features of Santa Fe's. *See Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 873 (8th Cir. 2012) (narrowing a PAC-style disclosure law to allow its event-driven reporting, but eliminating the law's *ongoing* reporting requirement, which was "potentially perpetual regardless of whether the association ever again makes an independent expenditure"); *Iowa Right to Life Comm. v. Tooker*, 717 F.3d 576, 597 (8th Cir. 2013).

Mississippi law requiring group that raises or spends $200 to register and submit detailed periodic contribution and spending reports), *cert. denied*, 136 S. Ct. 1514 (2016).[9]

### 3. Only "earmarked" contributions must be reported.

In addition to its event-driven reporting structure, subsection 9-2.6 is also narrowed by an "earmarking" limitation. When an organization meets the spending threshold, its one-time report need include details about only those "contributions received *for the purpose of paying for* [the relevant] expenditures." SFCC § 9-2.6 (emphasis added). The provision does not require RGF or any other organization to disclose all of its donors; rather, organizations must disclose information about only those who contributed and "earmarked" their contribution for the relevant election communication. This limitation thus focuses the law on Santa Fe's underlying interest: informing voters about who seeks to influence their votes and how they seek to do so.

The Tenth Circuit has discussed such provisions favorably. When it upheld Colorado's electioneering communications disclosure requirements as applied to a 501(c)(3) group, the Circuit noted that "it is important to remember that the [group] need only disclose those donors who have specifically earmarked their contributions for electioneering purposes" in assessing the careful tailoring of the law. *Indep. Inst.*, 812 F.3d at 797. Similarly, the Third Circuit has indicated that "an earmarking limitation . . . result[s] in a more narrowly tailored statute. *DSF*, 793 F.3d at 312. To be sure, the absence of an earmarking provision does not necessarily render a reporting requirement insufficiently tailored, *see id*. Nevertheless, the presence of such a provision

---

[9]     The Supreme Court has been invited to review nearly every one of these post-*Citizens United* disclosure decisions—and has declined to do so each time. *See, e.g., DSF*, 793 F.3d 304 (3d Cir. 2015), *cert. denied sub nom. DSF v. Denn*, 136 S. Ct. 2376 (2016); *Yamada*, 786 F.3d 1182 (9th Cir.), *cert. denied sub nom. Yamada v. Shoda*, 136 S. Ct. 569 (2015); *Worley*, 717 F.3d at 1240, *cert. denied sub nom. Worley v. Detzner*, 571 U.S. 991 (2013).

highlights just how prudently the Santa Fe City Council approached this issue. It took careful steps to ensure that organizations like RGF would face minimal burdens in filing the necessary reports—requiring them to do so only on an event-driven basis and reaching only those contributors who specifically intended to influence elections—in order to ensure that the law was appropriately tailored to the important interests it serves.

      4.   *The provision applies to local elections in a small city, and its coverage is tailored accordingly.*

The City of Santa Fe is a relatively small jurisdiction, and the disclosure requirements in subsection 9-2.6 reflect that fact—for example, in the relevant dollar thresholds and the targeting criteria. The cost of Santa Fe political campaigns is quite low and even $250 can buy a significant amount of exposure for a political message. *See, e.g.*, ECRB R. 60 (Mar. 18 Mins. at 10) (noting that $500 would likely be in the top 1% of contributions in City elections).

As the Tenth Circuit has noted, it is appropriate that "a disclosure threshold for state elections is lower than an otherwise comparable federal threshold. Smaller elections can be influenced by less expensive communications." *Indep. Inst.*, 812 F.3d at 797. This principle has guided judicial review of event-driven reporting laws nationwide, with respect to disclosure in both candidate and ballot measure elections. *See, e.g.*, *DSF*, 793 F.3d at 310 (upholding $500 threshold in part because "Delaware is a small state," so "[i]t is unsurprising that Delaware's thresholds are lower than those for national elections"); *Justice*, 771 F.3d at 288 (noting that "[s]ome states with large populations set the [PAC] registration bar higher," and identifying Texas's $500 threshold as one such example; *cf. NOM*, 649 F.3d at 60 (upholding Maine's $100 threshold based on *Buckley*'s instruction to "grant[] judicial deference to plausible legislative judgments" as to the appropriate reporting threshold).

Subsection 9-2.6 is also tailored to the small scale of Santa Fe elections in its approach to the disclosure of group-to-group financial transfers. Several commenters urged the ECRB to adopt a more penetrating disclosure provision to address the so-called "Russian doll" problem, *i.e.*, the use of successive group-to-group transfers to conceal the original source of campaign funds and thus impede meaningful disclosure. There was extensive discussion of the legal and practical implications of various proposals designed to capture this activity, *see*, *e.g.*, ECRB R. at 63-64 (discussion draft), but the Board ultimately concluded that the complexity of multi-step "traceback" measures was not suitable for a small jurisdiction like Santa Fe, and could pose "an impossible technical burden." Def. Ex. A at 40 (City Council Mins. at 59); Miller Decl. ¶¶ 33-36.

## III.    Subsection 9-2.6 Is Constitutional As Applied to RGF.

### A. RGF has not met the standard for an as-applied "harassment" exemption from Santa Fe's facially valid disclosure requirement.

The Supreme Court has recognized only one basis for an as-applied challenge to an election-related disclosure requirement: "if there were a reasonable probability that the group's members would face threats, harassment, or reprisals if their names were disclosed." *Citizens United*, 558 U.S. at 370. To obtain this narrow exemption, a group must show "specific evidence of past or present harassment of group members, harassment directed against the organization itself, or a pattern of threats or specific manifestations of public hostility." *Doe*, 561 U.S. at 204 (citation omitted).

RGF has not made such a showing. Indeed, it is unclear whether RGF is even claiming this particular as-applied exemption from disclosure. It asserts that it is "aware of" donors who "prefer to keep their donations private." Compl. ¶ 13. But "the desire for privacy and loss of donations alone does not render viable an as-applied challenge to a disclosure regime." *Citizens United v.*

*Schneiderman*, 203 F. Supp. 3d 397, 407 n.1 (S.D.N.Y. 2016) (rejecting as-applied challenge to New York regulatory disclosure provision where plaintiffs relied on allegations that "their donors in particular 'value their privacy,' and 'if individuals know that their names could be divulged to the public, they often will refuse to donate'"), *aff'd*, 882 F.3d 374 (2d Cir. 2018).

RGF also alleges that the Santa Fe disclosure law cannot be constitutionally applied to RGF because disclosure may subject RGF's donors to harassment or reprisals. Compl. ¶¶ 13, 29. But when asked to "state with specificity all facts" upon which that contention is based, RGF acknowledged that it is actually "*not* aware of any of its own donors who have been subject to such harassment." Def. Ex. K (RGF Resp. to Interrog. 1) (emphasis added). It instead offered only that it is "aware of" donors to *other* groups, such as Planned Parenthood and the National Rifle Association "being targeted for intimidation and harassment around the nation." *Id.* But even if this unsupported allegation is credited, RGF has not attempted to explain why the experience of a hypothetical Planned Parenthood or NRA donor is relevant to RGF or this case.

The fact that RGF has disclosed its large donors in years past—and its donors who supported the No Way Santa Fe initiative—further cuts against its assertions about the supposed harms of disclosure. *See Citizens United*, 558 U.S. at 370 ("Citizens United has been disclosing its donors for years and has identified no instance of harassment or retaliation."). RGF has made no allegation that its past donors, or the two contributors disclosed in its 2017 report at issue here, have suffered any adverse consequences by reason of such publicity—much less any specific "threats, harassment, or reprisals."

In essence, RGF's "exemption argument appears to be premised, in large part, on the concept that individuals should be free from even legal consequences of their speech."

34

*ProtectMarriage.com v. Bowen*, 830 F. Supp. 2d 914, 932 (E.D. Cal. 2011). "That is simply not the nature of their right." *Id.* What RGF and its donors apparently consider most threatening is the loss of anonymity in and of itself—and the public debate that may ensue. But even if some members of the public may criticize the policy stances endorsed by RGF and, by extension, its donors, that does not amount to unconstitutional "harassment" of those donors. Indeed, this is precisely the type of lawful public debate that the First Amendment is meant to promote.

**B.  RGF's tax status is immaterial to the constitutionality of a disclosure law.**

RGF is fixated on its tax status, as if the particular organizational form it claims for federal tax purposes affects the First Amendment analysis. It does not. The Supreme Court has never premised the constitutionality of a disclosure requirement on the tax status of the filer. On the contrary, the Court has *questioned* campaign finance laws that discriminate "based on the speaker's identity." *Citizens United*, 558 U.S. at 350.

No exemption from disclosure for 501(c)(3) organizations (or any other "nonprofit" or "charitable" organizations, Compl. ¶¶ 60-64) is constitutionally required. In *McConnell*, the Supreme Court sustained the federal electioneering communication disclosure provisions even though they contained no exemption for 501(c)(3) groups. 540 U.S. at 194-96. And in *Independence Institute v. FEC*, 216 F. Supp. 3d 176, 192 (D.D.C. 2016), *aff'd*, 137 S. Ct. 1204 (2017), a three-judge panel of the D.C. District Court specifically rejected this argument, holding that the plaintiff's status there as a "tax-exempt non-profit" made no "constitutional difference," because "[t]he First Amendment permits disclosure provisions that . . . regulate speech based on its reference to electoral candidates, and not on the speaker's identity or taxpaying status." The Supreme Court summarily affirmed that decision. *Id*.

At least two other circuits have rejected this theory. The Third Circuit rebuffed an argument that a Delaware disclosure law should be invalidated as applied to the plaintiff "by virtue of its status as a § 501(c)(3) organization." *DSF*, 793 F.3d at 308. It instead concluded that "it is the conduct of an organization, rather than an organization's status with the [IRS], that determines whether it makes communications subject to the Act." *Id.* at 308-09; *see also Indep. Inst. v. Gessler*, 71 F. Supp. 3d 1194, 1203 (D. Colo. 2014) ("[T]he public's interest in knowing who is speaking is in no way related to an entity's organizational structure or its tax status."), *aff'd*, 812 F.3d 787 (10th Cir. 2016). And the Fourth Circuit *struck down* an exemption for 501(c)(3) groups from a West Virginia disclosure law, finding that it "d[id] not bear a substantial relation to [the] governmental interest" in "providing the electorate with information about the source of campaign-related spending." *Tennant*, 706 F.3d at 289.

RGF can provide no substantive reason why nonprofit organizations are situated differently than any other entities for purposes of disclosure. In fact, 501(c)(3) groups are already subject to extensive reporting and recordkeeping under federal tax law, Facts ¶¶ 34-36, and thus are likely *better* positioned to satisfy the minimal reporting required by subsection 9-2.6 without any additional administrative cost. Although RGF insinuates that there is a potential chill specific to "nonprofits," Compl. ¶¶ 60-64, it cannot offer any substantive reason why this should be the case.

## C. RGF is not the type of "small-scale issue committee" that has received as-applied relief from this Circuit.

RGF has not produced or even alleged any facts that suggest that it is entitled to as-applied relief due to its size, lack of sophistication, or any other attribute that would make the requirements of subsection 9-2.6 uniquely burdensome to the facts of its case. On the contrary, as a long-established, well-funded nonprofit with a significant history of lobbying and ballot measure-

related advocacy in the State of New Mexico, RGF is the polar opposite of the "small-scale issue committees" that elicited concern from the Tenth Circuit in *Sampson* and *CSG*.

RGF is governed by an eight-member Board of Directors, and boasts a staff of eight, including its full-time, compensated President, Paul Gessing. Facts ¶ 31. Its annual revenue between 2012 and 2016 ranged between $404,773 and $213,306. Facts ¶ 32. RGF has frequently voiced public support for or opposition to New Mexico ballot propositions, including the City of Albuquerque's 2017 proposition concerning paid sick leave and a 2018 County of Santa Fe proposition concerning an increase to the gross receipts tax. Facts ¶ 33.

RGF is simply not comparable to the plaintiff groups in *Sampson* and *CSG*, and even if the disclosure laws at issue were closer in form or scope—which they are not—RGF cannot credibly claim to be faced with analogous administrative burdens here. *Sampson* revolved around a one-time, ad hoc association of neighbors who raised and spent $782.02 to pay for signs, a banner, postcards, and postage to oppose annexation of their neighborhood into a nearby town. 625 F.3d at 1251-52. *CSG* involved an organization established, operated, and primarily self-financed by a single individual. The organization's advocacy essentially involved one position paper, the updating and dissemination of which was its only relevant activity; $3,500 was the organization's full budget. *CSG v. Gessler*, 71 F. Supp. 3d 1176, 1178 (D. Colo. 2014).

RGF, on the other hand, is an established organization that has been operating since 2000, with a Board of Directors, compensated staff and an annual budget well into the six-figures. It is organized to receive significant donations and comply with all applicable provisions of federal tax law, with all the attendant bookkeeping responsibilities its tax status entails. RGF does not claim that subsection 9-2.6 is complicated to understand or that it gives rise to any material administrative

37

burden—much less one of constitutional significance. In short, RGF is not meaningfully burdened, it is not "chilled," and it has *already filed* the required disclosure here without incident. It simply would have preferred not to. But this hardly constitutes a First Amendment violation, and favoring RGF's mere preference over the vital public interest in disclosure would undermine the robust debate and informed elections the Amendment was intended to promote.

**IV.   RGF's New Mexico Constitutional Claim Should Be Dismissed for Failing to State a Claim for Which Relief Can be Granted.**

RGF's claim under the New Mexico Constitution should be dismissed because it duplicates the federal First Amendment claim and a state court applying state law would not reach the claim. The New Mexico Supreme Court has instructed that the state uses an "interstitial approach" when examining claims arising under both the federal and state constitutions. Under this approach, a threshold question for a state constitutional claim is "whether the right being asserted is protected under the federal constitution." *State v. Tapia*, 414 P.3d 332, 336 (N.M. 2018) (citation omitted). If so, "then the state constitutional claim is not reached." *Id.* Here, every aspect of RGF's state constitutional claim arises under the federal First Amendment. New Mexico courts have indicated that the State Constitution provides no greater speech protections than the Federal Constitution. *See, e.g.*, *State v. Ongley*, 882 P.2d 22, 23 (N.M. Ct. App.1994) (noting that "the protection of the federal and state constitutions are the same," and collecting cases to that effect); *cf*. *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1208 (D.N.M. 2010) (noting that N.M. Const. art. II, § 17 is "analogous" to federal First Amendment). Because RGF's state claim also arises under the Federal Constitution, the protections of which are coextensive with the State constitutional protections, this Court should dismiss it for failure to state an independent claim.

## CONCLUSION

The City respectfully requests that summary judgment be granted in Defendants' favor as to both counts of RGF's complaint.

**Dated: June 11, 2018**

Respectfully submitted,

CITY ATTORNEY
CITY OF SANTA FE, NEW MEXICO

/s/ Marcos D. Martinez
Marcos D. Martínez
Assistant City Attorney City of Santa Fe
200 Lincoln Avenue
P.O. Box 909
Santa Fe, New Mexico 87504-0909
Telephone: (505) 955-6967
Facsimile: (505) 955-6748
mdmartinez@ci.santa-fe.nm

Tara Malloy, DC Bar No. 988280*
Megan P. McAllen, DC Bar No. 1020509*
Campaign Legal Center
1411 K Street, NW, Suite 1400
Washington, D.C. 20005
Telephone: (202) 736-2200
Facsimile: (202) 736-2222
tmalloy@campaignlegalcenter.org,
mmcallen@campaignlegalcenter.org

*Appearing *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Motion for Summary Judgment and Memorandum in Support with the Clerk of the Court for the United States District Court of the District of New Mexico via the CM/ECF system on June 11, 2018 which will effect service on all counsel of record.

CITY ATTORNEY
CITY OF SANTA FE, NEW MEXICO

/s/ Marcos D. Martínez
Marcos D. Martínez
Assistant City Attorney, City of Santa Fe