**Scharf-Norton Center for**
**Constitutional Litigation at the**
**GOLDWATER INSTITUTE**
*Matthew R. Miller
*Jonathan Riches
500 E. Coronado Rd.
Phoenix, Arizona 85004
(602) 462-5000
litigation@goldwaterinstitute.org

*Attorneys for Plaintiff*

*Motion for admission *pro hac vice*
pending

**BARNETT LAW FIRM**
Colin L. Hunter
Jordy L. Stern
1905 Wyoming Boulevard Northeast
Albuquerque, New Mexico  87112
(505) 275-3200
colin@theblf.com
jordy@theblf.com

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO

RIO GRANDE FOUNDATION,

   Plaintiff,

  vs.

CITY OF SANTA FE, NEW MEXICO; and
CITY OF SANTA FE ETHICS AND
CAMPAIGN REVIEW BOARD,

   Defendants,

No.  1:17-cv-00768-JCH-CG

**PLAINTIFF RIO GRANDE**
**FOUNDATION'S MOTION FOR**
**SUMMARY JUDGMENT**

COMES NOW Plaintiff Rio Grande Foundation (the "Foundation"), by and through its attorneys of record, the Scharf-Norton Center for Constitutional Litigation at the Goldwater Institute (Matthew R. Miller and Jonathan Riches) and Barnett Law Firm (Colin L. Hunter and Jordy L. Stern), and in support of its Motion for Summary Judgment, filed pursuant to F.R.C.P. 56 and Rule 1-056, NMRA, states:

Pursuant to D.N.M.LR-Civ. 7.1(a) Plaintiff sought concurrence and Defendants oppose this motion.

Plaintiff moves for summary judgment under F.R.C.P. 56 and Rule 1-056, NMRA. Plaintiff is entitled to judgment as a matter of law because the undisputed material facts in this case show that Santa Fe City Campaign Code § 9-2.6, which was adopted by Defendant City of Santa Fe (the "City" or "Santa Fe") and which is enforced by Defendant Santa Fe Ethics and Campaign Review Board (the "Board"), violates the First Amendment to the United States Constitution, as incorporated against the states through the Fourteenth Amendment to the United States Constitution, and Article II, § 17 of the New Mexico Constitution.  Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 and the Civil Rights Act of 1871, 42 U.S.C. § 1983, Plaintiff asks this Court to declare Santa Fe City Campaign Code § 9-2.6 unconstitutional, as applied to non-profit speech about municipal ballot measures, and to permanently enjoin its enforcement by Defendants.

1

## I. STATEMENT OF UNDISPUTED MATERIAL FACTS

### *Santa Fe Adopts a Law Requiring Non-Profits to Disclose Their Donors*

1.   In 2015, Defendant City of Santa Fe amended its Campaign Code to require non-profit groups to disclose their donors to Defendant Santa Fe Ethics & Campaign Review Board any time the non-profit spends more than $250 to communicate with voters about a municipal ballot measure.  Santa Fe City Campaign Code § 9-2.6(A) attached as Exhibit 1.

2.   Specifically, Santa Fe City Campaign Code § 9-2.6 (the "Donor Disclosure Ordinance") is triggered when a non-profit organization, like Plaintiff:

> makes expenditures of two hundred fifty dollars ($250) or more in the aggregate during a single election[;]
>
> to pay for any form of public communication including print, broadcast, cable or electronic advertising, billboards, signs, pamphlets, mass mailers, mass electronic mail, recorded phone messages, organized phone-banking or organized precinct-walking[;]
>
> that is disseminated to one hundred (100) or more eligible voters[;]
>
> and that either expressly advocates the … approval or defeat of a ballot proposition; or refers to a … ballot proposition within sixty (60) days before an election at which the … proposition is on the ballot[.]
>
> *Id.*

3.   Once an organization has triggered the reporting requirements—by spending more than $250 to communicate with voters about a ballot proposition—that

organization must file "a report of all such expenditures made and all contributions received for the purpose of paying for such expenditures."  *Id.*

4.   The report must include the date, amount, and method of payment of each contribution.  *Id*.  It must also include the name, address, and occupation of the person making the contribution.  *Id*.

5.   The reports, including the list of donors, are made publicly available.  Deposition Transcript of Justin Miller attached as Exhibit 2 at 25:7–14.

6.   Media organizations, including non-profit media organizations, are exempted from the reporting requirements.   Ex. 1 § 9-2.6(A).

7.   Although the reporting requirements apply to speech about candidates, as well, Plaintiff does not challenge the ordinance as it applies to speech about candidates for office, as Plaintiff is prohibited from engaging in such speech as a 501(c)(3) non-profit. *Id.*; *See also,* Plaintiff's Complaint ¶ 39.

8.   A non-profit that refuses or fails to disclose its donors is subject to penalties of up to $500 per day.  Santa Fe, N.M., Code § 6-16.7(B)(2) attached hereto as Exhibit 3.

9.   Although the language of the ordnance is somewhat ambiguous, Plaintiff City of Santa Fe clarified, in a Rule 30(b)(6) deposition, that donations must be reported only if they are specifically earmarked to pay for communications about a particular ballot proposition.  Ex. 2 at 23:11–25.

10. Non-earmarked, general contributions do not trigger the reporting requirements.

*Id.*

11. If an organization receives no earmarked contributions related to a specific ballot measure, that organization is not required to disclose any donors to the City.  *Id.*

### The Rio Grande Foundation Decides to Educate Voters About a Proposed Soda Tax

12. Plaintiff Rio Grande Foundation is a non-profit New Mexico Corporation that receives tax-exempt status under 26 U.S.C. § 501(c)(3).  Affidavit of Paul Gessing attached as Exhibit 4 at ¶ 3.

13. The Foundation has operated in New Mexico since 2000.  *Id.* ¶ 4.

14. The Foundation is based in Albuquerque, but it works on policy issues all around New Mexico.  *Id.* ¶ 5.

15. Paul Gessing is the current President of the Foundation, a position he has held since 2006.  *Id.* ¶ 1.

16. The Foundation's mission is to educate the public and promote individual liberty, constitutional rights, and market-based solutions for policy questions of the day. *Id.* ¶ 6.

17. As a 501(c)(3) organization, the Foundation is completely prohibited from supporting or opposing candidates for office, and is limited in the amount of its budget that can be spent on lobbying for or against state and local laws. *Id.* ¶ 7.

18. From the time it was established in 2000, until the current dispute arose in 2017, the Foundation had never filed any campaign-finance reports with any governmental entity, nor—like most 501(c)(3)s—was it ever legally required to do so. *Id.* ¶ 8.

19. Nevertheless, the Foundation inadvertently ran afoul of Santa Fe's new donor-disclosure law when it began a campaign to educate Santa Fe voters about a soda tax that was set to appear on the May 2017 ballot. *Id.* ¶ 9.

20. The ballot proposition would impose a two-cents-per-ounce tax on every sugary beverage sold in the City. Ordinance No. 2017-4 attached hereto as Ex. 5 at § 18-20.4.

21. As part of its mission to educate the public about various policy issues, the Foundation developed a campaign, called "No Way Santa Fe," to provide voters with information about the dangers of the soda tax. Ex. 4 ¶ 11.

22. The campaign consisted of a series of newspaper editorials written by Foundation President Paul Gessing, a NoWaySantaFe.com website, and a short YouTube video that was featured on the website. *Id.* ¶ 12.

23. The kinds of facts provided in the campaign were things like the effect of soda taxes on small businesses, or the fact that the tax would apply to all sugary beverages,

and not just soda, or the fact that the tax would nearly double the price of a 12-pack of Coca-Cola.  *Id.* ¶ 13.

24. The Foundation also ordered 5,000 postcards, about the soda tax, that it planned to send to Santa Fe voters.  However, the postcard initiative was abandoned once the current controversy arose.  The postcards were never mailed.  *Id.* ¶ 14.

### *The Rio Grande Foundation's Speech Triggers the Donor-Disclosure Law, Resulting in a Mini-Trial*

25. On April 6, 2017, the Foundation issued a news release, Facebook post, and made other communications about the proposed soda tax.  *Id.* ¶ 15.

26. That same day, Santa Fe Assistant City Attorney Zachary Shandler sent Foundation President Paul Gessing a letter.  "Based on information in your press release," Mr. Shandler wrote, "it appears your organization has spent more than $250, on broadcast advertisements referring to a ballot proposition, which have reached more than 100 eligible voters.  If so, your organization must file a campaign finance statement."  The letter concluded, "[i]f you disagree, please contact the City Clerk's office immediately *in writing* to explain why you believe your organization is exempt from Section 9.2-6." (Emphasis in original.)  April 6, 2017 Letter attached as Ex. 6.

27. The report that the City was requesting would require the Foundation to list the identities and occupations of its donors.  Ex. 1 § 9-2.6(A).

28. One day later, on April 7, 2017, Santa Fe resident Edward T. Stein filed a complaint against the Foundation with the Ethics and Campaign Review Board, alleging that the Foundation violated the "Election and Political Campaign Codes. Specifically, with regard to Ch. 9-2 and 9-3 of City Code." Stein Complaint attached as Exhibit 7.

29. That same day, Mr. Gessing responded to Mr. Shandler's letter and informed the City that the Foundation had not spent more than $250 to communicate about the soda tax and that, accordingly, it would not be disclosing its donors to the City. Gessing Letter attached as Exhibit 8.

30. Three days later, on April 10, 2017, the City notified the Foundation about Mr. Stein's citizen complaint. In a letter, the City Clerk wrote, "you have 10 business days to file a sworn written response; however, the Board has a previously scheduled meeting at 3:30 p.m. on April 19, 2017 and you have the option of submitting your response on or before this date for submittal at the meeting." Shandler Letter attached as Exhibit 9.

31. On April 13, 2017, Mr. Stein amended his complaint to specifically list the "No Way Santa Fe" website and video as violating the ordinance. It further alleged that "The charged party or parties have continued to violate Santa Fe's election code by

trying to influence the soda tax election without filing the proper papers."  Stein Amended Complaint attached as Exhibit 10.

32. The next day, on April 14, 2017, Mr. Gessing submitted another letter to the City, stating that "[w]e were planning to engage in public communications [mailing the postcards] that would have triggered your reporting requirements and would have done so but for the ordinance.  Requiring 501c3 nonprofits to disclose their donors is a major burden and, accordingly, we are choosing not to speak rather than expose the privacy of our donors, including exposing them to potential harassment."  Gessing Letter attached as Exhibit 11.

33. On April 20, 2017, the Foundation received yet another letter from the City.  Mr. Shandler informed the Foundation that—notwithstanding the fact that the Foundation had refrained from engaging in further communications about the soda tax—the Board would hold a formal hearing on the Foundation's alleged violations of the City's campaign-finance ordinance.  Shandler Letter attached as Exhibit 12.

34. The hearing would be held on April 24, 2017.  *Id.*

35. The hearing was being held on the basis of Mr. Stein's amended complaint.  The April 20 letter informed the Foundation that, on April 19, 2017—with the Foundation *not* present—Mr. Stein had presented his complaint to the Ethics and Campaign Review Board.  At that meeting, Mr. Stein "presented an affidavit from Mr. Glenn Silber

8

regarding the potential cost of the video found on the webpage 'No Way, Santa Fe.'"
The letter informed the Foundation that the Board "viewed the video" and concluded
that Mr. Stein's complaint "set forth 'legally sufficient facts which, if true, show
probable [cause] to believe that there was a violation' of the City Campaign Code." *Id.*

36. The letter informed the Foundation that the April 24 hearing would "include
opening statements, witnesses, and submittal of written documents. … At the
conclusion of the hearing, the Board may vote on the matter and may dismiss the
complaint or announce monetary sanctions." *Id.*

37. The Foundation's formal hearing before the Board was held on April 24, 2017 in
the Santa Fe City Council Chamber.  Ex. 4 ¶ 16.

38. Mr. Gessing, accompanied by Albuquerque attorney Colin Hunter, attended the
hearing on behalf of the Foundation.  *Id.* ¶ 17.

39. At the hearing Mr. Stein first presented his case.  During his presentation, he
called Mr. Silber, the local videographer, as a witness.  Mr. Silber testified that the video
was estimated to have cost at least $3,000 to produce.  Since this allegedly exceeded the
$250 reporting threshold, Mr. Stein argued that the Foundation was required to disclose
its donors to the City.  *Id.* ¶ 18.

40. Even though the Foundation had not spent any money on the video or website, Mr. Stein argued that these were in-kind donations that nevertheless triggered the disclosure requirements. *Id.* ¶ 19.

41. Mr. Gessing then testified about the provenance of the video and website. He testified that the Foundation had neither produced nor paid for them. The Foundation simply directed people to these resources, which had been created by a third party. *Id.* ¶ 20.

42. The hearing lasted approximately one hour. At the conclusion, the Board went into executive session for approximately 15 minutes. After this, the Board issued a unanimous reprimand to the Foundation for failing to comply with the donor-disclosure requirements. The Board deemed the video and website to be in-kind contributions to the Foundation, with an approximate value of $3,000. *Id.* ¶ 21. *See also,* Order of Public Reprimand attached as Exhibit 13 and Affidavit of Glenn Silber attached as Exhibit 14.

43. After the hearing was completed, the Foundation filed the paperwork that the City demanded it file. This paperwork included disclosure of the separate 501(c)(3) non-profit organization that produced the video and website, as well as the identities of individual donors who funded the Facebook advertising purchased by the Foundation

to educate voters about the soda tax.  Foundation's Campaign Finance Statement

attached as Exhibit 15.

44. The soda tax was defeated on the May 2017 ballot.  *Soda Tax Goes Flat in Santa Fe*,

T.S. Last, Albuquerque Journal (May 2, 2017) attached as Exhibit 16.

### *The City Asserts That Disclosure Serves a Public Informational Interest*

45. The City claims that the forced disclosure of the names, addresses, occupations,

and employers of donors to non-profit groups serves an informational interest.

Specifically, the City contends that "the public's right to know how political campaigns

are financed far outweighs any right that this matter remain secret and private[.]"[1]

Santa Fe's Response to Interrogatory No. 1 attached as Exhibit 17.

46. When asked to explain further, in a Rule 30(b)(6) deposition, what it means by a

"right to know how political campaigns are financed," the City referred back to its

interrogatory response, with no further explanation.  Ex. 2 at 15:4–10.

47. The City has no basis for claiming that the public has a right to know who gives

to support speech about ballot measures.  *Id.* at 19:18–23.

---

[1] The City also claims that "the public interest is served by encouraging the widest participation of the public in the electoral process by reducing the dependence of candidates on large contributions."  Ex. 17.  However, this interest cannot possibly apply here since this case is about ballot-measure elections, and not candidate elections. Here, there are no "candidates" who could "depen[d]" on the money being spent.

48. The City is unable to say whether the law has actually addressed the interest it purportedly was designed to address—namely, making voters materially more informed about groups that speak about ballot-measure elections. *Id.* at 16:20–24.

### *Plaintiff Seeks Prospective Relief and a Permanent Injunction*

49. As noted in the Complaint, the Foundation does not seek redress for the ordeal it was forced to endure due to its speech about the soda tax, although that ordeal strongly informs the need for this law to be enjoined. It seeks only *prospective* relief in the form of a declaration of the law's unconstitutionality, as it relates to speech by non-profits about municipal ballot measures, and a permanent injunction against its enforcement in such circumstances. Plaintiff's Complaint at p. 13.

50. The Foundation is very concerned that compelled disclosure of its donors will make those donors less likely to contribute in the future because some donors will fear public harassment and intimidation from their ideological opponents if their support is made public. Ex. 4 ¶ 22.

51. The Foundation hopes to avoid prosecution for its speech in the future. Educating the public about policy issues—like the soda tax—is central to the Foundation's mission. It fully intends to continue speaking about municipal ballot measures in the future, and that speech is certain to trigger the disclosure law. *Id.* ¶ 23.

## II. LEGAL STANDARD

A party may move for summary judgment at any time.  Fed. R. Civ. P. 56(b).

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed.R.Civ.P. 56(a).  Summary judgment is an integral part of the Federal Rules of

Civil Procedure, which are intended to "secure the just, speedy and inexpensive

determination of every action." *Zaintz v. City of Albuquerque*, 739 F. Supp. 1462, 1467

(D.N.M. 1990) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)).

## III. ARGUMENT

This case is about a government obsessed with knowing the origins of garden-

variety speech about municipal ballot measures, and the strength (or lack thereof) of the

government's interest in such information.  In an attempt to learn the source of a

website and YouTube video—which featured cartoon characters talking about why a

soda tax is a bad idea—the City attorney sent no fewer than four letters to the

Foundation, demanded that it explain the source of the website and video *under oath*,

and eventually conducted a mini-trial before the Board, after which the Foundation was

declared guilty and issued a public reprimand.  All of this happened because of a

YouTube video—and associated website—about a proposed soda tax.  This lawsuit

seeks to prevent that kind of ordeal from happening to the Foundation ever again.

13

Under the U.S. Constitution, the outcome of this case is controlled by two recent Tenth Circuit cases.  Under *Sampson v. Buescher*, 625 F.3d 1247 (10th Cir. 2010), and *Coalition for Secular Gov't v. Williams*, 815 F.3d 1267 (10th Cir. 2016), the Donor Disclosure Ordinance violates the First Amendment, and should be permanently enjoined from all future applications of the law to the Foundation and other groups wishing to speak about municipal ballot measures.  The Ordinance also violates Article II, § 17 of the New Mexico Constitution which, as shown below, has independent vitality and provides even greater protection for free speech than does the First Amendment.

**A.     The Donor Disclosure Ordinance is unconstitutional under recent, direct, and binding Tenth Circuit precedent.**

In *Sampson v. Buescher*, the Tenth Circuit articulated the test for analyzing donor-disclosure rules in the ballot-measure context.  For speech about ballot measures, "campaign-disclosure statutes must survive exacting scrutiny."  625 F.3d at 1261; *cf. Independence Inst. v. Williams*, 812 F.3d 787 (10th Cir. 2016) (analyzing disclosure requirements for speech about issues in conjunction with a *candidate* election).  A reviewing court should weigh the government's interest in the regulation against the First Amendment speech and privacy interests of the non-profit.  The government must demonstrate a "substantial relation between the disclosure requirement and a sufficiently important governmental interest. To withstand this scrutiny, the strength of

14

the governmental interest must reflect the seriousness of the actual burden on First

Amendment rights." *Doe v. Reed*, 561 U.S. 186, 196 (2010) (internal quotations and

citations omitted).

In ballot-measure cases, the government's traditional interests in "facilitating the

detection of violations of contribution limitations" and deterring *quid pro quo* corruption

do not apply. *Sampson,* 625 F.3d at 1256. Those concerns are unique to *candidate*

elections. *Id*. The remaining interest, which does apply here, is "the public interest in

knowing who is spending and receiving money to support or oppose a ballot issue[.]"

*Id*. The outcome of this case hinges on the strength of that interest.

*Sampson* involved a group of neighbors in Parker North, Colorado, who opposed

a petition seeking to annex Parker North into the adjacent town of Parker. *Id*. at 1251.

Opponents of the annexation purchased "No Annexation" yard signs, mailed a

postcard to their neighbors, and discussed the annexation on the internet. *Id*. This

required them to spend more than $1,000. In order to intimidate and silence the group

of opponents, a pro-annexation resident accused them of violating Colorado's

campaign-finance laws. *Id*. Those laws required the annexation foes to register as an

issue committee, establish a segregated bank account, and submit regular reports to the

Secretary of State because the group had exceeded the state's $1,000 spending

threshold. In response to the complaint, the annexation opponents sued in federal court

under the First Amendment.  After losing in district court, the annexation opponents won in the Tenth Circuit.

As here, the government in *Sampson* claimed an informational interest in knowing who was opposing the annexation.  *Id*. at 1256.  The Court explained that the strength of the public's informational interest varies depending on the dollar amount in question.  It indicated that "expenditure[s] of tens of millions of dollars" would rise to the level of a strong informational interest.  *Id*. at 1261.  On the other hand, the $1,000 expenditures at issue in *Sampson* amounted to an informational interest that is "minimal, if not nonexistent."  *Id*.  This minimal interest, the Court found, was not sufficient to overcome the obvious burdens that the law placed on opponents of the annexation.  *Id*.  The *Williams* court expanded on this further, holding that "at a $3,500 contribution level, we cannot under *Sampson*'s reasoning characterize the disclosure interest as substantial."  *Williams*, 815 F.3d at 1278.

The Santa Fe ordinance is triggered by expenditures of $250 or more, and it applies to all contributions, even those as small as one cent.  Santa Fe, N.M., City Campaign Code § 9-2.6(A) (requiring a list of "all" contributions, with no stated minimum).  Because this threshold is significantly lower than the amounts at issue in *Sampson* ($1,000) and *Williams* ($3,500), the public's informational interest in these

16

expenditures and contributions can only be classified as "minimal or non-existent."  As

the *Sampson* court noted:

> We do not attempt to draw a bright line below which a ballot-issue
> committee cannot be required to report contributions and expenditures.
> The case before us is quite unlike ones involving the expenditure of tens of
> millions of dollars on ballot issues presenting complex policy proposals.
> We say only that Plaintiffs' contributions and expenditures are well below
> the line.

> *Id*. at 1261 (internal quotations and citation omitted).

### 1.     A "minimal or non-existent" governmental interest should never be sufficient to justify impinging on First Amendment rights.

The First Amendment does not allow the government to regulate speech based

on minimal or non-existent interests.  *See, e.g., Frazier v. King*, 873 F.2d 820, 826 (5th Cir.

1989) ("minimal interest" in preventing disruption among inmates insufficient to

overcome nurse whistleblower's interest in exposing unethical medical practices);

*Cummings v. Hampton*, 485 F.2d 1153, 1155 (9th Cir. 1973) ("minimal interest" in

knowing whether physicians belong to the Communist Party insufficient to overcome

physicians' First Amendment right to privacy).  Yet that is exactly what is happening

here.  The City claims "the public's right to know how political campaigns are financed

far outweighs any right that this matter remain secret and private," but this is directly

contrary to what the Tenth Circuit has said about disclosure.  (SOF ¶ 45).  The public's

"informational interest" in knowing the donors of every non-profit that spends $250 on

17

a ballot measure is, *at best*, minimal.  That should never be sufficient to justify violating the First Amendment rights of non-profit groups and their donors, regardless of how small or large the burden on those groups happens to be.

      **2.**      **Even if a "minimal or non-existent" interest could justify violating First Amendment rights in some cases, this is not such a case.**

Plaintiff has been unable to identify a single case where a court has held that a minimal or non-existent governmental interest was sufficient to uphold an intrusion on First Amendment rights.  However, even if such a case exists, *Sampson* and *Williams* instruct us to weigh that interest against the burdens placed on non-profits and their donors.  In *Sampson*, the Court examined the burdens that the registration and reporting requirements placed on the plaintiffs.  Specifically, it identified, as significant burdens, "the many campaign financial-disclosure requirements set forth in Colorado's constitution," the costs ($50 per day) of failing to comply with the laws, the expense of hiring counsel to ensure compliance, and "the burden on Plaintiffs of time, energy, and money to review the law themselves and to take off work to attend the hearing on the complaint against them."  625 F.3d at 1259-60.

Santa Fe's law certainly imposes all of these burdens on the Foundation.  *See, e.g.,* SOF ¶¶ 3–4 (reporting) and SOF ¶ 8 ($500 penalties per day).  However, the larger question this case presents regards the burden of disclosing the identities and

occupations of the Foundation's donors.  To understand the magnitude of this burden, *Williams* is more instructive, because its facts are so similar to those here.

In *Williams*, the state of Colorado attempted to require the non-profit Coalition for Secular Government to register as an issue committee.  815 F.3d at 1269.  The alleged basis for needing to register was a 34-page policy paper the group published each year that a so-called "personhood amendment" was put on the state ballot.  *Id*.  One sentence of the paper urged voters to reject the amendment.  *Id*.  Colorado claimed that the publication of this policy paper triggered the state's issue-committee reporting requirements because printing and distributing the policy paper exceeded the state's $3,500 spending threshold.  *Id*. at 1275.  Among other things, these reporting requirements mandated that the Coalition "report to the appropriate officer [its] contributions received, including the name and address of each person who has contributed twenty dollars or more; expenditures made, and obligations entered into by the committee[.]"  *Id*. at 1271.

In challenging the requirements under the First Amendment, the Committee showed that the disclosure requirements placed an undue burden on it and its supporters, relative to any informational interest the disclosures might serve.  *Id*. at 1278-79.  The Tenth Circuit agreed.  It struck down the requirement, holding that "the burden of asking for personal information of $20-contributors is substantial.  Gaining

19

the necessary information from these contributors might well result in fewer contributors willing to support an issue committee's advocacy." *Id*. at 1279.

Although it did not expressly say so, the *Williams* court was following a line of reasoning adopted by the Supreme Court in *National Ass'n for the Advancement of Colored People v. Alabama*, 357 U.S. 449 (1958). In *NAACP*, the Court ruled that the attorney general of Alabama could not demand the identities of supporters of the Association. *Id*. at 466. The government argued that it needed the names of supporters to determine whether the group was required to register as a corporation in the state. *Id*. at 464. This argument was plainly specious, given that the Association admitted that it was doing business in the state and had already agreed to submit to the remaining registration requirements. *Id*. at 464-65. In this sense, *NAACP* was an easy case. But the Court used the case to make a strong statement about the rights of donors and non-profits to associate anonymously. There is a "vital relationship," the Court unanimously recognized, "between freedom to associate and privacy in one's associations." *Id*. at 462.

Privacy is an important associational interest under the First Amendment because being forced to publicly reveal a non-profit's donors exposes those donors to potential intimidation and harassment, and that makes them less likely to support a given group or cause. "It is not sufficient to answer, as the State does here, that

20

whatever repressive effect compulsory disclosure [has on the Association] follows not from state action but from private community pressures. The crucial factor is the interplay of governmental and private action[.]."   *Id*. at 463.

It is true that the pressures faced by non-profits and their donors are different today than they were at the time *NAACP* was decided.  The threat of serious physical violence is, today, less immediate.  But the risk of retaliation is nevertheless significant. People are frequently subjected to harassment, job loss, doxxing, and other harms on the basis of their ideological beliefs.  *See, e.g., Americans for Prosperity Found. v. Harris*, 182 F. Supp. 3d 1049, 1055-56 (C.D. Cal. 2016) (documenting extensive harassment and intimidation, including death threats, by ideological opponents); *Planned Parenthood Golden Gate v. Superior Court*, 83 Cal. App. 4th 347, 363 (2000) (group seeks identities of Planned Parenthood staff in order to picket their homes); U.S. House of Representatives, Comm. On Oversight & Gov't Reform, The Internal Revenue Service's Targeting of Conservative Tax-Exempt Applicants: Report of Findings for the 113th Congress[2] at i-ii, (Dec. 23, 2014); Gigi Brienza, *I Got Inspired. I Gave. Then I Got Scared*,[3] Washington Post, July 1, 2007.

---

[2] *Available at* http://oversight.house.gov/wp-content/uploads/2014/12/December-2014-IRS-Report.pdf

[3] *Available at* http://www.washingtonpost. com/wp-dyn/content/article/2007/06/29/AR2007062902264.htm

Sometimes people choose to publicly reveal their identities and accept the consequences that may follow, as on Twitter or other forms of social media.  But *choosing* to reveal one's beliefs is a far cry from having them involuntarily revealed as part of a mandatory government disclosure order.  Courts have long recognized that being involuntarily stripped of one's anonymity is a significant First Amendment injury.  *See, e.g., McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341-42 (1995) ("The decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible."); *Talley v. California*, 362 U.S. 60, 64 (1960) ("The obnoxious press licensing law of England, which was also enforced on the Colonies was due in part to the knowledge that exposure of the names of printers, writers and distributors would lessen the circulation of literature critical of the government."); *Delaware Strong Families v. Denn*, 136 S. Ct. 2376, 2377 (2016) ("Given the specter of these First Amendment harms [economic reprisal, harassment, and intimidation], a State's purported interest in disclosure cannot justify revealing the identities of an organization's otherwise anonymous donors.") (Thomas, J., *dissenting from denial of certiorari*).

3. **As the Tenth Circuit recognizes, *Doe v. Reed* strengthens the conclusion that the government's informational interest is minimal.**

In *Doe v. Reed*, the Supreme Court affirmed a law that required disclosure of signatories to referendum petitions.  561 U.S. 186 (2010).  However, despite *Reed*'s seeming endorsement of disclosure, *Sampson* distinguished that holding from cases where the supporters of ballot-measure campaigns face significant burdens.  625 F.3d at 1259.  In *Doe*, the Supreme Court "relied on the utility of disclosure in preserving the integrity of the electoral process," *not* "on the State's asserted interest in providing information to the electorate about who supports the petition."  *Id*.

This information/integrity distinction is pivotal.  When gathering referendum petitions, the government must be able to verify that the signatures belong to individuals who are authorized, by law, to sign a petition and have their signatures counted.  *Reed*, 561 U.S. at 221 ("When a Washington voter signs a referendum petition subject to the PRA, he is acting as a legislator.").  Without this verification, petitioners could simply claim to have gathered the requisite number of signatures without any verification being possible.

But speech *about* ballot measures is very different.  A website or YouTube video is not a structural or legal component of the electoral process and does not harm the integrity of that process.  Speech about a measure can certainly inform and influence people, but it plays no legal role in the outcome, whereas signatures to a petition often

determine the outcome.  Indeed, the City has not claimed that protecting the *integrity* of the electoral process is an interest that the donor-disclosure law advances.  Unlike signatures on a referendum—which have legal consequences—speech about a ballot measure is just speech.  The City can only assert an inchoate "informational interest" in knowing who is (indirectly) funding the speech—and, as shown above, that interest is minimal.

Thus, despite any superficial resemblance between *Doe* and this case, the government's interest in compelling disclosure here is completely distinguishable.  As the Tenth Circuit correctly observed, it is significant that the Supreme Court did not accept the government's asserted informational interest, and instead relied on electoral process integrity to uphold disclosure in that context. *Sampson*, 625 F.3d at 1259.

**B.     The Donor Disclosure Ordinance violates Article II, § 17 of the New Mexico Constitution.**

Even if the Court finds—which it should not—that the Donor Disclosure Ordinance does not violate the First Amendment, the law is nevertheless unconstitutional under Article II, § 17 of the New Mexico Constitution.  "[S]tates have inherent power as separate sovereigns in our federalist system to provide *more* liberty than is mandated by the United States Constitution[.]"  *Morris v. Brandenburg*, 356 P.3d 564, 572 (N.M. App. 2015) (internal quotation marks omitted, emphasis in original).

Courts "are not bound to give the same meaning to the New Mexico Constitution as the United States Supreme Court places upon the United States Constitution[.]"  *Id*.

The New Mexico free-speech clause provides that, "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press."  N.M. CONST., art. II, § 17.  As the Court of Appeals observed in *City of Farmington v. Fawcett*, "the authors of the New Mexico Constitution were aware of the language of the First Amendment to the United States Constitution and consciously chose to adopt a different formula."  843 P.2d 839, 847 (N.M. App. 1992).

*Fawcett* clarified that the New Mexico Constitution is indeed more protective of speech than the federal.  *Id*. at 848 (agreeing with appellant's argument that the New Mexico Constitution "offers more protection than the First Amendment").  The court struck down a ban on adult bookstores by finding that the standard for "obscenity" was more difficult to satisfy under Article II, § 17 than the First Amendment standard. Rather than adopting the federal standard (that allegedly obscene materials must be "acceptable" under community standards to enjoy First Amendment protection), the Court held that the New Mexico Constitution requires allegedly obscene materials to be "intolerable" to the community before they can be restricted.  *Id*. at 848.  "We … believe that the tolerance standard better protects freedom of expression … and is the only

standard which can truly satisfy Article II, Section 17 of the New Mexico Constitution."
*Id*. at 849 (internal quotations and citation omitted).

This more-protective view of the New Mexico Constitution is consistent with the plain language of the state's free-speech clause.  This clause protects the right of the Foundation to "speak, write and publish" about municipal ballot measures, and it restricts the City's ability to "restrain or abridge" anything the Foundation may wish to say.  NM Const., art. II, § 17.  The Donor Disclosure Law requires the Foundation to disclose its supporters' identities and occupations to the City any time it spends more than $250 to communicate with voters about a ballot measure.  SOF ¶¶ 1, 4.  Because, as discussed above, that disclosure burdens both the Foundation and its supporters, that disclosure requirement is a "restraint" on the Foundation's ability to "speak, write, or publish" its views.  The requirement is therefore unconstitutional under Article II, § 17.

## IV. CONCLUSION

As it applies to speech about ballot measures, Santa Fe's law is unconstitutional. The City's asserted informational interest—as in *Sampson* and *Williams*— is minimal or nonexistent.  This weak interest is insufficient to overcome the significant harms that compelled disclosure places on non-profits and their donors.

The law plainly violates the First Amendment to the U.S. Constitution, and Article II, § 17 of the New Mexico Constitution, and the City should therefore be

permanently enjoined from demanding the identities of donors to groups speaking about ballot measures.

WHEREFORE, Plaintiff Rio Grande Foundation asks this Court to:

(1) grant Plaintiff's Motion for Summary Judgment;

(2) declare that Santa Fe City Campaign Code § 9-2 violates the First Amendment to the United States Constitution to the extent that it requires non-profit groups to disclose their donors to the City when those groups spend more than $250 to communicate with voters about a ballot measure;

(3) declare that Santa Fe City Campaign Code § 9-2 violates Article II, § 17 of the New Mexico Constitution to the extent that it requires non-profit groups to disclose their donors to the City when those groups spend more than $250 to communicate with voters about a ballot measure;

(4) permanently enjoin Defendants' enforcement of Santa Fe City Campaign Code § 9-2 against non-profit groups that are communicating about ballot measures; and,

(5) grant such other relief as is just and proper.

**RESPECTFULLY SUBMITTED** this 11th day of June, 2018 by:

/s/ Matthew R. Miller
*Matthew R. Miller
*Jonathan Riches
**Scharf-Norton Center for Constitutional Litigation
at the GOLDWATER INSTITUTE**

Colin L. Hunter
Jordy L. Stern
**BARNETT LAW FIRM**

*Attorneys for Plaintiff*

*Motion for admission *pro hac vice* pending.

## CERTIFICATE OF SERVICE

Document Electronically Filed and Served by ECF this 11th day of June, 2018 to:

Marcos D. Martínez
Assistant City Attorney
City of Santa Fe
200 Lincoln Avenue
P.O. Box 909
Santa Fe, New Mexico 87504-0909
mdmartinez@ci.santa-fe.nm.us

Tara Malloy
Megan McAllen
Campaign Legal Center
1411 K St. NW, Ste. 1400
Washington, DC  20005
tmalloy@campaignlegalcenter.org

/s/ Kris Schlott
Kris Schlott, Paralegal