# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

|  |  |  |
|---|---|---|
| RIO GRANDE FOUNDATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:17-cv-00768-JCH-CG |
| v. | ) | |
| | ) | |
| CITY OF SANTA FE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Tara Malloy, DC Bar No. 988280*
Megan P. McAllen, DC Bar No. 1020509*
CAMPAIGN LEGAL CENTER
1411 K Street, NW, Suite 1400
Washington, D.C. 20005
Telephone: (202) 736-2200
tmalloy@campaignlegalcenter.org,
mmcallen@campaignlegalcenter.org

*Appearing pro hac vice

CITY ATTORNEY
CITY OF SANTA FE, NEW MEXICO
Marcos D. Martínez
Assistant City Attorney, City of Santa Fe
200 Lincoln Avenue
P.O. Box 909
Santa Fe, New Mexico 87504-0909
Telephone: (505) 955-6967
mdmartinez@ci.santa-fe.nm.us

*Counsel for Defendants*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................. iii

**OBJECTIONS AND COUNTERSTATEMENTS OF FACT** .................................................1

**ARGUMENT** ...........................................................................................................................4

I.   Tenth Circuit Precedents Permit the Disclosure Santa Fe Requires ...................................6

    A.   The informational interest here is not "minimal" or "nonexistent" .............................6

    B.   *Sampson* and *CSG* were based on findings about the particular burdens that a
         particular PAC disclosure regime placed on particular groups .................................10

II.  RGF Cannot Rely on the As-Applied "Harassment" Exemption to Prevail on its
     Facial Claims Here...........................................................................................................12

    A.   *NAACP v. Alabama* did not create a freestanding First Amendment right to speak
         anonymously in elections based on bare speculation about possible "donor chill." ...13

    B.   RGF has not adequately stated a claim for an as-applied "harassment" exemption,
         and most certainly has not substantiated one..............................................................15

III. Even if Subsection 9-2.6 Was Comparable to the Colorado Law Reviewed in *Sampson*
     and *CSG*, RGF Has Not Laid the Foundation Necessary to Apply Those Decisions to
     RGF, Much Less to "Nonprofits" as a Class ...................................................................18

    A.   The Court should examine this claim facially—and reject it .....................................18

    B.   If the Court does entertain RGF's as-applied claim, that claim also fails ..................21

IV.  RGF's State Constitutional Arguments Are Unavailing...................................................22

**CONCLUSION** .....................................................................................................................25

# TABLE OF AUTHORITIES

**Cases:**

*American Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183 (D.N.M. 2010)........................................................................................24, 25

*Americans for Prosperity Found. v. Harris*, 182 F. Supp. 3d 1049 (C.D. Cal. 2016) ("*AFPF*")..................................................................................15, 16, 17

*Best v. Marino*, 404 P.3d 450 (N.M. Ct. App. 2017)................................................24

*Buckley v. Valeo*, 424 U.S. 1 (1976) ................................................................. *passim*

*Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290 (1981) ("*CARC*").............. 17-18

*Citizens United v. FEC*, 558 U.S. 310 (2010)...................................................... *passim*

*City of Albuquerque v. Pangaea Cinema LLC*, 284 P.3d 1090 (N.M. Ct. App. 2012)............23, 24

*City of Farmington v. Fawcett*, 843 P.2d 839 (N.M. Ct. App. 1992)......................................23, 24

*Coal. for Secular Gov't v. Williams*, 815 F.3d 1267 (10th Cir. 2016) ("*CSG*")................... *passim*

*Ctr. for Individual Freedom, Inc. v. Madigan*, 697 F.3d 464 (7th Cir. 2012) .................13, 14, 15

*Family PAC v. McKenna*, 685 F.3d 800 (9th Cir. 2012) .......................................................13, 14

*First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765 (1978) ...........................................................18

*Human Life of Wash. v. Brumsickle*, 624 F.3d 990 (9th Cir. 2010)...............................................19

*Indep. Inst. v. Williams*, 812 F.3d 787 (10th Cir. 2016) ...............................................................10

*John Doe No. 1 v. Reed*, 561 U.S. 186 (2010) .....................................................................11, 19

*Justice v. Hosemann*, 771 F.3d 285 (5th Cir. 2015) ...............................................................19, 20

*Kansas Judicial Review v. Stout*, 519 F.3d 1107 (10th Cir. 2008) ...............................................25

*McConnell v. FEC*, 540 U.S. 93 (2003)........................................................................9, 12, 14, 18

*Montoya v. Herrera*, 276 P.3d 952, 958 (N.M. 2012) ...................................................................24

*Morris v. Brandenburg*, 356 P.3d 564 (N.M. Ct. App. 2015) .......................................................22

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ................................................ *passim*

*Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1 (D.C. Cir. 2009) (en banc)........................................8, 9

*Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377 (2000) ...................................................................8

*N.M. Right to Choose/NARAL v. Johnson*, 975 P.2d 841 (N.M. 1988) .........................................23

*N.M. Youth Organized v. Herrera*, No. 08-cv-1156-JCH/WDS, 2009 WL 10681497
(D.N.M. Aug. 3, 2009) ("*NMYO*"), *aff'd*, 611 F.3d 669 (10th Cir. 2010)................................4

*N.Y. State Club Ass'n v. City of N.Y.*, 487 U.S. 1 (1988)................................................5

*Paris Adult Theatre I v. Slaton*, 413 U.S. 49 (1973)...................................................8

*Planned Parenthood Golden Gate v. Superior Court*, 83 Cal. App. 4th 347 (2000) ..............16, 17

*ProtectMarriage.com v. Bowen*, 830 F. Supp. 2d 914 (E.D. Cal. 2011) ......................................15

*Sampson v. Buescher*, 625 F.3d 1247 (10th Cir. 2010) ........................................................ *passim*

*State v. Ongley*, 882 P.2d 22 (N.M. Ct. App.1994) ..........................................................24

*United States v. Harriss*, 347 U.S. 612 (1954) ...........................................................8, 9, 13

*Williams v. Superior Court*, 398 P.3d 69 (Cal. 2017).........................................................16

*Worley v. Fla. Sec'y of State*, 717 F.3d 1238 (11th Cir. 2013)..................................19, 20

**Santa Fe City Code of Ordinances:**

SFCC § 6-16.7(B)(2) ..............................................................................................2

SFCC § 9-2.2 ..............................................................................................6, 7

SFCC § 9-2.2(B) ..............................................................................................6

SFCC § 9-2.2(C) ..............................................................................................6

SFCC § 9-2.2(D) ..............................................................................................7

SFCC § 9-2.3(M) ..............................................................................................1

SFCC § 9-2.6 .......................................................................................... *passim*

SFCC § 9-2.6(A) ..............................................................................................12

**Other Materials:**

Pet'r Br., *NAACP v. Ala.*, 357 U.S. 449 (1958), 1957 WL 55387 ..................................15

N.M. Att'y Gen., *Charity Detail: Rio Grande Foundation*, https://secure.nmag.gov/
CharitySearch/CharityDetail.aspx?FEIN=85-0468446 (last visited July 16, 2018)...............21

Charitable Solicitations Act, NMSA 1978 § 57-22-1 *et seq.*........................................21

iv

## OBJECTIONS AND COUNTERSTATEMENTS OF FACT

Defendants the City of Santa Fe ("City" or "Santa Fe") and the Ethics and Campaign Review Board ("ECRB") agree that this case can be resolved on summary judgment. As the City discusses at length in its summary judgment filing (Dkt. 39) ("SF Br.") and herein, Plaintiff Rio Grande Foundation ("RGF") has framed its case as a facial challenge to subsection 9-2.6 of the Santa Fe Campaign Code ("SFCC") insofar as it requires disclosure in connection to ballot measure elections. *See* RGF Br. at 1 (Dkt. 40). On that understanding, the City believes that the primary disputes to be resolved are legal, not factual. But the City does object to several specific characterizations within RGF's statements of fact:

First, RGF makes several misleading claims about the scope of the ordinance, repeatedly suggesting that it covers any communication "about" a ballot proposition, *see, e.g.*, RGF Facts ¶¶ 1, 3, 47, 48; specifically applies to "nonprofits," *see, e.g.*, *id.* ¶¶ 1-11, 45; or requires groups to provide, without restriction, a "list of donors," *see, e.g.*, *id.* ¶¶ 5, 27. But subsection 9-2.6 applies to *any* "person or entity" regardless of organizational form,[1] and covers only "expenditures"—*i.e.*, the "payment or transfer of anything of value" for the purpose of supporting or opposing a ballot proposition—made for communications that either contain "express advocacy" or refer to a "clearly identifiable" proposition within 60 days of the election. SFCC § 9-2.6 (emphasis added); *id.* § 9-2.3(M) (defining "expenditure"). And by its express terms, it requires that groups report only those "contributions received for the purpose of supporting" the relevant expenditures, *id.* § 9-2.6; the City rejects RGF's contention (at ¶ 9) that this language is "ambiguous."

---

[1] Even if true, RGF's unsupported assertions (Facts ¶¶ 7, 18) about what is "legally required" of "most 501(c)(3)s" are not relevant.

1

The City also disputes RGF's exaggerated account of the enforcement proceedings that gave rise to this case, such as its suggestion (at ¶ 35) that the ECRB's April 19 meeting was improper because RGF "was *not* present." There, the Board only considered whether the allegations were sufficient to proceed to the merits; it would have been required to dismiss the complaint if it did not state a violation or if it "was filed solely to harass or intimidate." Rule (D)(4)(c), ECRB Rules of Organization and Practice (attached hereto as Exhibit V). And the "ordeal" of the April 24 hearing, RGF Facts ¶ 49, was not "due to" RGF's speech, but to its refusal, after receiving written notice, to comply with a disclosure requirement. Nor was RGF "prosecut[ed] for its speech," *id.* ¶ 51; the Campaign Code does not prescribe criminal penalties. Likewise irrelevant is RGF's invocation (at ¶ 8) of SFCC § 6-16.7(B)(2), which sets a $500 maximum fine that the ECRB *may* assess per violation if it determines, after a hearing, that the Code of Ethics, the Campaign Code, or the Public Campaign Code was violated. No fines were assessed here. *Cf. id.* § 9-2.10 (authorizing clerk to assess $100 fine for late filings).

RGF's account of the "burdens" on its donors likewise resorts to embellishment and speculation. For example, RGF claims (at ¶ 43) that its disclosure report included the group that contributed the $7,500 website and video "as well as the identities of individual donors," but other than the Interstate Policy Alliance, RGF reported only *one* other donor, an individual who gave $250. Ans. Ex. 1 (Dkt. 12-1). And RGF cites (at ¶ 50) *its own* "concern" that its donors "fear public harassment," but there is nothing to suggest that its *donors* have ever experienced or expressed such fears, and the record actually indicates the opposite. *See* SF Facts ¶¶ 38-40.

Several of RGF's "facts" about the nature of its "No Way Santa Fe" campaign are also contradicted by the record here. First, RGF suggests (at ¶¶ 29, 41) that its video and website should

be valued at $0, but according to its own report, these materials—which were publicly identified as RGF's "project," bear RGF's logo, and were produced pursuant to an "ongoing arrangement" with the Interstate Policy Alliance—had a value of $7,500. SF Facts ¶¶ 54, 65. Second, RGF's claim (at ¶ 33) that it "had refrained from engaging in further communications about the soda tax" by April 20 is contradicted by its disclosure statement, which reports payments for Facebook ads well after that date. And third, RGF portrays (at ¶¶ 12-24) the materials as generically "about" the soda tax, but all of the communications contained either express advocacy or its functional equivalent; RGF was not merely "educat[ing] voters *about* the soda tax," *id.* ¶ 43 (emphasis added), but expressly advocating that they vote against it. The record demonstrates, and RGF does not dispute, that its campaign had an electoral purpose.[2]

Finally, to the extent that RGF seeks (at ¶ 23) to relitigate the merits of the soda tax, those "facts" are immaterial and the City takes no position on them either way. However, the City notes that factual claims about ballot measures are often hotly contested on all sides, and that was certainly true of the soda tax. Disclosure enables voters to weigh the source and credibility of such messages. SF Facts ¶¶ 9, 41-45. Therefore, the City strongly denies that it "has no basis for claiming that the public has a right to know who gives to support speech about ballot measures." RGF Facts ¶ 47. That is a legal premise and is not in dispute. Beyond the decades of judicial precedent affirming the importance of such an informational interest, Santa Fe's policy judgments

---

[2]   For example, one of its Facebook ads directing users to the No Way Santa Fe website reached 17,378 people through paid promotion. Def. Ex. S (Dkt. 39-5 at 112). And RGF printed enough express advocacy mailers (5,000) to reach at least one of every four voters in the 2017 electorate— or more, if sent to households with multiple voters. *See* RGF Ex. 16 (Dkt. 40-1 at 28) (noting that after a "record 37.6 percent of registered voters turned out for the election," "[t]he final tally was 11,533 against the soda tax and 8,382 in favor").

were well founded and supported by the legislative record. SF Facts ¶¶ 15-29; *see also* Decl. of Carol Romero-Wirth ¶¶ 8-11 (attached hereto in further support of the City's claimed interest).

## ARGUMENT

As this Court has recognized, "[n]arrowly drawn disclosure requirements capturing campaign-related spending are unquestionably constitutional." *N.M. Youth Organized v. Herrera*, No. 08-cv-1156-JCH/WDS, 2009 WL 10681497, at \*13 (D.N.M. Aug. 3, 2009) ("*NMYO*"), *aff'd*, 611 F.3d 669 (10th Cir. 2010). So, too, is the Santa Fe disclosure requirement at issue here.

This case does not involve the imposition of a comprehensive "committee" reporting regime on small groups, like the law reviewed in *Sampson v. Beuscher*, 625 F.3d 1247 (10th Cir. 2010) and *Coalition for Secular Gov't v. Williams*, 815 F.3d 1267 (10th Cir. 2016) ("*CSG*"), or on groups that lack the major purpose of electioneering, like the law reviewed in *NMYO*; this case does not involve the imposition of political committee status *on anyone*. Instead, subsection 9-2.6 is event-driven and requires only limited donor disclosure: whenever a person or entity spends $250 or more to support or oppose a ballot proposition, the person must disclose that spending and the donors who contributed for the purpose of funding it. Although RGF tries to recast this modest disclosure provision as an insidious government dragnet targeting "nonprofits" and forcing them to turn over their donor lists, the ordinance neither singles out "nonprofits," nor forces them to provide "disclosure of every organizational contribution and expenditure," *NMYO*, 2009 WL 10681497, at \*12. Its modest event-driven reporting is materially distinct from the political committee disclosure regimes at issue in *NMYO*, *Sampson*, and *CSG*.

RGF's challenge hinges not only on "conflat[ing] the two types of laws," *id.*, but also on confounding the as-applied relief granted in *Sampson* and *CSG* with the broad facial relief plaintiff

seeks here. RGF insists that "the outcome of this case is controlled by" the as-applied holdings in *Sampson* and *CSG*, *see* RGF Br. at 14, 14-24, but asks the Court to find that Santa Fe's ordinance is *facially* unconstitutional. RGF's conflation of its facial and as-applied claims saves neither.

First, although RGF's case relies almost exclusively on *Sampson* and *CSG*, neither provided the kind of relief that RGF seeks here; indeed, both cases specifically declined to consider a facial challenge to Colorado's $200 issue committee registration threshold. The decisions analyzed only the application of Colorado's "overly burdensome regulatory framework" to groups spending $800 and $3,500; they say nothing about the facial validity of ballot measure disclosure.

Second, RGF does not even attempt to engage in the analysis required for a First Amendment facial challenge, namely showing that "a substantial number of instances exist in which the [law] cannot be applied constitutionally." *N.Y. State Club Ass'n v. City of N.Y.*, 487 U.S. 1, 14 (1988). Instead it claims, incorrectly, that the Tenth Circuit found the informational interest "weak" or "nonexistent" (RGF Br. at 26) with respect to all ballot measure disclosure as a matter of law, and *ipso facto* RGF's "speech and privacy interests" (*id.* at 14) categorically outweigh the public's interest in knowing who funds ballot measure advocacy in Santa Fe elections. Even if this were an accurate statement of circuit precedent—and it is not—it does not constitute a valid facial challenge to *Santa Fe's* law or cast doubt on *its* plainly legitimate sweep.

Third, RGF offers no evidence whatsoever that disclosure will subject its donors to "threats, harassment, or reprisals," and thus cannot claim an as-applied exemption under *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958). The Court should not indulge RGF's attempt to claim this exemption by invoking the notional chilling effect of disclosure without producing a shred of evidence to substantiate it.

Finally, RGF—assuming it even seeks as-applied relief like that granted in *Sampson* and *CSG*—offers no particularized facts *about RGF* or its intended activities upon which such as-applied relief could be based. RGF has specifically disclaimed anything but prospective relief. To that end, it has communicated its general intent to advocate for or against future Santa Fe ballot measures, both by spending unspecified amounts in excess of the $250 disclosure threshold and by soliciting contributions of unspecified amounts for that purpose. This is simply not an adequate foundation upon which a court can analyze an as-applied claim.

I.      **Tenth Circuit Precedents Permit the Disclosure Santa Fe Requires.**

        **A.  The informational interest here is not "minimal" or "nonexistent."**

As the City has already discussed at length, the public's informational interest in knowing who finances the support or opposition of City ballot measures is not a matter of dispute. *See* SF Br. at 17-22, 24-26. The Supreme Court and this circuit have consistently affirmed that such an interest exists and can be used to justify electoral disclosure laws.

And that is precisely the interest upon which Santa Fe based its 2015 amendments to subsection 9-2.6, which were intended to further the Campaign Code's articulated purposes of securing "full[ ] disclos[ure]" of "political campaign contributions and expenditures" and avoiding "secrecy in the sources and application of such contributions." SFCC § 9-2.2(B). These purposes reflect the City Council's legislative judgment that "the public's right to know how political campaigns are financed far outweighs any right that [they] remain secret and private," *id*. § 9-2.2(C)—a judgment that was buttressed in 2015 by universal public support for enhanced transparency. SF Facts ¶¶ 17-18, 24, 27. There is no question that Santa Feans have an important interest in learning who supports and opposes ballot measures.

To claim that *Sampson* and *CSG* suggest the opposite—that the City's informational interest is *per se* "weak" or "nonexistent," RGF Br. at 26—requires disassociating those decisions from their facts. In neither case did the court suggest that Colorado needed to justify the *existence* of its informational interest. In *Sampson*, for instance, the court "assum[ed] that there is a legitimate public interest" in the disclosure required by Colorado's issue committee reporting regime; it just found the interest "attenuated" where "the organization is concerned with only a single ballot issue" and "the contributions and expenditures are slight." 625 F.3d at 1259. That conclusion was thus made in the context of a specific contemplated application of the reporting regime to a specific group.[3] And in *CSG*, the court likewise emphasized that "there is an informational interest in [CSG]'s financial disclosures," 815 F.3d at 1278, but found the interest "minimal" as to a group that planned to limit its spending against a statewide ballot measure, and indeed its entire budget, to $3,500. *Id.* at 1272, 1277 & n.5.

RGF attempts to import this fact-specific analysis into this case by arguing that Santa Fe's $250 threshold is "significantly lower than the amounts at issue in *Sampson* ($1,000) and [*CSG*] ($3,500)," and that consequently Santa Fe's informational interest is even more "minimal." RGF Br. at 16-17. Even the premise of this argument is wrong. The $1,000 and $3,500 figures in those cases were the plaintiffs' overall expenditures; the *threshold* at issue under Colorado law was $200. 815 F.3d at 1271. Here, by contrast, RGF devoted almost $10,000 to advocacy opposing the soda

---

[3]   *Sampson* was also concerned about a mismatch between the law's stated purposes, which emphasized "large" expenditures on behalf of candidates, and the extensive reporting it required of plaintiffs that "together spent less than $1,000." *Id.* at 1261. RGF incorrectly implies (at 11 n.1) that the City asserts a similar interest here, but as is clear from RGF's Exhibit 17 (Defs.' Resp. to Interrog. 1), the City is only claiming to rely on three of the Campaign Code's four generally applicable statements of purpose—not on subsection 9-2.2(D), which refers to candidate elections.

tax, *see infra* Part III.A, and its annual budget reaches well into the six figures. SF Facts ¶ 32.

More fundamentally, RGF's argument fails because it seeks to convert an as-applied judgment about Colorado's interest in disclosure from two specific, small-scale groups into a general rule about the government's interest in ballot measure disclosure on its face. This argument simply cannot be squared with the case law. The general validity of the informational interest need not be demonstrated anew in each successive disclosure case; it has long been recognized by the Supreme Court and this circuit, and the City was entitled to rely upon it in adopting the ordinance. Because the informational interest is so well established, the City's burden to provide additional or jurisdiction-specific evidence is light. *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000) ("The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised.").

In fact, the Supreme Court has never required the rigorous evidentiary showing that RGF demands to establish the basic legitimacy of an interest in electoral transparency. On the contrary, the Court has readily upheld state and federal laws in First Amendment cases, including challenges to electoral disclosure laws, based on "various unprovable assumptions" about the interests at stake. *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 61 (1973). In *Citizens United v. FEC*, for example, the Court treated the existence of the "informational interest" as self-evident, and found it "alone . . . sufficient to justify" the disclosure requirements in question. 558 U.S. 310, 369 (2010). Likewise, in upholding lobbying disclosure requirements in *United States v. Harris*, 347 U.S. 612 (1954), "the Court made no inquiry into whether the legislative record supported the determination that disclosure of who was endeavoring to influence Congress was 'a vital national interest.'" *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 16 (D.C. Cir. 2009) (en banc) (quoting

*Harriss*, 347 U.S. at 626). This is likely because, as the en banc D.C. Circuit noted, the interest does not "rest[] on 'economic' analysis that [i]s susceptible to empirical evidence," but instead represents a legislative judgment "that good government requires greater transparency." *Id.* The same principle obtains here: the City's interest in informing the electorate "is a value judgment based on the common sense of the people's representatives, and repeatedly endorsed by the Supreme Court as sufficient to justify disclosure statutes." *Id.* (citing *McConnell v. FEC*, 540 U.S. 93, 196 (2003); *Buckley v. Valeo*, 424 U.S. 1, 66-67 (1976); *Harriss*, 347 U.S. at 625-26).

But even assuming that Santa Fe is required to substantiate the underlying validity of the interest long recognized by the Supreme Court, the record confirms that its informational interest is well founded. The amendments to subsection 9-2.6 were adopted in response to widespread public concern about the growth of "dark money" campaign spending in City elections. *See* SF Facts ¶¶ 17-18, 24, 27. Support came from a diverse range of groups and individuals, from the Chamber of Commerce to Common Cause, all of whom called on the City to "ensure the public's right to know" by "increasing the extent to which there is disclosure of sources of outside funding." *Id.* ¶ 24. After comprehensively examining the problem, the ECRB and the City Council concluded that broadening the ordinance would help City voters make informed choices in elections. *Id.* ¶ 9; Miller Decl. ¶ 13. RGF's assertion that Santa Fe "has no basis" for its informational interest, *see* RGF Facts ¶ 47, is flatly contrary to the legislative record. Romero-Wirth Decl. ¶ 9 (observing that "Santa Feans strongly support the City's disclosure requirements and believe that disclosure allows them to more effectively exercise their right to vote and participate in political life").

More specifically, Santa Feans had an interest in knowing who funded RGF's "No Way Santa Fe" campaign. The effort had an explicit electoral purpose—"kill[ing]" the soda tax

measure. *See* SF Facts ¶¶ 44-45. All of the communications at issue evinced that purpose, *id.* ¶¶ 46-53, and fundraising appeals make plain that RGF solicited and received large contributions to achieve it, *id.* ¶¶ 44-45. City voters had an interest in knowing who was behind this effort.

**B. *Sampson* and *CSG* were based on findings about the particular burdens that a particular PAC disclosure regime placed on particular groups.**

The relevant question here is ultimately not whether an informational interest *exists*, but rather whether the interest outweighs any First Amendment burdens imposed by the challenged law. That is a tailoring question.

To answer it, courts assess whether the disclosure required under the law is tailored to achieve the government's informational interest without unduly burdening the regulated group. In *CSG*, therefore, the court considered whether Colorado could impose its "issue committee" regime on a specific "small-scale" plaintiff that expected to spend under $3,500 on a ballot measure. 815 F.3d at 1274 n.5. Although *CSG* ultimately found that Colorado's valid informational interest was outweighed by the "substantial burdens" it placed on a $3,500-budget group, the court recognized that it lacked the information needed to assess the tailoring of the law on its face. It thus declined to rule on the law's facial validity—although not without implying that its $200 threshold for committee status may pass muster if the requirements triggered by that status were less onerous. *Id.* at 1278 ("An issue committee raising or spending a meager $200 might still be required to disclose *limited* information without violating the First Amendment" (emphasis added)).[4]

---

[4] Even assuming that *CSG*'s as-applied analysis of a materially different disclosure regime could be mechanically extended to the review of RGF's facial claim here, a dollar-for-dollar comparison with *CSG* would not be warranted. Colorado's law applied to *statewide* elections, whereas "[s]maller elections"—like Santa Fe's—"can be influenced by less expensive communications." *Indep. Inst. v. Williams*, 812 F.3d 787, 797 (10th Cir. 2016). *See* SF Br. at 32-33.

*CSG*'s holding was thus confined to one question: whether Colorado could constitutionally apply its particular "onerous" issue committee reporting regime to CSG. "Voters *certainly* have an interest in knowing who finances support or opposition to a given ballot initiative," the court emphasized, "but for small-scale issue committees like [CSG], Colorado's onerous reporting requirements outweigh that informational interest." *Id.* at 1280 (emphasis added).

Here, by contrast, the plaintiff is not "small scale" and subsection 9-2.6's limited, event-driven reporting is not "onerous." And perhaps for that reason, RGF makes no serious attempt to engage in the kind of tailoring analysis employed in *Sampson* and *CSG*—nor could it.

Indeed, RGF suggests that the Court need not engage in a tailoring analysis *at all*. To pass muster under the exacting scrutiny test, as RGF acknowledges, "the strength of the governmental interest must reflect the seriousness of the *actual burden* on First Amendment rights." *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010) (emphasis added) (citation omitted). But because RGF assumes, incorrectly, that Santa Fe's interest is *per se* "minimal or nonexistent," it conveniently concludes that no further inquiry is required. *See* RGF Br. at 18 (positing that the disclosure required under subsection 9-2.6 would "violat[e] the First Amendment rights of nonprofit groups and their donors, *regardless of how small or large the burden on those groups happens to be*" (emphasis added)). RGF thus gives short shrift to both halves of the "exacting scrutiny" equation: first, by treating the "informational" interest as "minimal or nonexistent" as a matter of law; and second, by sidestepping the tailoring analysis and ignoring what the law actually requires.

As noted in *Sampson*, however, "not all burdens on freedom of association are unconstitutional." 625 F.3d at 1255. Any First Amendment burdens created by a disclosure law must be "balance[d]" against the strength of the interest in the information it requires, *CSG*, 815

11

F.3d at 1278—so even if the City's interest were deemed "minimal," it would still need to be weighed against the "actual burdens" imposed. And as the City has explained, any such "burdens" here, if they exist at all, are minimal in light of the law's careful tailoring. *See* SF Br. at 26-33.[5]

RGF makes no attempt to grapple with the weight of any "actual" burdens imposed by subsection 9-2.6, preferring to rest on hyperbole about the ECRB enforcement process that RGF set in motion by refusing to follow the law. But the upshot of this "ordeal"—where no fines were assessed and no speech was curtailed—was a letter of reprimand directing RGF to file a report as the law required. It did so, disclosing two donors in a 6-page report filed 44 days *after* the election, and neither RGF nor its donors suffered any apparent harm as a result.

In the meantime, as Election Day neared, Santa Feans were still in the dark. Like the plaintiffs in *McConnell v. FEC*, RGF "ignores the competing First Amendment interests of individual citizens seeking to make informed choices in the political marketplace," and fails to explain "how 'uninhibited, robust, and wide-open' speech can occur when organizations hide themselves from the scrutiny of the voting public." 540 U.S. at 197 (citation omitted).

## II.   RGF Cannot Rely on the As-Applied "Harassment" Exemption to Prevail on its Facial Claims Here.

As noted previously (*see* SF Br. at 33-35), the Supreme Court has recognized one basis for granting an as-applied exemption from a facially valid disclosure requirement. A group must make a particularized factual showing that the group or its donors would face a "reasonable probability"

---

[5]   As the City has already discussed at length, subsection 9-2.6 is event-driven, SF Br. at 27-31, requires minimal information to be reported, *id*. at 26-27, and limits donor disclosure to those contributors who gave for an electoral purpose, *id*. at 31-32. It also exempts communications made to or by the news media and expenditures for impartial candidate forums, shareholder/member communications, or "impartial voter guides." SFCC § 9-2.6(A). Each of these exceptions denotes precise tailoring.

of "threats, harassment, or reprisals if their names were disclosed." *Citizens United*, 558 U.S. at 370. RGF has not even attempted to make such a showing. Instead, RGF fuses this limited—and fact-specific—standard for an as-applied exemption with the analysis applicable to a facial claim. RGF thus asks this Court to strike down subsection 9.2-6 on its face based on the conclusory assertion that disclosure "exposes [a nonprofit's] donors to potential intimidation and harassment, and that makes them less likely to support a given group or cause." RGF Br. at 20. This claim conflates distinct legal issues, has no grounding in the record, and does not succeed.

### A. *NAACP v. Alabama* did not create a freestanding First Amendment right to speak anonymously in elections based on bare speculation about possible "donor chill."

According to RGF, requiring a nonprofit to disclose its donors inevitably "exposes those donors to potential intimidation and harassment," RGF Br. at 20—and under *NAACP v. Alabama*, this general speculation about harm is enough to outweigh the City's interest in informing voters about those who are spending money to sway their votes.

But general allegations of donor "chill" have never been sufficient to facially invalidate an otherwise constitutional political disclosure law. It is not that the courts have ignored the potential effects of disclosure on associational privacy: that is why they apply "exacting scrutiny" in the first place. *Buckley*, for example, observed that "[i]t is undoubtedly true that public disclosure of contributions" may "deter some individuals who otherwise might contribute." 424 U.S. at 68. In recognition of the potential for compelled disclosure to encroach on associational rights, the Court required such laws to withstand heightened review. *Id.* at 64. Nonetheless, it upheld the federal laws under challenge, concluding that disclosure "certainly in most applications appear[s] to be the least restrictive means of curbing the evils of campaign ignorance." *Id.*; *see also Family PAC v. McKenna*, 685 F.3d 800, 806-07 (9th Cir. 2012) (finding this burden "modest"); *Ctr. for*

13

*Individual Freedom, Inc. v. Madigan*, 697 F.3d 464, 482 (7th Cir. 2012) (same). Similarly, in *Harriss*, the Court acknowledged that "[h]ypothetical borderline situations are conjured up in which . . . persons choose to remain silent." 347 U.S. at 626. But it concluded that "[t]he hazard of such restraint is too remote to require striking down a statute which on its face is otherwise plainly within the area of [legislative] power and is designed to safeguard a vital interest." *Id.*

Thus, contrary to RGF's claims, the Supreme Court has not interpreted *NAACP* to strike down political reporting laws on their face based on general allegations of their chilling effects. *NAACP* has been found to provide only as-applied relief to those plaintiffs who can make a specific factual showing that its donors would face a "reasonable probability" of "threats, harassment, or reprisals if their names were disclosed." *Citizens United*, 558 U.S. at 370; *see also McConnell*, 540 U.S. at 198 (demanding specific showing of "reasonable probability" of harm); *Buckley*, 424 U.S. at 74 (same). If RGF actually means to suggest that *NAACP* stands for the proposition that *all* "nonprofit donors," whether today or in 1950s Alabama, face "pressures" entitling them to an exemption from disclosure, *see* RGF Br. at 21, the argument is badly misconceived. And the blanket statement that "[p]eople" are sometimes exposed to consequences "on the basis of their ideological beliefs," *id.*, provides grounds for neither as-applied nor facial relief.

Again, RGF purports to root its arguments in Tenth Circuit case law, suggesting (Br. at 20) that *CSG* was implicitly "following" *NAACP*. But *CSG* did not explicitly or tacitly rely on the reasoning in *NAACP* or other cases involving the as-applied harassment exemption. The plaintiff there made a particularized showing that Colorado's issue committee reporting regime was unduly burdensome as applied, in part because it had caused the group to lose donations, and the court assessed this showing as part of the overall balancing that "exacting scrutiny" demands. But *CSG*'s

14

discussion of the "burden" of donor loss did not purport to address whether these donors faced a reasonable probability of threats, harassments, and reprisals; the court engaged in no such analysis. *See* 815 F.3d at 1278-79 (discussing donor loss as part of the burden to be weighed against state's interest); *cf. Madigan*, 697 F.3d at 498-99 (same). *CSG* provides no basis for RGF's belief that its general claims of subjective "chill" entitle it to facial or as-applied relief under *NAACP*.

### B. RGF has not adequately stated a claim for an as-applied "harassment" exemption, and most certainly has not substantiated one.

RGF plainly "cannot in good conscience analogize [its] current circumstances to those of either the [Socialist Workers' Party] or the Alabama NAACP circa 1950." *ProtectMarriage.com v. Bowen*, 830 F. Supp. 2d 914, 928 (E.D. Cal. 2012). It has made no showing that it is likely to suffer any of the severe harms that warranted exemptions for those groups.[6]

Quite the opposite. RGF acknowledges that none of its contributors have ever been exposed to "harassment" for associating with RGF. SF Facts ¶ 39. It alleges that its donors "prefer" anonymity, but even that claim appears to be based entirely on RGF's own supposition, Compl. ¶ 62, and not on any donor requesting anonymity, SF Facts ¶ 38. RGF offers nothing that would support a properly particularized claim for an as-applied relief.

Instead, RGF simply states that "[p]eople," *in general*, "are frequently subjected to harassment, job loss, doxxing, and other harms on the basis of their ideological beliefs." RGF Br. at 21. Then it presents a grab bag of inapposite cases and articles that concern *other groups* and

---

[6] The NAACP's briefing stressed that it faced "an atmosphere of violent hostility" from state officials and the general public. Pet'r Br., *NAACP v. Ala.*, 357 U.S. 449 (1958), 1957 WL 55387, at *12-17 (recounting a "series of bombings and shootings"; "19 major acts of violence" in Montgomery; "9 bombings and 10 shootings"; "Ku Klux Klan activity, demonstrations, and cross burnings" across Alabama; and bombings of multiple churches and private residences).

*their* donors: (1) a district court decision, *Americans for Prosperity Found. v. Harris*, 182 F. Supp. 3d 1049 (C.D. Cal. 2016) ("*AFPF*"), *appeal docketed*, No. 16-55727 (9th Cir. May 18, 2016), granting an as-applied exemption after a weeklong trial based on the plaintiff's specific demonstration that disclosure exposed it to a "reasonable probability" of threats, harassment, and reprisals; (2) *Planned Parenthood Golden Gate v. Superior Court*, 83 Cal. App. 4th 347, 362-64 (2000), a case that was recently overruled by the California Supreme Court[7] involving the discoverability of information about a group's staff and volunteers under a *state* constitutional privacy right; (3) a congressional report detailing IRS oversight issues; and (4) a 2007 op-ed by someone whose donations to a presidential candidate apparently exposed her to threats and harassment from animal rights extremists who were subsequently imprisoned for their harassment.

This does not even begin to approach the type of particularized evidence that *Buckley* and *Citizens United* required for an as-applied disclosure exemption. In *Citizens United*, for instance, the Court rejected the generalized argument that "disclosure requirements can chill donations to an organization by exposing donors to retaliation"—the precise argument RGF makes here—because Citizens United had "identified no instance of harassment or retaliation." 558 U.S. at 370. This notwithstanding that Citizens United and its *amici* had pointed to harassment suffered by *other* groups, as RGF does here. *Id.* (rejecting evidence of "recent events in which donors to certain causes were blacklisted, threatened, or otherwise targeted" because Citizens United "offered no evidence that its members may face similar threats or reprisals"). And there, as here, the plaintiff's

---

[7]   In *Williams v. Superior Court*, 398 P.3d 69 (Cal. 2017) the state Supreme Court specifically rejected *Planned Parenthood*'s overly broad interpretation of the Privacy Initiative. *Id.* at 87 (holding that courts must "place the burden on the party asserting a privacy interest to establish its extent . . . and against that showing must weigh the countervailing interests" in disclosure).

claims were undercut by the fact that it had disclosed its donors in the past without incident. *Id*.

By contrast, in the cases RGF cites, each plaintiff showed or at least attempted to show a "reasonable probability" of "threats, harassment, or reprisals" specific to itself and its own donors. *See AFPF*, 182 F. Supp. 3d at 1055 ("During the course of trial, the Court heard ample evidence establishing that [AFPF], its employees, supporters and donors face public threats, harassment, intimidation, and retaliation once their support for and affiliation with the organization becomes publicly known."); *Planned Parenthood*, 83 Cal. App. 4th at 363 (noting evidence "pertaining to the parties" establishing "particularly strong" privacy interests of plaintiff's staff and volunteers).

RGF has made no comparable showing. The only harm RGF claims is speculative—that "disclosure of its donors will make those donors less likely to contribute in the future because some donors will fear public harassment and intimidation." RGF Br. at 12. But even after RGF *did* disclose the (two) donors to its "No Way Santa Fe" campaign, it was unable to identify a single instance of intimidation, harassment, or even disagreement.

In essence, RGF asks the Court to borrow specific factual showings from *other* cases and plaintiffs, and graft them onto this case as proof that RGF and its donors face parallel dangers. Under such a standard, no disclosure law could survive. A group could simply point to the cases RGF cites to make generalized statements that "[p]eople are frequently subjected to harassment, job loss, doxxing, and other harms," RGF Br. at 21, and on this basis, claim an exemption from disclosure. The law does not countenance this, not least because it would deprive voters of the opportunity to know the source of election messaging, whether in a ballot measure or candidate election context. This would completely undermine the interests that disclosure serves, as well as four decades of unbroken Supreme Court precedent extolling the importance of those interests.

17

*See, e.g.*, *Citizens United*, 558 U.S. at 366-71 (discussing important interests); *McConnell*, 540 U.S. at 194-99 (same); *Buckley*, 424 U.S. at 64-68 (same); *see also Citizens Against Rent Control v. Berkeley*, 454 U.S. 290, 299-300 (1981) ("*CARC*") (expressing approval of disclosure in ballot measure context); *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 791 n.32 (1978) (same).

## III.    Even if Subsection 9-2.6 Was Comparable to the Colorado Law Reviewed in *Sampson* and *CSG*, RGF Has Not Laid the Foundation Necessary to Apply Those Decisions to RGF, Much Less to "Nonprofits" as a Class.

For the reasons noted above, this Court should reject RGF's claim for facial and as-applied relief based upon its unsupported allegations that disclosure threatens its donors with harassment or reprisals. RGF has also failed to provide any basis for extending the kind of as-applied exemption based on undue administrative burden granted in *Sampson* and *CSG*. First, RGF does not actually seek as-applied relief. Instead, it requests an injunction that would extend far beyond its own circumstances, to all "nonprofits" that spend "more than $250" to support or oppose City ballot propositions, RGF Br. at 23-24—and unlike the plaintiffs in *Sampson* and *CSG*, it does not frame its request around a concrete upper limit of overall or electoral spending. Second, even insofar as RGF does seek relief specific to itself and its donors, it has not demonstrated that it qualifies for the kind of as-applied exemption that the Tenth Circuit has granted to small groups subject to PAC disclosure regimes.

### A.  The Court should examine this claim facially—and reject it.

RGF has requested prospective relief that would apply equally to all "nonprofit groups" spending "more than $250" to support or oppose City ballot measures. RGF Br. at 27. Exactly how much activity it believes falls into this realm of unregulable "nonprofit" advocacy is left unclear. What is clear is that RGF is actually challenging subsection 9-2.6 on its face.

18

The Supreme Court rejected a similar attempt to avoid the more rigorous standards applicable to facial challenges in *Doe*, where the plaintiffs challenged Washington's Public Records Act "as applied" to the disclosure of referendum petitions generally. 561 U.S. at 193. Despite noting that the claim had "characteristics of both" an as-applied and a facial challenge, the Court deemed it a facial challenge, reasoning: "The label is not what matters. The important point is that plaintiffs' claim and the relief that would follow . . . reach beyond the particular circumstances of these plaintiffs." *Id.* at 194.

RGF's claim is also deficient because it does not describe the parameters of the prospective as-applied relief it seeks. RGF apparently planned to devote about $10,000 to advocating against the 2017 soda tax measure. SF Facts ¶ 51 (valuing mailers at $1,500); Ans. Ex. 1 (reporting $7,500 in-kind contribution and $200 in additional expenditures for Facebook ads). But the record is bereft of any information about what RGF hopes to spend on *future* ballot propositions. The possibilities are untenably speculative to maintain this as an as-applied challenge.

When other courts have been presented with similarly undefined challenges to the hypothetical prospective application of a ballot measure disclosure law, they have routinely declined to engage in as-applied analyses. For example, the Fifth Circuit rejected an as-applied challenge to Mississippi's $200 committee registration threshold because "the record [wa]s bereft of facts that would allow [it] to assume that Plaintiffs intend[ed] to raise 'just in excess of' $200." *Justice v. Hosemann*, 771 F.3d 285, 292 (5th Cir. 2014). Conversely, the *Sampson* and *CSG* plaintiffs spent about $800 and $3,500 *in total*, and both cases were explicitly framed around those upper limits. *See* 625 F.3d at 1261; 815 F.3d at 1274. *Cf. Worley v. Fla. Sec'y of State*, 717 F.3d 1238, 1242 n.2 (11th Cir. 2013) (declining to engage in as-applied analysis because "the record

[was] [un]developed about how much money Challengers plan to or will raise"); *Human Life of Wash. v. Brumsickle*, 624 F.3d 990, 1022 (9th Cir. 2010) (declining to engage in as-applied analysis because "the complaint [was] devoid of information" by which to judge it).

Moreover, courts have made clear that an as-applied claim for prospective relief in this context cannot simply rest on a group's past activity. The Eleventh Circuit, for example, found that plaintiffs' past participation in ballot initiative elections in which they had specific plans to raise $600 was not license for the court to assume that future endeavors would yield similar sums. *Worley*, 717 F.3d at 1242 n.2. RGF clearly has strong views on matters of New Mexico state and municipal policy, and it has demonstrated significant capacity to raise funds in furtherance of those views. *See* SF Facts ¶¶ 32, 45. There is no reason to suppose that RGF would limit itself in the context of a hypothetical future ballot measure to the $10,000 it deployed in 2017, and of course subsection 9-2.6 does not require it to do so. *Cf. Justice*, 771 F.3d at 293 ("Why would a political group stop accepting contributions at an amount 'just in excess of' $200?").

It is impossible for this Court to know whether the next time RGF advocates for or against a Santa Fe ballot proposition, it will spend thousands, tens of thousands, or even millions of dollars. That is not an adequate foundation upon which to assess whether subsection 9-2.6, *as applied* to this undefined future activity, passes muster under exacting scrutiny. *Cf. CSG*, 815 F.3d at 1278 (recognizing that "the strength of the informational interest in financial disclosure varies depending" on the amount raised and spent by the group); *Sampson*, 625 F.3d at 1260-61 (same).

Nothing in *Sampson* or *CSG* suggests otherwise. Each case dealt with particularized facts in developed records. In *Sampson*, the court knew exactly how much the plaintiff had raised and was thus able to balance the state's interest in that information against the burdens on the group.

625 F.3d at 1261. And while the *CSG* court did note the loss of donations—based on an actual record—it, too, knew the baseline of activity against which to balance this effect. The plaintiff had engaged in precisely the same advocacy on precisely the same ballot issue (and no others) across multiple elections, allowing the parties and the court to agree that the relevant figure was $3,500. 815 F.3d at 1274 & n.5. And CSG was granted as-applied relief only insofar as it would engage in the same or similar ballot measure advocacy, at the same cost. *Id.* at 1280. Here, however, RGF seeks far-reaching relief, extending to any amount of spending on any future ballot proposition. This does not lend itself to the careful balancing that "exacting scrutiny" requires.

**B.  If the Court does entertain RGF's as-applied claim, that claim also fails.**

Even if the Court does find that it has sufficient information to engage in an as-applied analysis like that conducted in *CSG*, it should still rule against RGF. CSG made a particularized showing that complying with Colorado's PAC disclosure law was uniquely burdensome in light of the group's small size and budget, and demonstrated that it had borne significant administrative costs and lost donations as a result. *Id.* at 1279. RGF has offered no such evidence here, and in fact has complied with subsection 9-2.6 without apparent difficulty or repercussion. *See* SF Facts ¶ 65.[8]

In *CSG*, the court found the consequences of lost donations relatively severe *as to that plaintiff*, given its size, explicitly comparing it with "larger-dollar issue committees [that] may not notice some lost donations." 815 F.3d at 1279. RGF is precisely the type of well-established,

---

[8]   In at least some recent years, RGF has submitted to the New Mexico Attorney General an unredacted IRS Form 990 Schedule B listing its contributors, notwithstanding the fact that such submissions are placed online for public inspection—and even though it was not required to submit its Schedule B at all, in redacted form or otherwise. *See* N.M. Att'y Gen., *Charity Detail: Rio Grande Foundation*, https://secure.nmag.gov/CharitySearch/CharityDetail.aspx?FEIN=85-0468 446 (last visited July 16, 2018); Charitable Solicitations Act, NMSA 1978 § 57-22-1 *et seq.*

"larger-dollar" organization with which the Tenth Circuit contrasted CSG. More importantly, the Colorado law aggravated the burden of potential donor chill by requiring disclosure of *all* contributors, not only those who had earmarked their contributions for electioneering. The law also created an "overly burdensome regulatory framework," including ongoing periodic reporting even in times of inactivity and extensive itemization requirements that were "no small chore." *Id.*

Here, by contrast, the law prescribes simple, event-driven reporting. It differs from Colorado's PAC law in kind and in degree, and the reporting it imposes is carefully tailored to the underlying informational interest it serves. Insofar as this Court engages in an as-applied analysis (which it should not), it should reject RGF's attempt to invoke one small portion of *CSG*—a portion based on an actual factual showing that RGF cannot replicate—to strike down a disclosure law based solely on a conjectural and counterfactual fear of lost donations.

## IV.    RGF's State Constitutional Arguments Are Unavailing.

RGF misconstrues both Art. II, § 17 of the state constitution and the cases interpreting it.

As an initial matter, New Mexico's doctrine of interstitial constitutional interpretation has no application here. RGF cites *Morris v. Brandenburg*, 356 P.3d 564 (N.M. Ct. App. 2015), for the proposition that states may construe their own constitutions to "provide *more* liberty than is mandated by the United States Constitution." *Id.* at 572. On its own, this is obviously true; states *may* do so. But RGF fails to note *when* New Mexico courts may adopt this interstitial approach:

> [T]he court asks first whether the right being asserted is protected under the federal [C]onstitution. If it is, then the state constitutional claim is not reached. If it is not, then the state constitution is examined. A state court adopting this approach may diverge from federal precedent for three reasons: a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics.

*Id.* at 573 (citation omitted). It is not clear which of the three reasons—"flawed federal analysis,"

"structural differences," or "distinctive state characteristics"—RGF believes could control here.

But even if RGF had adequately justified its invocation of interstitial interpretation, which it has not, this Court would face the question of whether Art. II, § 17 reaches more broadly than the First Amendment in the electoral disclosure context. It does not. Under the New Mexico Supreme Court's precedents, a decision to interpret the state constitution more broadly than a parallel federal constitutional provision cannot be "base[d] . . . on a mere textual difference." *N.M. Right to Choose/NARAL v. Johnson*, 975 P.2d 841, 852 (N.M. 1988). RGF claims that Art. II, § 17 protects its right "to 'speak, write and publish,'" and that it "restricts the City's ability to 'restrain or abridge' anything the Foundation may wish to say." RGF Br. at 26. That is certainly the case. But even "assum[ing] that the authors of the New Mexico Constitution were aware of the language of the First Amendment . . . and consciously chose to adopt a different formula," *City of Farmington v. Fawcett*, 843 P.2d 839, 847 (N.M. Ct. App. 1992), RGF leaves this Court to wonder why a "mere textual difference," *NARAL*, 975 P.2d at 852, requires that RGF be exempt from disclosure under New Mexico law but not under the U.S. Constitution.

Apparently recognizing the futility of its textual argument, RGF turns to *Fawcett*, a 1992 pornography case. But *Fawcett* does not help RGF, for at least two reasons.

First, *Fawcett*'s holding by its own terms is limited to obscenity. *Fawcett* invoked Art. II, § 17's language that "every person . . . [is] responsible for the abuse of that [speech] right," to hold that allegedly obscene speech must be "intolerable" to the community, not merely "unacceptable," before such speech may be considered an "abuse." 843 P.2d at 846-48. At most, *Fawcett* stands for the proposition that the standards for obscenity are higher under Art. II, § 17 than under the First Amendment. And state courts have since recognized this limitation. *See City of Albuquerque*

*v. Pangaea Cinema LLC*, 284 P.3d 1090 (N.M. Ct. App. 2012) (rejecting claim that Art. II, § 17 affords greater free-speech rights than the First Amendment and distinguishing *Fawcett* as "an obscenity case"), *rev'd on other grounds*, 310 P.3d 604 (N.M. 2013). Interpreting *Fawcett* to mean that "the New Mexico Constitution is more protective of speech than the federal [Constitution]" *in general*, RGF Br. at 25, rather than as it relates to obscenity, plainly misconstrues the case.

Second, *Fawcett* explicitly rejected the argument that Art. II, § 17 creates an absolute right to free speech that extends beyond the protections of the First Amendment.[9] Rather, it held that—excepting the "abuse" clause at issue in the obscenity context—Art. II, § 17 "reads substantially the same as the First Amendment." 843 P.2d at 846 (citations omitted); *see also Best v. Marino*, 404 P.3d 450, 458 (N.M. Ct. App. 2017) (collecting cases). Because *Fawcett* reaffirmed that Art. II, § 17 and the First Amendment are substantively the same outside of the "abuse" clause context, RGF's state constitutional claim must be rolled into its First Amendment claim.[10]

This Court has also recognized that New Mexico law in the decades after *Fawcett* has not countenanced the notion that Art. II, § 17 reaches more expansively than the First Amendment. *See American Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1224 (D.N.M. 2010) (describing Art. II, § 17 as "analogous" to the First Amendment and treating plaintiffs' "free speech and association rights" under both provisions as "co-extensive" because "the protections

---

[9]  This argument also cuts in both directions: a disclosure requirement "do[es] not prevent anyone from speaking," *Citizens United*, 558 U.S. at 366, but it "*further[s]* First Amendment values." *Buckley*, 424 U.S. at 82 (emphasis added).

[10]  Moreover, New Mexico considers laws like subsection 9-2.6 content-neutral, and "the [free-speech] protection of the federal and state constitutions are the same . . . with respect to content-neutral restrictions." *State v. Ongley*, 118 N.M. 431, 432 (1994); *see also Montoya v. Herrera*, 276 P.3d 952, 958 (N.M. 2012) (treating campaign finance laws as content-neutral).

of the federal and state constitutions are the same"). RGF ignores this development.

In short, RGF today asks this Court to use a 1992 intermediate state appellate case on a narrow issue of obscenity to rewrite the New Mexico Constitution's relationship to political speech. That, to put it mildly, is unwarranted. If there is a real question—and Defendants believe there is not—as to whether Art. II, § 17 reaches so much more broadly than the First Amendment that it invalidates disclosure laws, then that question should be answered on certification to a state court. *Cf. Kansas Judicial Review v. Stout*, 519 F.3d 1107, 1120 (10th Cir. 2008).

## CONCLUSION

Defendants respectfully urge this Court to deny Plaintiff's Motion for Summary Judgment and enter judgment for the City.

**Dated: July 16, 2018**

Respectfully submitted,

CITY ATTORNEY
CITY OF SANTA FE, NEW MEXICO

/s/ Marcos D. Martinez
Marcos D. Martínez
Assistant City Attorney City of Santa Fe
200 Lincoln Avenue
P.O. Box 909
Santa Fe, New Mexico 87504-0909
Telephone: (505) 955-6967
Facsimile: (505) 955-6748
mdmartinez@ci.santa-fe.nm

Tara Malloy, DC Bar No. 988280*
Megan P. McAllen, DC Bar No. 1020509*
Campaign Legal Center
1411 K Street, NW, Suite 1400
Washington, D.C. 20005

Telephone: (202) 736-2200
Facsimile: (202) 736-2222
tmalloy@campaignlegalcenter.org,
mmcallen@campaignlegalcenter.org

*Appearing *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing and Memorandum in Opposition to Plaintiff's Summary Judgment Motion with the Clerk of the Court for the United States District Court of the District of New Mexico via the CM/ECF system on July 16, 2018 which will effect service on all counsel of record.

CITY ATTORNEY
CITY OF SANTA FE, NEW MEXICO

/s/ Marcos D. Martínez
Marcos D. Martínez
Assistant City Attorney, City of Santa Fe

27