**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

RIO GRANDE FOUNDATION,

     Plaintiff,

v.                                No. Civ. 1:17-cv-00768-JCH-CG

CITY OF SANTA FE, et al.,

     Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on (i) the Motion for Summary Judgment (ECF No. 39) filed by Defendants City of Santa Fe, New Mexico, ("Santa Fe" or the "City") and City of Santa Fe Ethics and Campaign Review Board ("ECRB"), collectively "Defendants," and (ii) the Motion for Summary Judgment (ECF No. 40) filed by Plaintiff Rio Grande Foundation ("Plaintiff" or "RGF"). The motions have been fully briefed. Additionally, this Court granted permission for the Brennan Center and ten other *amici* to file an *amici curiae* brief in support of Defendants' motion for summary judgment. The Court, having considered the cross motions for summary judgment, the parties' briefs, the *amici* brief, the evidence, relevant law, and otherwise being fully advised, concludes that Defendants' motion for summary judgment should be granted, and Plaintiff's motion should be denied.

### I.    INTRODUCTION

This case presents colliding interests of constitutional significance – a person's or collection of persons' rights to donate anonymously for speech on ballot issues against the electorate's right to know who is spending money and in what amounts advocating for or against ballot measures. On the one hand, encouraging discourse and testing the merits of a person or

group's thoughts and arguments in the court of public opinion is essential to a functioning democracy, and the source of the message should carry less weight than the merits of the ideas. As the Supreme Court has stated, "[a]nonymity … provides a way for a writer who may be personally unpopular to ensure that readers will not prejudge her message simply because they do not like its proponent." *McIntyre v. Ohio Elections Com'n*, 514 U.S. 334, 342 (1995).[1] Anonymity also enables speakers concerned for their own safety, economic security, or social standing to speak on issues without concern that they may incur personal or financial harm from opponents of their speech. The First Amendment protects unpopular individuals from retaliation and the suppression of their ideas by an intolerant society. *Id.* at 357. "Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *NAACP v. Alabama*, 357 U.S. 449, 462 (1958). "[F]orbidding anonymous political advertising reduces the amount of political advertising because some would-be advertisers are unwilling to reveal their identity." *Majors*, 361 F.3d at 352.

On the other hand, bringing more transparency and informing the electorate of special interests seeking to influence ballot measures helps citizens evaluate who stands to gain and lose from proposed legislation. State and local governments have passed disclosure requirements to try to limit the impact of "dark money" and the disproportionate effect that wealthy individuals or entities may have on an election. As the Supreme Court has noted, "[i]dentification of the source of advertising may be required as a means of disclosure, so that people will be able to evaluate the arguments to which they are being subjected." *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 792 n.32 (1978).

---

[1] Notably, Madison, Hamilton, and Jay published *The Federalist* anonymously so that readers would evaluate the arguments on the merits. *Majors v. Abell*, 361 F.3d 349, 357 (7th Cir. 2004) (J. Easterbrook, dubitante).

In its efforts to bring transparency to independent spending in local elections, Santa Fe has attempted to craft a disclosure law that will not offend First Amendment rights and withstand constitutional scrutiny. Plaintiff Rio Grande Foundation nonetheless asks this Court to declare Santa Fe City Campaign Code § 9-2.6 unconstitutional on its face and as applied to nonprofit speech about municipal ballot measures and to permanently enjoin its enforcement by Defendants. At a minimum, RGF asks the Court to find that RGF and similarly situated nonprofit groups should be protected from involuntary donor disclosure, but RGF urges the Court to rule more expansively that all nonprofits are protected from involuntary donor disclosure when they speak about ballot measures. Pl.'s Resp. 5, ECF No. 45 at 9 of 31.

## II.    FACTUAL BACKGROUND

### A.  Undisputed Facts[2]

Santa Fe, a municipal charter city in New Mexico, administers local elections pursuant to the City Charter and the Santa Fe City Code of 1987 ("SFCC"). Defs.' Mot. for Summ. J. ("MSJ"), Undisputed Fact ("UF") ¶ 1, ECF No. 39. Santa Fe has an estimated total population of 82,927 persons and a voting age population of 58,453. *Id.* UF ¶ 8.

The ECRB for Santa Fe promotes and enforces compliance with the City's Campaign Code (Section 9-2), the Public Campaign Finance Code (Section 9-3), and the Code of Ethics (Section 1.7). *Id.* UF ¶ 2. The stated purpose of the Campaign Code is to promote public confidence in city

---

[2] Plaintiff failed to include in its response to Defendants' Motion for Summary Judgment "a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist." N.M. Local Civ. R. 56.1(b). Nor did Plaintiff number the facts in dispute and refer with particularity to the portions of the record upon which the non-movant relies. *Id.* Accordingly, the Court deems undisputed the material facts set forth in Defendants' Memorandum. *Id.* ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted."). Plaintiff, however, filed its own motion for summary judgment and asserted 51 paragraphs of facts. *See* Pl.'s Mot. For Summ. J. 2-12, ECF No. 40 at 3-13 of 29. Defendants agree that the case can be resolved on summary judgment, but they dispute several characterizations made in RGF's statement of facts. *See* Defs.' Mem. 1-4, ECF No. 44 at 5-8 of 31. The Court has considered Defendants' objections to certain of RGF's enumerated facts. However, the majority of the facts – and the most significant, relevant facts – are undisputed. Relying on the relevant undisputed facts, the Court agrees that this case can be resolved on summary judgment.

government, fully disclose campaign contributions and expenditures to the public, and encourage the widest participation by the public in the electoral process by reducing candidates' dependence on large contributions. SFCC § 9-2.2(A), (B), and (D). The City determined that the "public's right to know how political campaigns are financed far outweighs any right that this matter remain secret and private." *Id.* § 9-2.2(C).

Subsection 9-2.6 of the Campaign Code was enacted in 2005 and amended in 2007, 2013, and 2015. Defs.' UF ¶ 3, ECF No. 39. After the 2014 elections, the ECRB concluded that adjustments to the Campaign Code's disclosure requirements were necessary to ensure voters were informed about the funding sources of outside groups trying to influence their votes. *See id.* UF ¶ 6. City residents expressed concerns about potential coordination between outside groups and candidates and about the lack of transparency regarding outside groups' funding sources. *Id.* UF ¶ 17. The ECRB held eight public meetings and referred proposed changes to the City Council. *Id.* UF ¶ 19. After receiving the ECRB's recommendations, in 2015 the City Council adopted changes to the Campaign Code. *See id.* UF ¶¶ 7, 19.

As relevant here, post-2015 amendments, Subsection 9-2.6 of the SFCC provides:

9-2.6   Independently Sponsored Campaign Communications and Reporting.

A.  Any person or entity that makes expenditures of two hundred fifty dollars ($250) or more in the aggregate during a single election to pay for any form of public communication including print, broadcast, cable or electronic advertising, billboards, signs, pamphlets, mass mailers, mass electronic mail, recorded phone messages, organized phone-banking or organized precinct-walking, that is disseminated to one-hundred (100) or more eligible voters, and that either expressly advocates … the approval or defeat of a ballot proposition; or refers to a clearly identifiable candidate or ballot proposition within sixty (60) days before an election at which the … proposition is on the ballot, shall thereafter on each of the days prescribed for the filing of campaign finance statements, file with the city clerk *a report of all such expenditures made and all contributions received for the purpose of paying for such expenditures* on or before the date of the report and which have not been previously reported. Each report shall be submitted on a form prescribed by the city clerk. Contributions shall be specified by date, amount of contribution, name, address and occupation of the person

> or entity from whom the contribution was made…. Expenditures shall be specified by date, the amount of the expenditure, the name and address of the person or entity where an expenditure was made and the purpose of the expenditure….

SFCC § 9-2.6(A) (italics added). The report must also include the name of the president, chief executive officer, or equivalent position and the entity's address. SFCC § 9-2.6(C)-(D). If a person or entity subject to subsection A "receives contributions from another entity that does not have to disclose its contributors to the city clerk", then the entity subject to subsection A must place the following disclosure on campaign materials: "This campaign material is supported in part by donations from an organization that is not required to disclose its contributors to the Santa Fe city clerk." SFCC § 9-2.6(B). News media organizations are exempt from the reporting requirements. SFCC § 9-2.6(A). Santa Fe makes these reports available to the public. Dep. of Justin Miller 25:7-14, ECF No. 40-1.

Under the ordinance, a person or entity that spends more than $250 to support or oppose a ballot measure only needs to report donations that were specifically earmarked to pay for those communications. *See id.* 23:11-25. An entity does not need to report non-earmarked, general donations. *See id.*

The SFCC also gives the ECRB powers to sanction persons or entities who violate the Code of Ethics, the Campaign Code, or the Public Campaign Finance Code, following a hearing. *See* SFCC § 6-16.7(B). Sanctions may include imposition of a fine not to exceed $500.00 per violation and each day of a continuing violation may be deemed a separate offense. SFCC § 6-16.7(B)(2). Additional authority is bestowed on the city clerk to assess a fine of $100.00 for unexcused late filing of campaign finance statements. *See* SFCC § 6-16.7(A) and § 9-2.10.

RGF is an Albuquerque-based non-profit corporation founded in 2000 and organized under section 501(c)(3) of the federal tax code. Defs.' UF ¶¶ 30-31, ECF No. 39; Pl.'s UF ¶¶ 12-13, ECF

No. 40. RGF is governed by an eight-member Board of Directors and has a full-time, compensated President, Paul Gessing. *See* Defs.' UF ¶ 31, ECF No. 39; Pl.'s UF ¶ 15, ECF No. 40. RGF's annual revenue between 2012 and 2016 ranged between $404,773 and $213,306. Defs.' UF ¶ 32, ECF No. 39.

RGF often participates in legislative and policy advocacy in New Mexico. Defs.' UF ¶ 33, ECF No. 39; Pl.'s UF ¶ 14, ECF No. 40. Its mission is to educate the public and promote individual liberty, constitutional rights, and market-based solutions for policy questions. Pl.'s UF ¶ 16, ECF No. 40. For example, RGF publicly opposed the City of Albuquerque's 2017 paid sick leave proposition. Defs.' UF ¶ 33, ECF No. 39. As a 501(c)(3) organization, RGF may not support or oppose candidates for office and is limited in the amount of its budget that it can spend on lobbying for or against state and local laws. Pl.'s UF ¶ 17, ECF No. 40.

The Santa Fe City Council voted to hold a special municipal election on May 2, 2017 to ask Santa Fe residents to vote for or against a sugary sweetened beverage tax ("soda tax"). Defs.' UF ¶ 41, ECF No. 39. Four groups reported expenditures and/or in-kind contributions exceeding $250 to advocate for or against the soda tax. *Id.* UF ¶ 42. Based on reports submitted according to Santa Fe's Campaign Code, "Pre-K for Santa Fe," which raised about $1.9 million, disclosed former New York City Mayor Michael Bloomberg contributed almost $800,000 to support the measure, while "Better Way for Santa Fe & Pre-K," which expended approximately $2.2 million for its advocacy, disclosed its funding was almost entirely contributed by a Washington, D.C.-based beverage industry group. *See id.* UF ¶¶ 42-43.

On April 6, 2017, RGF announced the launch of its "No Way Santa Fe" initiative, a campaign to raise awareness about the harms of the soda tax, by issuing a news release, Facebook post, and communicating in other ways about the proposed soda tax. *See* Defs.' UF ¶ 46, ECF No.

39; Pl.'s UF ¶¶ 21, 25, ECF No. 40. The campaign consisted of a series of newspaper editorials written by Mr. Gessing, a NoWaySantaFe.com website, and a YouTube video featured on the website. Pl.'s UF ¶ 22, ECF No. 40. RGF's "No Way Santa Fe" website expressly advocated the defeat of the proposition, listing reasons it was a terrible tax scheme and urging residents to "Vote on Tuesday, May 2, 2017!" Defs.' UF ¶ 47, ECF No. 39. RGF additionally paid to promote its website and advocacy against the soda tax via its Facebook page. *Id.* UF ¶ 50.

The website also featured a video that expressly advocated the rejection of the ballot measure. *Id.* UF ¶ 48. The website identified "No Way Santa Fe" as "a project of the Rio Grande Foundation." Defs.' UF ¶ 49 & Ex. Q, ECF No. 39-5 at 105. The Interstate Policy Alliance, a Washington, D.C.-based organization that shares an address with a public affairs firm, produced the "No Way Santa Fe" video and website and contributed them to RGF pursuant to an ongoing arrangement between the two entities. *See* Defs.' UF ¶¶ 54-55, ECF No. 39.

On April 6, 2017, Santa Fe Assistant City Attorney Zachary Shandler sent Mr. Gessing a letter informing him that, because it appeared RGF spent more than $250 on broadcast advertisements referring to a ballot proposition that reached more than 100 voters, RGF was required to file a campaign finance statement by the next reporting date, April 7, 2017. *Id.* UF ¶ 59; Pl.'s UF ¶ 26, ECF No. 40. The letter noted that Mr. Gessing could contact the city clerk's office immediately in writing if he disagreed and explain why RGF is exempt from § 9-2.6. Pl.'s UF ¶ 26, ECF No. 40. Mr. Gessing informed Mr. Shandler in writing that RGF did not believe it crossed the reporting threshold of § 9-2.6. *See* Pl.'s Ex. 8, ECF No. 40-1 at 14 of 30.

On April 7, 2017, the ECRB received a citizen complaint against RGF from Edward Stein alleging RGF violated chapters 9-2 and 9-3 of the SFCC. *See* Defs.' UF ¶ 57, ECF No. 39; Pl.'s UF ¶ 28, ECF No. 40. The city clerk notified Mr. Gessing of Mr. Stein's complaint by letter dated

April 10, 2017 and informed him that he had 10 business days to file a sworn written response or the option of submitting a response before the previously scheduled April 19, 2017 ECRB meeting. Pl.'s Ex. 9, ECF No. 40-1 at 15. On April 13, 2017, Mr. Stein amended his complaint, including additional information such as the "No Way Santa Fe" website and video. *See* Defs.' UF ¶ 57, ECF No. 39; Pl.'s UF ¶ 31, ECF No. 40. He also submitted an affidavit from Glenn Silber, a documentary filmmaker, who estimated the video cost a minimum of $3,000 and possibly two or three times that amount to make. Defs.' UF ¶ 58, ECF No. 39.

RGF also spent $1,500 on 5,000 postcards that it planned to mail urging citizens to vote against the soda tax. *See* Def.'s UF ¶ 51, ECF No. 39. *See also* Aff. of Paul Gessing ¶ 14, ECF No. 40-1. RGF never mailed the postcards once the controversy arose. Pl.'s UF ¶ 24, ECF No. 40. RGF notified Mr. Shandler by letter that it declined to send the postcards because of the disclosure requirements. *Id.* UF ¶ 32. On April 20, 2017, Mr. Shandler notified Mr. Gessing that at the April 19, 2017 hearing, the ECRB, after considering Mr. Stein's complaint, Mr. Silber's affidavit, the video, and RGF's letters, voted that the complaint stated sufficient facts to show probable cause of a violation of the City Campaign Code. Pl.'s Ex. 12, ECF No. 40-1 at 20 of 30. The letter also informed RGF that the ECRB set a hearing to consider Mr. Stein's complaint against it. *Id.*

On April 24, 2017, the ECRB held a hearing on the merits of the complaint, considering testimony and arguments from Mr. Stein, Mr. Silber, Mr. Gessing, and RGF's counsel, Colin Hunter. *See* Defs.' UF ¶ 60, ECF No. 39; Pl.'s UF ¶¶ 37-41, ECF No. 40. During the hearing, Mr. Silber estimated that the cost to produce the video was at least $3,000 but probably closer to at least twice that amount. *See* Defs.' UF ¶ 62, ECF No. 39; Pl.'s UF ¶ 39, ECF No. 40. Mr. Gessing testified that a third party produced and paid for the video and website. *See* Defs.' UF ¶ 62, ECF No. 39; Gessing Aff. ¶ 20, ECF No. 40-1. Mr. Gessing also stated that RGF spent approximately

$200 in advertising fees connected to the video, planned to send postcards opposing the soda tax, and contemplated radio advertising. Defs.' UF ¶ 63, ECF No. 39.

The ECRB found that the video cost more than $250 to make and that RGF received the video as an in-kind contribution from the third party. *Id.* UF ¶ 62; Order of Public Reprimand, ECF No. 40-1 at 23 of 30. The ECRB unanimously concluded that RGF "violated SFCC 1987, Section 9-2.6b by creating No Way Santa Fe as a political committee, which made independent expenditures and received contributions of items of value in amounts greater than $250 and it failed to file a campaign report." Order of Public Reprimand, ECF No. 40-1 at 23 of 30. *See also* Defs.' Ex. F, ECF No. 39-3 at 37 of 40. The ECRB issued a reprimand to RGF and ordered it to file a report under the Campaign Code. Defs.' Ex. F, ECF No. 39-3 at 37 of 40. It assessed no penalties or fines. Order, ECF No. 12-2.

The soda tax did not pass on the May 2017 ballot. Pl.'s UF ¶ 44, ECF No. 40. On June 15, 2017, RGF filed a six-page Campaign Finance Statement, listing $250 in contributions from James Higdon, $7,500 in in-kind contributions from Interstate Policy Alliance for the video/website, and $200 in expenditures for Facebook advertising. *See* Answer, Ex. 1, ECF No. 12-1; Pl.'s Ex. 15, ECF No. 40-1 at 26-27 of 30.

## B. Evidence of harassment and intimidation of other free-market non-profit groups[3]

---

[3] Plaintiff included in its response additional facts concerning harassment and intimidation of other free-market non-profit groups. *See* Pl.'s Resp. 7-11, ECF No. 45 at 11-15 of 31. Although Plaintiff failed to letter each additional fact, as required by Local Rule 56.1, it submitted evidence in support of the facts. In their Reply, Defendants argue that these facts, even if true, have no connection to RGF, its donors, or this case. Defs.' Reply 3, ECF No. 48 at 7 of 22. Defendants also note that Plaintiff did not include these facts in its own motion for summary judgment, so they have not had an opportunity to test or dispute their accuracy. *Id.* n.1. Defendants, however, did not refute the evidence in their reply or request an opportunity to conduct additional discovery and supplemental briefing. Consequently, the Court has considered the facts presented by Plaintiff in its response that are supported by admissible evidence and for which there is no rebuttal evidence. The Court will address in its analysis section Defendants' arguments that the evidence is not relevant.

RGF submitted affidavits of persons affiliated with other free-market nonprofit groups that describe harassment and intimidation against the individuals. Dave Trabert, the President of the Kansas Policy Institute, a nonprofit with a mission of promoting efficient government and protecting individual freedoms, such as educational choice, received threatening emails and tweets. *See* Aff. of Dave Trabert ¶¶ 3-8, ECF No. 45-1 at 1-5 of 10. Lynn Harsh, the former CEO of Freedom Foundation, a nonprofit that promotes policies that advance individual liberty, free enterprise, limited government, and worker freedom, experienced property damage and verbal harassment during the litigation of a case challenging certain union practices. Aff. of Lynn Harsh ¶¶ 4-11, ECF No. 45-1 at 6-8 of 10. In another incident, a protestor spat on F. Vincent Vernuccio while he was the Director of Labor Policy at the Mackinac Center for Public Policy and after he spoke at a nonprofit-sponsored event about how Right-to-Work legislation benefitted Michigan. Aff. of F. Vincent Vernuccio ¶¶ 4-5, ECF No. 45-1 at 10 of 10. Additionally, when Mr. Vernuccio was featured as a guest on an NPR radio program in 2012 following Michigan's passage of Right-to-Work legislation, he was threatened by a listener to the program who suggested there might be something waiting for him when he returned home that night. *See id.* ¶ 7.

### C. RGF's complaint

RGF filed a complaint for declaratory and injunctive relief challenging SFCC § 9-2.6's donor-disclosure requirements for nonprofit entities making expenditures of $250 or more to communicate with voters regarding the approval or defeat of ballot propositions. *See* Compl. 1-2, 11-13, ECF No. 1. RGF seeks a declaration that the ordinance is unconstitutional, facially and as applied, as it relates to speech about the approval or defeat of a ballot proposition under the First Amendment of the United States Constitution and under Article II, § 17 of the New Mexico Constitution. *Id.* 2, 11-13. RGF also requests a permanent injunction against Defendants

prohibiting them from administering § 9-2.6 as it relates to speech about municipal ballot propositions. *Id.* at 13. Both parties have submitted motions for summary judgment.

## III.    STANDARD

On a motion for summary judgment, the moving party initially bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995). Only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Cross-motions for summary judgment must be treated separately, and the denial of one does not require the grant of the other. *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (*quoting Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)). When considering cross-motions for summary judgment, a court may assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is inappropriate if material factual disputes nevertheless exist. *Id.*

## IV.    ANALYSIS

### A.  First Amendment of the United States Constitution

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Discussion of public issues and debate on the merits of candidates for political office are essential to the operation of democracy. *See Buckley v. Valeo*, 424 U.S. 1, 14 (1976); *Republican Party of New Mexico v. King*, 741 F.3d 1089, 1092 (10th Cir. 2013). The First Amendment provides fundamental protections against contribution and expenditure limitations for political campaigns. *King*, 741 F.3d at 1092 ("the financing and spending necessary to enable political speech receives substantial constitutional protection"). Unlike restrictions on campaign spending, disclosure requirements "impose no ceiling on campaign-related activities and do not prevent anyone from speaking." *Citizens United v. Federal Election Com'n*, 558 U.S. 310, 366 (2010) (internal citations and quotations omitted). Accordingly, the Supreme Court in *Citizens United* held that the "Government may regulate corporate political speech through disclaimer and disclosure requirements, but it may not suppress that speech altogether." *Id.* at 319. "[D]isclosure requirements certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist." *Buckley*, 424 U.S. at 68.

The First Amendment also protects political association, as group association may enhance effective advocacy. *Id.* at 15 (quoting *NAACP*, 357 U.S. at 460). "[C]ompelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Id.* at 64. The concern of squelching speech through disclosures arises not only from direct government action but also indirect action from private citizens that results from the compelled disclosure. *Id.* at 65. Compelled disclosures must survive exacting scrutiny – there must be a substantial relationship between the governmental interest and the information that must be disclosed. *Id. See also Citizens United*, 558 U.S. at 366; *Sampson v. Buescher*, 625 F.3d 1247,

1255 (10th Cir. 2010) (quoting *Doe v. Reed*, 561 U.S. 186, 130 S.Ct. 2811, 2818 (2010)). "To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Reed*, 561 U.S. at 196 (internal quotations omitted).

In *Buckley*, the Supreme Court upheld disclosure requirements for contributions and expenditures for candidates and political committees seeking to influence the nominations or elections of candidates, finding that disclosure directly serves three substantial governmental interests. *See* 424 U.S. at 60-72. First, disclosure gives voters information to aid them in evaluating candidates and the interests to which candidates may be most responsive. *See id.* at 66-67. Second, disclosure helps deter actual corruption and the appearance of corruption by helping citizens detect post-election favors. *Id.* at 67. Third, the reporting requirements gather the data needed to detect violations of contribution limits. *Id.* at 67-68. With this background in mind, the Court will turn to case law regarding ballot initiatives. *Cf. Sampson*, 625 F.3d at 1255 ("When analyzing the governmental interest in disclosure requirements, it is essential to keep in mind that our concern is with ballot issues, not candidates.").

1. **Supreme Court precedent on disclosure laws regarding ballot initiatives**

The Supreme Court examined the constitutionality of a state law prohibiting banks and business corporations from making expenditures to influence voters on referendum proposals. *Bellotti*, 435 U.S. 765, 767 (1978). The *Bellotti* Court overturned the state law, noting that the "inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual." *Id.* at 777. It nevertheless commented in dicta that the state has an interest in the identification of the source of campaign materials: "Identification of the source of advertising may be required as a means of

disclosure, so that the people will be able to evaluate the arguments to which they are being subjected." *Id.* at 792 n.32.

Subsequently, in *McIntyre*, the Supreme Court considered an Ohio elections law that prohibited the distribution of anonymous campaign literature. *See McIntyre*, 514 U.S. at 338 n.3, 353. Because the law regulated the content of speech, the Court applied exacting scrutiny, in which the law is valid "only if it is narrowly tailored to serve an overriding state interest." *Id.* at 347. It noted that *Buckley*'s principles extend equally to issue-based elections like the school tax vote the plaintiff opposed. *Id.* The *McIntyre* Court concluded that the state's informational interest in the identity of the speaker was insufficient to require disclosure. *Id.* at 348-49. It later, however, distinguished the *Buckley* decision, explaining that, unlike a written leaflet, disclosure of expenditures reveals less information, is less specific, personal, and provocative. *Id.* at 355. Although disclosure of donations says something about the spender's political views, the Supreme Court concluded that "when money supports an unpopular viewpoint it is less likely to precipitate retaliation." *Id.* [4]

### 2. Tenth Circuit precedent on disclosure laws involving ballot initiatives

The parties rely extensively on two Tenth Circuit cases involving disclosure requirements related to ballot initiatives, *Sampson v. Buescher*, 625 F.3d 1247 (2010), and *Coalition for Secular Government v. Williams*, 815 F.3d 1267 (2016), so the Court will examine the details of these cases closely.

In *Sampson*, a neighborhood group opposed a petition seeking to annex land that included their neighborhood into the Town of Parker, Colorado. 625 F.3d at 1249-53. The plaintiffs bought

---

[4] Notably, "disclaimer" laws, such as in *McIntyre*, that require a speaker to include certain information in its speech, impose more constitutionally significant burdens on speech than disclosure or reporting provisions. *Citizens for Responsible Government State Political Action Committee v. Davidson,* 236 F.3d 1174, 1199 (10th Cir. 2000).

and distributed "No Annexation" signs, mailed residents of the proposed annexed land a postcard with reasons to oppose annexation, debated the issue on the internet, and submitted a document opposing annexation to the town council. *Id.* at 1251. The plaintiffs had raised less than $1,000 in monetary and in-kind contributions when supporters of the annexation filed a complaint with the Colorado Secretary of State alleging that the plaintiffs failed to register as an issue committee, to establish a separate committee bank account with a separate tax identification number, and to comply with the reporting requirements. *See id.* at 1249, 1251-53. Ultimately, the group received $2,239.55 in monetary and in-kind contributions. *See id.* at 1260 n.5. The neighborhood group challenged the Colorado law regulating ballot-issue committees as violating their First Amendment rights. *See id.* at 1249-53. As relevant here, the plaintiffs' complaint alleged that the registration and disclosure requirements unconstitutionally burdened their rights to free speech and association and the disclosure requirements violated their rights to anonymous speech and association. *Id.* at 1253. Plaintiffs requested a declaration that the registration and disclosure requirements were unconstitutional on their face and as applied. *Id.*

Under Colorado law, any group of two or more persons that accepted or made contributions or expenditures over $200 to support or oppose a ballot measure must register as an issue committee. *Id.* at 1249. The issue committee must deposit contributions in a separate account in the committee's name, register with the appropriate governmental officer before accepting contributions, and report all contributions and expenditures, including the name and address of any person who contributes $20 or more, and the occupation and employer of any person who gives $100 or more. *Id.* at 1249-50. Issue committees must file multiple reports, which are public and made available on the Secretary of State's website: 21 days before the election, the Friday before the election, 30 days after the election, and annually in off-election years. *Id.* at 1250. Colorado

law imposes a civil penalty of $50 per day for each day that a statement or other requisite information is not timely filed, although the Secretary or an administrative law judge may set aside or reduce the penalty for good cause. *See id.*

The Tenth Circuit held that, as applied to the plaintiffs, Colorado law violated their right to freedom of association because there "is virtually no proper governmental interest in imposing disclosure requirements on ballot-initiative committees that raise and expend so little money, and that limited interest cannot justify the burden that those requirements impose on such a committee." *Id.* at 1249. The Tenth Circuit distinguished the governmental interests at play for disclosure of donors to *candidates* as opposed to donors for *ballot issue advocacy*: the latter, unlike the former, does not involve the risk of *quid pro quo* corruption. *See id.* at 1255-56. Accordingly, two of the three justifications for disclosure rules – facilitating the detection of violations of contribution limits and deterring corruption and its appearance – are not relevant in ballot-issue campaigns. *Id.* at 1256.

The Tenth Circuit thus limited its exacting scrutiny review to the third governmental interest – the public's informational interest in knowing who is spending and receiving money to support or oppose a ballot measure. *Id.* It discussed how the Supreme Court jurisprudence on the value of disclosure in ballot-issue campaigns has been mixed. *Id.* at 1257. On the one hand, the Supreme Court has recognized that anonymity allows a writer to ensure readers will not prejudge a message merely because they dislike the writer, and thus permits the inherent worth of the speech to be tested on its merits. *See id.* at 1257-58 (quoting *McIntyre*, 514 U.S. at 342 & 348 n.11). On the other hand, the Supreme Court has stated in dicta that voters have an interest in being informed about the source and amount of money spent by supporters and opponents of ballot measures to better evaluate the arguments and determine who stands to benefit from the initiatives. *See id.*

(quoting *Bellotti*, 435 U.S. at 792 n.32 ("[i]dentification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected"); *Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley*, 454 U.S. 290, 299-300 (1981) ("The integrity of the political system will be adequately protected if contributors are identified in a public filing revealing the amounts contributed; if it is thought wise, legislation can outlaw anonymous contributions."); and *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 202-03 (1999) ("Disclosure of the names of initiative sponsors, and of the amounts they have spent gathering support for their initiatives, responds to that substantial state interest" in "a control or check on domination of the initiative process by affluent special interest groups")).

The *Sampson* court noted the "limited purpose" in identifying those who may have a financial interest in the outcome of a ballot measure, as opposed to identifying all who support a measure, such as volunteers who donate time and need not be identified, and that courts must keep the distinction in mind when weighing its value against the extent of the burden. *Id.* at 1259. The Tenth Circuit further noted the sliding scale nature of the informational interest: "while assuming that there is a legitimate public interest in financial disclosure from campaign organizations, we also recognize that *this interest is significantly attenuated* when the organization is concerned with only a single ballot issue and when the contributions and expenditures are slight." *Id.* at 1259 (italics added).

When weighing the burdens, the Tenth Circuit concluded that the registration and reporting requirements imposed on issue committees were "substantial," and beyond which the average citizen could master without hiring an attorney to help navigate the complex campaign finance laws and rules. *See id.* at 1259-60. The Tenth Circuit noted that the cost of hiring an attorney may

often exceed the amount spent for the ballot issue advocacy and that the laws placed a burden of time and energy to review the laws themselves. *See id.* at 1260. The circuit concluded:

> the financial burden of state regulation on Plaintiffs' freedom of association approaches or exceeds the value of their financial contributions to their political effort; and the governmental interest in imposing those regulations is minimal, if not nonexistent, in light of the small size of the contributions. We therefore hold that it was unconstitutional to impose that burden on Plaintiffs. We do not attempt to draw a bright line below which a ballot-issue committee cannot be required to report contributions and expenditures. The case before us is quite unlike ones involving the expenditure of tens of millions of dollars on ballot issues presenting "complex policy proposals." We say only that Plaintiffs' contributions and expenditures are well below the line.

*Id.* at 1261 (internal citation omitted). Given its as-applied ruling, the circuit declined to consider the facial challenge. *See id.* at 1254.

Nearly six years later, the Tenth Circuit again considered Colorado issue-committee registration and disclosure laws in the ballot context. *See Williams*, 815 F.3d at 1269. *Williams* involved higher expenditure and contribution amounts made by a nonprofit corporation, the "Coalition," in advocating against a "personhood" amendment in Colorado. *See id.* at 1269, 1274. The founder of the nonprofit, who was also the sole person responsible for its operations, was the co-author of a personhood policy paper. *See id.* at 1269. The nonprofit used contributions to distribute the policy paper publicly, by mail and online. *See id.* Having registered as an issue committee in prior elections and having found the requirements burdensome, in 2012, the nonprofit sued the Colorado Secretary of State seeking a declaration that the nonprofit's expected activity of $3,500 did not require registration as an issue committee. *Id.* at 1272-74. The district court issued the requested declaration and enjoined the Secretary from enforcing Colorado's disclosure requirements against the nonprofit. *Id.* The Secretary appealed two issues: (1) whether the $200 threshold for issue-committee registration and reporting was facially valid under the First Amendment and (2) whether Colorado's issue committee registration and disclosure requirements

were unconstitutional as applied to the Coalition. *Id.* at 1275. Applying *Sampson*'s exacting-scrutiny analysis, the Tenth Circuit determined that "Colorado's issue-committee regulatory framework remains too burdensome for small-scale issue committees like the Coalition.... [T]he burdens remain too great in the face of the public's legitimate but minimal interest in information about the Coalition's contributors and expenditures." *Id.* at 1277. The Tenth Circuit continued to apply a sliding-scale approach in weighing the interests and burdens, explaining that the strength of the public's informational interest increases as the amount of money the issue committee has raised or spent increases. *See id.* at 1278. After contrasting a $10 million expenditure, the *Williams* court concluded that the $3,500 contribution amount was not substantial. *Id.*

Turning to the burdens, the circuit recognized the additional resources the Secretary created since *Sampson* that eased some of the administrative difficulties. *See id.* at 1278-79. The Tenth Circuit nonetheless determined that the Coalition "faces an overly burdensome regulatory framework." *Id.* at 1279. The *Williams* court reasoned:

> The minimal informational interest here cannot support Colorado's filing schedule that requires twelve disclosures in seven months regardless of whether an issue committee has received or spent any money. Further, the burden of asking for personal information of $20–contributors is substantial. Gaining the necessary information from these contributors might well result in fewer contributors willing to support an issue committee's advocacy. *A $20 threshold for contributor disclosure—coupled with other registration and reporting requirements—is too burdensome when applied to a small-scale issue committee like the Coalition.*
>
> In short, Colorado law—as it stands—demands too much of the Coalition given the public's modest informational interest in the Coalition's disclosures. *Voters certainly have an interest in knowing who finances support or opposition to a given ballot initiative, but for small-scale issue committees like the Coalition, Colorado's onerous reporting requirements outweigh that informational interest.* At the same time, we recognize that Colorado's current issue-committee regulatory framework is much more justifiable for large-scale, bigger-money issue committees.

*Id.* at 1279-80 (internal footnote omitted and italics added). Despite the Secretary urging the Court to determine whether the $200 threshold was facially valid in order to avoid piecemeal litigation,

the Tenth Circuit declined to address the facial challenge, leaving the decision for the people of Colorado. *Id.* at 1280-81.

### 3. RGF's challenge

"[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United*, 558 U.S. at 331. The distinction goes to the breadth of the remedy. *Id.* A court should disregard labels and examine whether the "claim and the relief that would follow ... reach beyond the particular circumstances of the[ ] plaintiffs." *Doe v. Reed*, 561 U.S. 186, 194 (2010). *cf. Reed*, 561 U.S. at 194 (holding that the plaintiffs had to satisfy the "standards for a facial challenge" because "the relief that would follow" was "an injunction barring the secretary of state from making referendum petitions available to the public, ... reach[ing] beyond the particular circumstances of these plaintiffs" (internal quotation marks omitted)).

RGF requests entry of judgment that § 9-2.6 "is unconstitutional, facially and as-applied, as it relates to speech about the approval or defeat of a ballot proposition." Compl. 13, ECF No. 1. RGF complains that the Santa Fe ordinance chilled its speech and prevented it from making expenditures on speech regarding the soda tax. This challenge appears to be an as applied challenge. It seeks a permanent injunction prohibiting Defendants from administering § 9-2.6 as it relates to RGF's speech about ballot propositions. *Id.* Its desired relief, however, extends not only to enjoining the enforcement of the ordinance against RGF but also to other nonprofits similarly situated who wish to engage in ballot-measure advocacy in Santa Fe. That challenge appears to be facial. The Court therefore will examine both, beginning with the as-applied challenge.

#### a. As-applied challenge

When First Amendment rights are implicated, the government bears the burden of demonstrating the constitutionality of the challenged law. *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816-17 (2000); *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993) ("a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree"); *Ass'n of Cmty. Orgs. for Reform Now v. Municipality of Golden, Colorado*, 744 F.2d 739, 746 (10th Cir. 1984) ("In addition, though duly enacted laws are ordinarily presumed constitutional, when a law infringes on the exercise of First Amendment rights, its proponent bears the burden of establishing its constitutionality.").

### 1) Governmental interest

The Supreme Court has recognized the informational interest in disclosures of contributions designed to influence elections. *See, e.g., Citizens United*, 558 U.S. at 371 (transparency regarding the makers of corporate speech "enables the electorate to make informed decisions and give proper weight to different speakers and messages"). As the First Circuit noted, "Citizens rely ever more on a message's source as a proxy for reliability and a barometer of political spin." *National Organization for Marriage v. McKee*, 649 F.3d 34, 57 (2011). *See also Majors*, 361 F.3d at 352 ("[T]he quality of the political advertising that continues to be produced and disseminated under such a regime is enhanced because the advertising contains additional information useful to the consumer…. In areas of inquiry where logic or exact observation is unavailing, a speaker's credibility often depends crucially on who he is.").

Other circuit courts have also determined there is a governmental interest in educating voters in initiative and referenda elections on the source of messages promoting or opposing ballot

measures. *Center for Individual Freedom v. Madigan*, 697 F.3d 464, 480 (7th Cir. 2012). As the

Seventh Circuit explained when discussing initiative elections:

> [V]oters act as legislators, while interest groups and individuals advocating a measure's defeat or passage act as lobbyists. In an initiative campaign, average citizens are subjected to advertising blitzes of distortion and half-truths and are left to figure out for themselves which interest groups pose the greatest threats to their self-interest. Because the issues can be complex and the public debate confusing, voters' interest in knowing the source of messages promoting or opposing ballot measures is especially salient in such campaigns.

> Disclosure laws are substantially related to the public's interest in information during ballot initiative campaigns. Research shows that one of the most useful heuristic cues influencing voter behavior in initiatives and referenda is knowing who favors or opposes a measure. Because nominally independent political operations can hide behind misleading names to conceal their identity, often only disclosure of the *sources* of their funding may enable the electorate to ascertain the identities of the real speakers.

*Id.* at 480-81 (internal citations, quotations, and footnote omitted). The Seventh Circuit concluded

that disclosure laws are substantially related to the state's informational interest in the context of

ballot initiative campaigns. *Id.* at 482.

The Tenth Circuit, however, has taken a more measured view in its assessment of the value

of disclosure laws to ballot initiative voters, explaining that the interest diminishes substantially

as the amount of monetary support a donor gives falls to a negligible level. *Sampson*, 625 F.3d at

1260. It has, nevertheless, found such an informational interest in issue-committee disclosures.

*Williams*, 815 F.3d at 1278. This Court likewise concludes an informational interest exists in this

case, but it must consider the strength of the interest.

On the one hand, the City has provided evidence of the importance of this issue to the

electorate in Santa Fe. *See* Decl. of Justin Miller ¶¶ 22-28, ECF No. 39-1. The City argues that the

public had an interest in knowing who was financially supporting the "No Way Santa Fe"

campaign to defeat the soda tax. On the other hand, the $250 expenditure threshold triggering

disclosure burdens in this case is quite low and comparable to the thresholds in *Sampson/Williams*. In *Sampson*, the Tenth Circuit found the governmental interest in disclosure of monetary and nonmonetary contributions in the amount of $2,239.55 was "minimal, if not nonexistent, in light of the small size of the contributions." *Sampson*, 625 F.3d at 1261. The Tenth Circuit subsequently later concluded that expected expenditures of $3,500 were also too low to create more than a minimal governmental interest in issue-committee disclosures. *Williams*, 815 F.3d at 1277.

The City justifies the low threshold because it is a relatively small municipality in which amounts of $250 buy a relatively significant amount of communications for political messaging in local elections. In support, Defendants cite the ECRB record in which Jim Harrington from Common Cause said that he thought in Santa Fe that a $500 contribution would be in the top 1% of contributors to council candidates. *See* ECRB Minutes, ECF No. 39-2 at 52, 61 of 101. Setting aside the hearsay problems with considering a statement in meeting minutes as evidence, it is not clear from the statement or record that Mr. Harrington has the data or expertise to render such an opinion. The Court will therefore not consider it.

Nevertheless, the Tenth Circuit has recognized that "[s]maller elections can be influenced by less expensive communications." *Independence Institute v. Williams*, 812 F.3d 787, 797 (2016). Consequently, lower spending thresholds triggering disclosures for state elections may be sufficiently tailored to the public's informational interests than the permissible amounts for comparable federal thresholds. *See id.* at 797-98. By this reasoning, even lower disclosure thresholds may be permissible for municipal elections.

In this case, RGF's expenditures included $200 in social media advertising and use of an in-kind contribution in the form of a video that the ECRB valued at $7,500.[5] The $7,700 amount

---

[5] RGF also spent approximately $1,500 on postcard mailers that it ultimately did not send because of the City's disclosure requirements.

exceeds by more than double the amount in *Williams*, but certainly is quite unlike cases "involving the expenditure of tens of millions of dollars on ballot issues presenting 'complex policy proposals.'" *See Sampson*, 625 F.3d at 1261. *See also Williams*, 815 F.3d at 1278 ("But at a $3,500 contribution level, we cannot under *Sampson*'s reasoning characterize the disclosure interest as substantial."). Once the threshold expenditure level is met, the ordinance requires disclosure of all contributions made to the person or entity earmarked for ballot initiative communications. There is no baseline dollar requirement, so the identity of a person who donates even $1 to the cause must be publicly disclosed. Certainly, the informational interest in knowing the identity of a one-dollar donor is of minimal interest to the public under *Sampson/Williams*' sliding scale approach. As applied here, however, RGF did not disclose donors of such minimal amounts as a dollar. Instead, RGF listed one $250 contribution from Mr. Higdon and a $7,500 in-kind contribution from Interstate Policy Alliance for the video/website. By using the video on its website and spending on Facebook advertisements, RGF spent approximately $7,700 to advocate against the ballot measure. Unlike in *Sampson/Williams* that dealt with state-wide election law, the election here is a municipal election, in which less money may have a greater impact in swaying the smaller electorate.

At what amount do expenditures create a "substantial" governmental interest in a local election? It is difficult to determine the exact point where the governmental interest becomes great enough to justify disclosure. When offered an opportunity to set that threshold for Colorado, the Tenth Circuit declined and left the decision to the people of Colorado. *See Williams*, 815 F.3d at 1280. The Supreme Court has indicated there is a governmental interest in knowing where ballot initiative advocacy money comes from and how it is spent, so citizens have more information about whether special interests are attempting to influence the election. *See*, *e.g.*, *American*

*Constitutional Law Foundation*, 525 U.S. at 202-03 ("Disclosure of the names of initiative sponsors, and of the amounts they have spent gathering support for their initiatives, responds to that substantial state interest" in "a control or check on domination of the initiative process by affluent special interest groups")). The expenses in this case are more than twice the expenses in *Williams* and RGF spent them in a small municipal race. Applying the sliding scale approach, the Court finds that the $7,700 RGF spent in the small municipal election creates a substantial informational interest in the financial disclosures.

### 2) Burden

#### a) Reporting burdens

The City argues that section 9-2.6 is not at all like the laws at issue in *Sampson* and *Williams*. It contends that its law is carefully tailored to limit donor disclosures to donors who earmark their funds for electoral advocacy, and it requests only basic information about covered expenditures and contributions. RGF, however, argues that the focus on the paperwork burdens "is misguided because the Foundation does not challenge the paperwork burden—it challenges only the *donor-disclosure* burden." Pl.'s Resp. 17, ECF No. 45 at 21 of 31. RGF states that "the Foundation is not complaining about the paperwork at all…. Instead, the burden the Foundation complains of is the disclosure and publication of lists of its supporters." *Id.* at 22 of 31. Given that RGF has expressly disclaimed reliance on the reporting and regulatory burdens, the Court will not consider them. The Court will instead turn to the burden upon which RGF relies: the donor disclosure burdens.

#### b) Disclosure burdens

Disclosure of contributions "will deter some individuals who otherwise might contribute" and "may even expose contributors to harassment or retaliation." *Buckley*, 424 U.S. at 68. These

general concerns, however, do not *de facto* invalidate every disclosure law; rather, a court must consider the evidence of chilled speech and weigh the burdens against the legislative interests. *See id.*

RGF argues that the "burden is the disclosure of the identities and occupations of non-profit donors, and the subsequent ideological harassment that such disclosure invites." Pl.'s Resp. 20, ECF No. 45 at 24 of 31. Defendants argue that RGF has failed to show the disclosure requirements impose a burden on its ability to attract donations and convey its messages. Defendants note the lack of evidence that any contributors to RGF have suffered reprisals, in the past or after RGF submitted its report to the City. RGF, however, contends that it need not provide evidence that its own members have been threatened before bringing a First Amendment claim. RGF relies on the evidence of retaliation and threats it submitted regarding similar groups.

In the seminal case of *NAACP v. Alabama*, the NAACP "made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." 357 U.S. 449, 462 (1958). In *Buckley*, the Supreme Court distinguished the *NAACP* case, concluding that the appellants did not produce evidence that contributors to minor parties had been subject to harassment or retaliation. 424 U.S. at 69-72. *Buckley* nevertheless recognized a more flexible view of the proof that may suffice in future cases:

> We recognize that unduly strict requirements of proof could impose a heavy burden, but it does not follow that a blanket exemption for minor parties is necessary. Minor parties must be allowed sufficient flexibility in the proof of injury to assure a fair consideration of their claim. *The evidence offered need show only a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties.* The proof may include, for example, specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself. A pattern of threats or specific manifestations of public hostility may be sufficient. New parties that have no

history upon which to draw may be able to offer evidence of reprisals and threats directed against individuals or organizations holding similar views.

*Buckley*, 424 U.S. at 74 (italics added).

### (1) Burden of proof regarding chilling effect from disclosures

Before turning to the record, the parties dispute who bears the burden of coming forward with evidence of chilling effects, such as threats and harassment. RGF argues that in the First Amendment context, "the presumption is in favor of the Plaintiffs, and the government bears the burden of justifying restrictions on freedom of speech and association." Pl.'s Resp. 16, ECF No. 45 at 20 of 31. RGF asserts that the City must prove that its restriction on Plaintiff's rights is justified by a compelling interest using the least restrictive means. *Id.* The City acknowledges that it has the burden of demonstrating that the ordinance bears a substantial relation to a sufficiently important interest, but it asserts that once the law survives that review, the burden shifts to the plaintiff to show it is entitled to an as-applied exemption showing a "reasonable probability" of threats or harassment. Defs.' Reply 8, ECF No. 48 at 12 of 22.

In *Buckley*, the Supreme Court explained that the governmental interests in disclosure as a general matter serve substantial governmental interests. 424 U.S. at 68. To determine if the interests justified the requirements, it next examined the extent of the burden the requirements placed on individual rights. *Id.* The appellants argued that the balance tipped against disclosure when required of contributors to certain parties and candidates; in that case, to minor parties and independents. *See id. at* 68-69. The *Buckley* Court noted that "no appellant in this case has tendered record evidence of the sort proffered in *NAACP v. Alabama*." *Id.* at 71. It noted that appellants relied on the testimony of several minor-party officials that one or two persons refused to contribute because of the possibility of disclosure. *Id.* at 71-72. The Supreme Court determined on

the record that "the substantial public interest in disclosure identified by the legislative history of this Act outweighs the harm generally alleged." *Id.* at 72. It explained that "any serious infringement on First Amendment rights brought about by the compelled disclosure of contributors is highly speculative." *Id.* at 69-70.

The *Buckley* Court then addressed the appellants' argument that a blanket exemption should apply for minor parties "less irreparable injury be done before the required evidence can be gathered." *Id.* at 72. Instead of a blanket exemption, the Court opted for the flexible standard of proof—minor parties need only show a reasonable probability that the compelled disclosure of contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties. *Id.* at 74.

Construing *Buckley*, the government bears the burden to show that the disclosure requirements are substantially related to a sufficiently important governmental interest. The lack of evidence, however, of threats, harassment, or reprisals to contributors may render the harm too general and speculative to outweigh a substantial public interest in disclosure. *See id.* at 72. Consequently, the burden is on the challengers to show "a reasonable probability that the compelled disclosure … will subject them to threats, harassment, or reprisals" using a flexible means of proof. *Id.* at 74.[6]

### (2) Factual evidence of threats, harassment, and reprisals

As evidentiary support, RGF cited cases detailing harassment of other groups. *See Americans for Prosperity Foundation v. Harris*, 182 F.Supp.3d 1049, 1055-56 (C.D. Cal. 2016) (describing threats, harassment, intimidation, and retaliation, including death threats and physical

---

[6] Moreover, Defendants on their summary judgment motion asserted that there was no evidence of threats or reprisals to show a chilling effect. RGF, as the non-moving party, must come forward with evidence to show a genuine issue of material fact in order to survive summary judgment.

intimidation by protestors, against nonprofit Americans For Prosperity Foundation ("AFP") and Charles and David Koch, two of AFP's high-profile associates).[7] Americans for Prosperity Foundation has a mission of "further[ing] free enterprise, free society-type issues" and distributes policy papers and develops educational programs worldwide to promote free markets. *Americans for Prosperity Foundation v. Becerra*, 903 F.3d 1000, 1005 (9th Cir. 2018). It works "alongside Americans for Prosperity, a 501(c)(4) organization focused on direct issue advocacy." *Id.* While AFP and RGF's mission statements are similar, RGF admits that AFP "is larger than the Foundation." Pl.'s Resp. 12, ECF No. 45. Based on the limited evidence before the Court, AFP is not similar enough to RGF to be representative of the type of harassment donors to RGF might suffer from disclosure.

RGF also submitted affidavits from persons affiliated with other free-market nonprofits who suffered reprisals for their speech. *See* Trabert Aff., ECF No. 45-1 at 1-5 of 10 (averring he received threatening emails and tweets while serving as President of the Kansas Policy Institute, a 501(c)(3) nonprofit whose mission is to enact public policy promoting efficient government and protecting individual freedoms); Harsh Aff., ECF No. 45-1 at 6-8 of 10 (stating that as CEO for Freedom Foundation, a Washington nonprofit that promotes policies that advance individual liberty, free enterprise, limited government, and worker freedom, she experienced property damage and verbal harassment during the litigation of a case challenging certain union practices); Vernuccio Aff., ECF No. 45-1 at 9-10 of 10 (explaining that he was spat on by a protestor at an event in 2013 in which he was to speak about right-to-work legislation in Vancouver, Washington, and while a guest of a radio program in 2012, he was threatened by a listener to the program).

---

[7] RGF also cited *Planned Parenthood Golden Gate v. Superior Court*, 83 Cal. App. 4th 347, 363 (Cal. Ct. App. 2000), but the harm suffered by Planned Parenthood staff and volunteers is not relevant here because that organization has a widely different purpose than RGF.

Additionally, RGF points to media accounts of members of Congress and the President encouraging people to confront and threaten ideological opponents. *See* Pl.'s Resp. 13-14, ECF No. 45 at 17-18 of 31. This evidence of threats, harassment, and retaliation against other persons affiliated with nonprofit free enterprise groups and media accounts of public persons encouraging reprisals for speech by those with opposing views is alarming. The Court nevertheless is not convinced that the record establishes that the groups from outside New Mexico whose members have been subject to harassment and/or threats are similar enough to RGF to show a reasonable probability that the compelled disclosure of RGF's donor's identities will subject them to threats, harassment, or reprisals from private parties.[8]

RGF is correct that persons should not have to wait for threats or retaliation to start before challenging a law that is chilling its members' speech. For that reason, the Supreme Court has permitted the flexible approach of proof. But RGF is not a new foundation. RGF has been an established nonprofit speaking out in state and local matters since 2000. It thus has a history upon which to draw that does not show reprisals and threats directed against it or its donors, speakers, or affiliates during the time it has advocated for and against legislation in New Mexico. Arguably the best evidence of whether there is a reasonable probability RGF's donors would face threats and reprisals is what RGF or its donors have experienced in the last approximately 19-years of RGF's advocacy.

The Court finds *Citizens United* instructive on this issue of proof. In its as-applied challenge, Citizens United argued that the disclosure requirements could chill donations to it. *Citizens United*, 558 U.S. at 370. Although the Supreme Court noted its concern, it determined

---

[8] RGF contends that the harm of disclosure is greater at the local level where more townsfolk may know the speaker, but it offers no evidence in support of the proposition. The Court will thus not consider the point in its analysis. Nor does the Court give evidentiary weight to RGF's concern that compelled disclosure of donors would cause some donors to decline contributions because RGF has not provided evidence to support that concern.

that the evidence Citizens United provided did not meet the standard of showing a reasonable probability its members would face threats, harassment, or reprisals where it had disclosed donors for years and identified no instance of such retaliation. *Id.* It therefore concluded that the informational interest in knowing who is speaking about a candidate shortly before an election outweighed the group's unsupported, general concern about chilled speech. *See id.* at 369-70. Examining the record here, the concerns about chilled speech are likewise general and unsupported. There is not enough evidence to establish a reasonable probability that identified RGF donors have been or would be subject to threats, harassment, and reprisals or that RGF lost donations because of the loss of donors' anonymity, despite their nearly 20-year history as a nonprofit speaking out in state and local matters.

### 3) Balancing

There is a substantial informational interest in the public knowing the funding sources when a group spends $7,700 to sway an election on a ballot initiative in a small municipality. The Court must weigh that interest against the chilling effect of the forced disclosures. As noted above, the record of threats, harassment, or reprisals is highly speculative. Although the Court has concerns about the potential chilling effect of disclosure laws, in accordance with *Buckley* and *Citizens United*, a general concern about chilled speech does not outweigh the substantial informational interest in this case. *Cf. Citizens United*, 558 U.S. at 370. *See Reed*, 561 U.S. at 196 ("the strength of the governmental interest must reflect the seriousness of the *actual* burden on First Amendment rights") (italics added, quotations omitted). Defendants have met their burden of showing a substantial relation between the governmental informational interest and the information required to be disclosed by RGF. Section 9-2.6 is therefore constitutional as applied to RGF.

### b.      Facial challenge

Facial challenges are disfavored because they raise the risk of premature determination of a statute on a slim record, they do not follow the principle of judicial restraint not to create a rule broader than necessary to resolve the case, and they threaten to undo the will of the people by invalidating a duly passed law. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51 (2008). "[A] federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 502 (1985).

Nevertheless, "there is no one test that applies to all facial challenges." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1124 (10th Cir. 2012). Instead, courts considering facial challenges must determine the relevant constitutional test and apply it to the challenged statute, for example, applying heightened or strict scrutiny in certain First Amendment contexts. *Id.*

The Court has applied the exacting scrutiny test in this case, finding § 9-2.6 constitutional as applied to RGF. That does not end the inquiry, however, because a litigant in a First Amendment case whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court." *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 634 (1980). Consequently, even though RGF failed in its as-applied challenge, it may nevertheless proceed with its facial challenge.

In the First Amendment context, there is a specific type of facial challenge "whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 472-73 (2010) (quoting *Washington State Grange*, 552 U.S. at 449, n.6). *See also Colorado Right to Life Comm., Inc. v. Coffman*, 498 F.3d 1137, 1155 (10th Cir. 2007) (quoting *Forsyth*

*County v. Nationalist Movement*, 505 U.S. 123, 129–30 (1992)) (stating that to succeed on a facial challenge, the plaintiff must establish that "the law, in *every* application, 'creates an impermissible risk of suppression of ideas, such as an ordinance that delegates overly broad discretion to the decisionmaker, and in cases where the ordinance sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected.'"). The challenger of the law must show the law penalizes a substantial amount of protected speech judged in relation to the law's legitimate sweep. *United States v. Brune*, 767 F.3d 1009, 1018 (10th Cir. 2014). *See also Citizens United v. Schneiderman*, 882 F.3d 374, 383 (2d Cir. 2018) (holding that, to succeed on First Amendment facial challenge to state Attorney General's regulations requiring nonprofits to disclose their donors annually, nonprofits would have to plead either that no application would be permissible or that "substantial number" of applications are likely to result in prevention of financial support for protected expression). A court will not invalidate a law that chills a "fair amount of constitutional speech" unless a "significant imbalance exists." *Brune*, 767 F.3d at 1018. "The overbreadth doctrine is 'strong medicine' that is used 'sparingly and only as a last resort.'" *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 (1988) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)).

RGF argues that the law is not narrowly drawn because the ordinance requires, once the threshold expenditure amount has been met, disclosure of donations as small as one cent that have been earmarked for communications about ballot initiatives. Because the governmental informational interest is negligible regarding a one-cent contribution, RGF argues that the law fails exacting scrutiny. RGF, however, did not have to disclose contributions at the one-cent level; instead, its lowest disclosed contribution was for $250. Other than the ordinance's effect on RGF, there is no evidence on how § 9-2.6 affects other entities or if the law would subject numerous

donors of negligible amounts to disclosures. For example, does the majority of donors to nonprofit advocacy groups give in amounts of negligible governmental interest or do most donors give in larger amounts in which the government does have an interest?

RGF asserts that "[a]nyone wishing to communicate with the public is virtually guaranteed to exceed this threshold because advertising, YouTube videos, and websites cost money to develop, and—as in this case—those costs are considered as monetary contributions, even if the person or entity in question did not create those videos or websites." Pl.'s Reply 9, ECF No. 49. RGF, however, did not support this assertion with admissible evidence, only speculation. The only *evidence* before the Court of entities subject to the ordinance other than RGF reveals that "Pre-K for Santa Fe" and "Better Way for Santa Fe & Pre-K" disclosed donations of nearly $800,000 from Mayor Michael Bloomberg and in the millions from a Washington, D.C.-based beverage industry group, respectively. Spending at those amounts in a local election are more clearly at the end of the scale that the Tenth Circuit would view as creating a significant informational interest in financial disclosure. *See Williams*, 815 F.3d at 1277-78.

RGF nevertheless speculates about who the ordinance would cover and potentially chill: (i) a blogger who writes about current topics on a paid blogging website and cites his sources; (ii) the blog itself if it paid the blogger more than $250; (iii) a person who raises money on GoFundMe.com to speak out about ballot propositions if she spends more than $250 on communications about ballot issues. *See* Pl.'s Resp. 19, ECF No. 45. There may, however, be other constitutional applications of the law, such as a popular national advocacy group spending a million dollars on advertisements to influence a ballot initiative.

As to the burden of the potential chilling effect that may prevent donors from giving who fear reprisals if their names are disclosed, the evidence before the Court is specific to RGF and a

few individuals connected to similar free-market groups in other states. Not all ballot initiatives are controversial, however. As the Supreme Court pointed out in *Reed*, the typical referendum concerns more mundane issues of tax policy, revenue, budget, *etc.*, such that there is no reason to assume donors for or against such ballot initiatives are likely to suffer retaliation and harassment. *See Reed*, 561 U.S. at 200-01.

The facts before the Court primarily relate to the parties in this case. There are few, if any, facts pertaining to the frequency Santa Fe's ordinance will chill constitutionally protected speech of other nonprofit groups not in this case. Defendants have shown that the ordinance serves a legitimate governmental informational interest while imposing minimal burdens for the typical ballot initiative. To succeed on this facial challenge, the ordinance must penalize a substantial amount of speech that is constitutionally protected. Beyond speculation and hypotheticals, there is little evidence upon which the Court could base such a conclusion to impose the strong remedy of facial invalidation of the law as to all nonprofits engaged in ballot initiative advocacy. The record does not show the law penalizes a substantial amount of protected speech judged in relation to the law's legitimate sweep. Accordingly, the Court finds that Defendants are entitled to summary judgment on RGF's facial challenge under the First Amendment. For the same reasons, the Court will deny Plaintiff's motion for summary judgment under the First Amendment.

## B.  Article II, Section 17 of New Mexico Constitution

A court only examines a state constitutional claim if the right being asserted is not protected under the federal constitution. *See State v. Tapia*, 2018-NMSC-017, ¶ 12, 414 P.3d 332. States may provide more liberty in their respective constitutions than is mandated by the United States Constitution. *Morris v. Brandenburg*, 2015-NMCA-100, ¶ 22, 356 P.3d 564. Where the federal analysis of a constitutional provision is flawed, where there are structural differences between the

state and federal governments, or where there are distinctive New Mexico characteristics, interpretation of the state constitutional provision may diverge from federal precedent. *Id.* This Court has concluded on this record that the First Amendment does not protect RGF or similar nonprofits from the reporting and disclosure requirements of SFCC § 9-2.6. Accordingly, the Court must consider Plaintiff's challenge under Article II, Section 17 of the New Mexico Constitution. *Cf. Tapia*, 2018-NMSC-017, ¶ 39.

RGF argues that the language of the New Mexico Constitution differs from the First Amendment and that the broader language indicates a broader degree of freedom protected. Article II, Section 17 of the New Mexico Constitution states: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press." RGF asserts that § 9-2.6 "restrains" the ability of non-profit groups to communicate their views about local ballot measures and that the New Mexico Constitution offers greater protection than the First Amendment.

Despite the difference in language, the New Mexico Supreme Court has applied First Amendment tests and analysis to Article II, Section 17. *See, e.g., Temple Baptist Church, Inc. v. City of Albuquerque*, 1982-NMSC-055, ¶¶ 33-41 (analyzing issue of whether sign ordinance was legitimate time, place, and manner restriction on speech under First Amendment and N.M. Constitution, Art. II, s 17 using First Amendment standards). RGF relies on *City of Farmington v. Fawcett*, 1992-NMCA-075, 114 N.M. 537, for its argument that New Mexico courts have also construed Article II, Section 17 to provide greater protections. In *Fawcett*, a defendant convicted of dissemination of obscene material in violation of a City of Farmington ordinance asserted that the ordinance violated Article II, Section 17. *See id.* ¶ 1. Relying on the first clause, the New

Mexico Court of Appeals determined that the New Mexico Constitution offers more protection for obscene speech than the standard applied in First Amendment jurisprudence. *See id.* ¶¶ 32-36.

Section 9-2.6, unlike the obscenity ordinance at issue in *Fawcett*, does not prohibit the distribution of any speech. Section 9-2.6 does not prevent RGF from freely speaking, writing, and publishing its sentiments on all subjects. Likely for this reason, RGF relies on the latter clause of Article II, Section 17: "no law shall be passed to restrain or abridge the liberty of speech." This clause is similar to the language of the First Amendment. *Cf.* U.S. Const., Amend. 1 ("Congress shall make no law … abridging the freedom of speech….").

The New Mexico Constitution adds the prohibition that no law may "restrain" speech. "Abridge" means to shorten by omissions, reduce or lessen, deprive, or cut off. *See* Dictionary.com, https://www.dictionary.com/browse/abridge?s=t (last visited January 28, 2020). "Restrain" is to hold back, keep in check or under control, repress, deprive of liberty, or limit or hamper the activity, growth, or effect of. *See* Dictionary.com, https://www.dictionary.com/browse/restrain?s=t (last visited January 28, 2020). The similar definitions for "restrain" and "abridge" do not counsel for significantly broader protections under Article II, Section 17 than the First Amendment simply because of the addition of the term "restrain," at least as to how the terms pertain to laws requiring disclosure of information regarding persons donating money to pay for communications.

Based on the language of the provisions and the New Mexico case law construing Article II, Section 17, the Court is not convinced that the New Mexico courts would construe Article II, Section 17 differently from the First Amendment regarding disclosure laws. There is no cited New Mexico case law suggesting the First Amendment analysis regarding disclosure laws is flawed or that there are distinctive New Mexico characteristics to compel a divergence from federal law on

this issue. Accordingly, for the reasons given above in analyzing the ordinance under the First Amendment, the Court finds the ordinance constitutional facially and as applied to RGF under Article II, Section 17 of the New Mexico Constitution.

## V.     CONCLUSION

RGF's as-applied challenge fails because there is no evidence of threats, reprisal, harassment, or the like of donors or potential donors to RGF or that would-be donors declined to contribute because of the disclosure requirements. RGF did not rely on any other burdens. Because disclosure requirements serve substantial governmental interests, Defendants met their burden of demonstrating a substantial relation between the governmental informational interest and the information required to be disclosed. Although the Court remains concerned about the potential chilling effect of the ordinance for groups raising and spending small amounts on ballot initiatives, the factual record is insufficient to support the sweeping invalidation of the ordinance that RGF requests, especially where the facts primarily relate to RGF and the Court finds § 9-2.6 constitutional as applied to RGF. The Supreme Court and Tenth Circuit have shown reluctance to invalidate duly enacted laws on slim records as to the effect of the law on other groups, as the case here. This Court must follow their lead.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (**ECF No. 39**) is **GRANTED** and Plaintiff's Motion for Summary Judgment (**ECF No. 40**) is **DENIED**. No issue remains for trial so the Court will **DISMISS** this case in favor of Defendants.

**SENIOR UNITED STATES DISTRICT JUDGE**